## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### Atlanta Division

| | | |
|---|---|---|
| **FOLEY MA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action** |
| | ) | |
| **v.** | ) | **No. 1:16-cv-01055-LMM-CMS** |
| | ) | |
| **EQUIFAX INFORMATION** | ) | |
| **SERVICES LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE OR LIMIT TESTIMONY OF PLAINTIFF'S EXPERT, EVAN HENDRICKS

Plaintiff, Foley Ma, has employed a self-published reporter and consumer-privacy advocate, Evan Hendricks, as a purported "expert" to provide a host of opinions on Mr. Ma's case, other cases unrelated to Mr. Ma, and more broadly, Equifax's policies and procedures. But Mr. Hendricks's opinions about Mr. Ma's case are based largely on Mr. Ma's allegations and information provided to Mr. Hendricks by Mr. Ma's lawyers in this case – not on actual evidence. And his sweeping conjecture about Equifax's policies and procedures is based on nearly nothing; as he readily admits, he has never worked for Equifax, or any other consumer reporting agency, and has no special training or experience in the field.

In short, Mr. Hendricks's expert report is replete with conclusory statements rather than opinions, inappropriate legal conclusions, invective commentary, and

speculation. Mr. Hendricks is not qualified to be an expert in this case, he does not use a reliable methodology to arrive at his opinions, and he is incapable of assisting the trier of fact. Instead, he is a professional testifier with an axe to grind against Equifax, specifically, and consumer reporting agencies, in general, which is amplified by his references to excerpts from his self-published and biased book and other unrelated cases. The Court should exercise its role as a gatekeeper and prohibit Mr. Hendricks from testifying in this case.

## **ARGUMENT**

Under Federal Rule of Evidence 702, the Court must screen putative experts to ensure that the expert testimony is relevant and rests on a reliable foundation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592 (1993); *General Electric Co. v. Joiner,* 522 U.S. 136, 142 (1999); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999) (extending *Daubert* to non-scientific expert witnesses). As the Supreme Court explained in *Daubert*, Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury. 509 U.S. at 589 n.7; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005). Acting as a gatekeeper, the court must ensure that expert witnesses "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd.*, 526 U.S. at 152. This gatekeeping function is critical; "the

expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal quotation omitted).

Under Rule 702, a court may only admit relevant expert testimony if it finds (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002). The proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of *Daubert* and Rule 702. *McClain*, 401 F.3d at 1238 & n.2; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

Self-proclaimed knowledge and experience are not enough: as the Supreme Court explained in *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." "*Any* step that renders the analysis unreliable renders the expert's testimony inadmissible." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) (emphasis added).

The Supreme Court in *Daubert* listed four nonexclusive factors that the court should consider in assessing reliability: (1) whether the opinion is susceptible to testing and has been subjected to testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology the expert used and whether there are standards controlling the technique's operation; and (4) whether the theory is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

In addition, the Court must also perform a screening function to ensure that the expert testimony is relevant. *Daubert.,* 509 U.S. at 592; *Joiner,* 522 U.S. at 142; *Kumho Tire Co., Ltd.,* 526 U.S. at 149. Specifically, the Court must inquire "into whether proposed testimony is sufficiently 'relevant to the task at hand.'" *Daubert*, 509 U.S. at 597.

## I.    MR. HENDRICKS IS NOT QUALIFIED.

A witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In addressing an expert qualifications, the court should examine:

> whether the witness proposes to testify about matters growing naturally and directly out of research he or she conducted independent of the litigation, ***whether the witness developed opinions expressly for purposes of testifying***, and whether the field of expertise claimed by the witness is known to reach reliable results for the type of opinion the witness intends to express.

*United States v. Crabbe,* 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008) (emphasis added). Furthermore, where, as here, the proffered expert relies on personal knowledge or experience, "the qualifications of the expert will be of particular importance. This is so because in the nonscientific world, theories are often not subject to testing or experimentation," making application of the (separate Rule 702) reliability requirement "more difficult." *Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452, 461 (D.N.J. 1999).

Mr. Hendricks proposes to testify regarding the reasonableness of Equifax's procedures and damages common to "Victims of Chronic Credit Report Inaccuracy." Mr. Hendricks's limited and one-sided experience with consumer reporting agencies does not qualify him to testify regarding Equifax's policies and procedures or Mr. Ma's alleged damages. He has never worked for a credit reporting agency, and all of his professed expertise derives from testifying and lobbying against the credit reporting industry. He is not qualified to testify regarding either matter.

### A. Mr. Hendricks Is Not Qualified To Testify Regarding Equifax's Procedures.

Mr. Hendricks's purported "expertise in credit reporting" is based on his "professional activities," which include that he (1) previously wrote and self-published a newsletter on privacy issues; (2) authored a self-published book on credit reporting; (3) has testified in other Federal Credit Reporting Act ("FCRA"),

15 U.S.C. §§ 1681–1681x, cases; (4) has testified before Congress and other bodies; and (5) has worked as a consultant. (*See* Plaintiff's Expert Witness Report, attached as Exhibit A, at 29). He does not claim to have any education or training related to the operation of a consumer reporting agency, or in any related fields, such as computer programming, banking, accounting, economics, financial planning, or the law. (*See Sammy v. Equifax,* Deposition of Evan Hendricks, attached as Exhibit B, 69:24-70:12, 70:25-71:3, 73:13-23). He has never been employed by Equifax, any other consumer reporting agency, or the Consumer Financial Protection Bureau. (Ex. B 5:25-6:3, 70:13-15; Deposition of Evan Hendricks, attached as Exhibit C, 8:2-7). He has never tested any of his theories or subjected them to peer review. (Ex. B 7:20-8:7). He does not have the skill needed to test or implement a computer program designed to match consumer credit information to consumer credit files. (*See id.* 8:8-16). And he has never been involved with the development of policies or procedures for maintaining consumer-reporting accuracy or responding to consumer disputes. (*See id.* 6:4-7:5). He's never written a policy, procedure, or matching algorithm for use by a consumer reporting agency or anyone else. (Ex. C 8:8-24). Providing expert opinion is his only source of income. (*Id.* 46:4-7).

Mr. Hendricks's limited and one-sided familiarity with consumers who have experienced mixed files and other report issues does not qualify him to testify

regarding the reasonableness of Equifax's procedures for maintaining accuracy. He has accumulated, at most, only anecdotal evidence of the effectiveness of Equifax's procedures in a statistically insignificant number of cases. He has no knowledge of: (1) the number of consumers who have disputed information in their credit files and been satisfied with Equifax's response; (2) whether Equifax made any changes to its policies or procedures in response to known problems with mixed files; (3) how frequently Equifax remedies inaccurately mixed files to the consumer's satisfaction; or (4) how frequently combined files result in appropriate linkage of information regarding a single consumer, as opposed to multiple consumers. (*See* Ex. B 71:4-23.)

Mr. Hendricks's reliance on his past work as an expert and public speaker does not cure these deficiencies; "it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying." *Thomas J. Kline v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989); *accord Elcock v. Kmart Corp.*, 233 F.3d 734, 744 n.5 (3d Cir. 2000). Indeed, the mere fact that he has previously been allowed to testify as an expert on FCRA matters "is irrelevant to the determination whether he is qualified to give such testimony in this case." *Elcock*, 233 F.3d at 744 n.5. Furthermore, because "the crucible of litigation makes for a poor classroom," experience he gained in reviewing facts from prior cases has little impact on his qualifications. *Id*. "Being a litigator-advocate does qualify one

as an expert." *Neal v. CSC Credit Servs., Inc.*, No. 8:02CV378, 2004 WL 628212, at *1 (D. Neb. Mar. 30, 2004) (excluding expert witness because his "alleged expertise comes directly from his preparations for this and other" FCRA cases); *see also Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.,* 958 F.2d 1169, 1175 (1st Cir. 1992) (stating that extensive experience as an expert witness "is not an automatic qualification guaranteeing admission of expert testimony"). Because Mr. Hendricks's experience as a consumer advocate does not qualify him as an expert in consumer reporting procedures, he should not be allowed to testify regarding Equifax's procedures in this case.

### B.    Mr. Hendricks Is Not Qualified To Testify Regarding Mr. Ma's Damages.

Mr. Hendricks also proposes to testify regarding "Damages Known & Common To Victims of Chronic Credit Report Inaccuracy." (Ex. A at 11-14). Key factors to consider, according to Mr. Hendricks, include, among others, "[t]ime & energy needed to solve the immediate problem" and "the period of time over which the problem persist[ed]." (*Id*. at 13). Actual damages may take the form, for example, of "[i]mproperly denied credit or employment," "loss of time and energy," and a "[s]ense of helplessness." (*Id*.). Mr. Hendricks is not qualified to testify on damages, and this Court should follow other courts in similar FCRA cases and exclude Mr. Hendricks's proposed testimony regarding Plaintiff's damages. *See*, *e.g.*, *Taylor v. Equifax Information Services, LLC*, CIV-16-39-D,

Doc. 43 at 8-9 (W.D. Okla. July 19, 2017) (attached hereto as Exhibit D); *Neal v. Ford Motor Credit Co.*, No. 6:15-cv-03474-MDH, 2016 WL 7971447, at *2 (W.D. Mo. Oct. 18, 2016); *Valenzuela v. Equifax Info. Servs. LLC*, No. CV-13-02259-PHX-DLR, 2015 WL 6811585, at *3 (D. Ariz. Nov. 6, 2015); *McDonough v. JPMorgan Chase Bank, N.A.*, No. 4:15-CV-00617-JCH, 2016 WL 4944099, at *3 (E.D. Mo. Sept. 16, 2016); *Duncan v. JPMorgan Chase Bank, N.A.*, No. SA-14-CA-00912-FB, 2016 WL 4419472, at *13 (W.D. Tex. May 24, 2016), report and recommendation adopted, No. SA-14-CA-912-FB, 2016 WL 4411551 (W.D. Tex. June 17, 2016); *Toler v. Experian Info. Solutions, Inc.*, No. 6:12-cv-06032-RTD, Doc. 257 (W.D. Ark. Nov. 17, 2014) (attached hereto as Exhibit E - granting motion to exclude Mr. Hendricks's testimony regarding damages and many other matters).

Mr. Hendricks has no training or experience relevant to assessing damages in general, or in Mr. Ma's case in particular. Because he does not, for example, have a degree in psychology, he lacks the expertise necessary to opine that a "sense of helplessness" leads to monetary damages. *See*, *e.g.*, *Ferris v. Pennsylvania Fed'n Bhd. of Maint. of Way Employees*, 153 F. Supp. 2d 736, 743-44 (E.D. Pa. 2001) (holding that treating physician, who was trained as pathologist and who worked in the area of pain management, was not qualified to testify as to the causation of patient's mental conditions). He is not an accountant, economist, or

financial planner; he thus has none of the expertise necessary to opine that a consumer may be damaged based on "the time and energy required to solve" his purported "problem and the period of time over which the" purported problem allegedly "persisted." Just last month, a court in the Tenth Circuit held that Mr. Hendricks lacks qualifications to testify about damages: "Insofar as Hendricks purports to provide substantive expert testimony on the categories of damages requested in Plaintiff's Complaint (actual, punitive, and statutory damages), such testimony will not be allowed by this witness." *Taylor*, Ex. D at 8-9.

Absent any special qualifications, Mr. Hendricks is simply telling the jury what they could determine for themselves – a layman is capable of determining that a loss of time and energy could, under certain circumstances, contribute to emotional distress. *See Finley,* 301 F.3d at 1007 (testimony "must be beyond the common knowledge of the average layman. "[A]t a minimum, a proffered expect witness must possess skill or knowledge greater than the average layman." *Elcock*, 233 F.3d at 741. Because Mr. Hendricks does not, the Court should not allow him to testify regarding Mr. Ma's damages or damages in general.

## II.    MR. HENDRICKS'S OPINIONS ARE NOT RELIABLE.

Even if the Court were to conclude that Mr. Hendricks has some specialized knowledge, that would not open the gate for his opinions. The Court must also find that the proposed testimony "is properly grounded, well-reasoned, and not

speculative." Fed. R. Evid. 702, Advisory Committee Notes (2000); *Daubert,* 509 U.S. at 580 (requiring "[g]ood grounds" for opinion). Mr. Hendricks's testimony is inherently unreliable, and the Court should exclude it in its entirety.

Even the opinions of non-scientific experts—such as Mr. Hendricks—must be properly based on well-founded, relevant facts and not "unsupported speculation and subjective beliefs." *See Frazier*, 387 F.3d at 1260, 1296 (observing that the court must "'conduct an exacting analysis' of the ***foundations*** of expert opinions to ensure they meet the standards for admissibility under Rule 702" (quoting *McCorvey*, 298 F.3d at 1257) (emphasis in original)). "The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, ***and the expert must explain how the conclusion is so grounded***." Fed. R. Evid. 702, Advisory Committee Notes (2000) (emphasis added). An expert must explain his methods so that a court can determine their reliability, but "[a] court cannot evaluate the reliability of an expert's methodology unless he has actually employed one." *Davis v. BellSouth Telecommunications, Inc.*, No. 7:10-CV-02851-LSC, 2012 WL 3637762, at *6 (N.D. Ala. Aug. 16, 2012) *aff'd sub nom. Davis v. AT & T, Inc.*, 541 F. App'x 910 (11th Cir. 2013) (excluding expert testimony for "lack of qualification and the lack of support and methodology").

Mr. Hendricks has made no attempt to explain his methods, and his report reveals none. Indeed, he repeatedly leaves the reader guessing at the basis for his

broadly worded and unsupported assertions, for example:

- Mr. Hendricks states, without identifying any particular procedures, that the mixing in this case "meant that Equifax's procedures were not adequate for assuring accuracy." (Ex. A at 2).

- He states "that Equifax has failed to correct its systematic and procedural defects, both for reasonably and adequately understanding and responding to consumers' disputes, and for preventing mixed files," but he does not identify any particular defects or explain how their application in this case caused problems for Mr. Ma. (*Id*. at 3).

- He states that "Equifax still fails to reasonably use and/or consider full identifying information to an adequate or reasonable extent," but he does not explain what "an adequate or reasonable extent" might be. (*Id*. at 4).

- He asserts that "inaccuracies are typically recurring and lingering" but offers no support for the statement. (*Id*. at 5).

- He asserts that "Equifax's approach to partial matching reflected serious disregard for well-known, long-standing standards for accuracy, fairness and privacy," but nowhere does he explain how an approach would not "reflect serious disregard for well-known, long-standing standards for accuracy, fairness and privacy." (*Id*. at 5).

As these examples demonstrate, Hendricks's opinions are not based on any

scientific, academic, or business standard, guideline, or authority; he did not speak with anyone involved in the case before forming his opinions; and there is no evidence that his method has been tested, subjected to peer review, has a known rate of error, or has been generally accepted. Mr. Hendricks has not explained how or why his experiences led to the conclusions he reaches. Expert opinions may not be "connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702, Advisory Committee Notes (2000). Where, as here, "there is simply too great an analytical gap between the data and the opinion proffered," *Joiner,* 522 U.S. at 146, the expert's testimony should be excluded.

## III. MR. HENDRICKS'S OPINIONS WILL NOT ASSIST THE TRIER OF FACT.

Regardless of qualification and methodology, expert testimony should not be allowed if it will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "[T]he subject matter at issue must be beyond the common knowledge of the average layman." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002). The majority of Mr. Hendricks's proposed testimony concerns matters well within the unaided comprehension of the jury and, therefore, should not be permitted under Rule 702.

### A.     Mr. Hendricks's Opinions Do Not Require Specialized Knowledge.

Many of Mr. Hendricks's opinions consist merely of common sense observations that a lay juror is perfectly capable of making on his own:

- "[F]or Equifax to reasonably reinvestigate inaccuracies caused by mixed files, it is first necessary that its dispute operators consistently recognize/diagnose a dispute related to a mixed file." (Ex. A at 2).

- "One way to actually ensure that a reinvestigation adequately resolves an identity theft or mixed-file dispute is to assign an experienced 'case officer' to actually and *critically* review the result[s] of a consumer's dispute." (*Id*. at 7).

- "Equifax should have allocated sufficient attention to her case to ensure inaccuracies were corrected/deleted and would neither persist or reappear." (*Id*.).

No expert testimony is needed on these subjects and many others in Mr. Hendricks's report.[1] Courts have excluded similarly unhelpful testimony. *E.g.*, *Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11th Cir. 1993) (affirming exclusion of expert testimony describing factors leading to a fall as "(1) the uneven risers and treads, (2) the brick patio and steps, (3) the height of the handrail, and (4) the dim light"); *Taylor v. Ill. Cent. R.R. Co.*, 8 F.3d 584, 585-86 (7th Cir. 1993) ("This issue … boils down to whether a pile of large rocks is harder

---

[1] Furthermore, if the purpose of these statements is to assert that Equifax does not take the actions he discusses, the testimony is improper for the additional reason that it merely states (inaccurately) the facts of the case. As discussed below, expert testimony may not be used for this purpose.

to stand on than a pile of smaller rocks. Notwithstanding [the expert's] lengthy experience in the railway industry, any lay juror could understand this issue without the assistance of expert testimony."). Mr. Hendricks draws inferences and states opinions that do not require any expert analysis.

**B.      Speculation Regarding Equifax's State Of Mind Will Not Assist The Jury.**

Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs. *Daubert*, 509 U.S. at 590. Mr. Hendricks's report is replete with rank speculation about Equifax's supposed motive, knowledge, and intent. He states, for example, that Equifax "had no intention of changing its routine practices and procedures because Equifax was 'very satisfied with the way its system works.'" (Ex. A, at 16 (ellipsis omitted)). He frequently speculates regarding what Equifax "wants" (*id.* at 6), "knew" (*id.* at 4, 7, 9), or "prefers" (*id.* at 10), and what Equifax "seeks to maximize" (*id.* at 6). He also makes speculative statements regarding Equifax's "intention" (*id.* at 16), how it "sees its fundamental role" (*id.* at 7), and whether it "made a calculation" (*id.* at 16) or "stubbornly refused" to act and "stubbornly continued" (*id.* at 3, 15).

This proposed testimony is improper for a number of reasons. First, Mr. Hendricks has no expertise related to Equifax's subjective beliefs. He has never worked for Equifax and therefore has no insight into Equifax's decision-making,

much less its state of mind. (*See* Ex. B 5:23-24, 70:19-21). More to the point, "state of mind" testimony is improper because it describes matters that a jury is capable of understanding and deciding without expert assistance. *See*, *e.g.*, *Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (citing cases); *City of Grass Valley v. Newmont Mining Corp.*, No. 2:04-CV-00149GEBDAD, 2008 WL 544388, at *1 (E.D. Cal. Feb. 26, 2008) (excluding "testimony concerning whether Defendants were aware of potential liabilities and water contamination" where jurors were capable of reviewing relevant documents and making their own determination). The jury can draw inferences from evidence regarding Equifax's policies just as competently and effectively as Mr. Hendricks. This Court should follow other courts in similar FCRA cases and exclude Mr. Hendricks's proposed testimony regarding Equifax's state of mind. *See*, *e.g.*, *Valenzuela*, 2015 WL 6811585, at *3.

### C.   Mr. Hendricks's Factual Testimony Will Not Assist The Jury.

"Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand." *SEC v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998); *see also Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) (affirming exclusion of expert testimony describing content of video jury could watch for itself). Expert testimony, particularly in the form of factual summations, "will not help the trier of fact when it offers nothing more than

16

what lawyers for the parties can argue in closing arguments." *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004); *see also United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987) (advising caution when police experts are offered to interpret criminal code language, because the testimony "may have the effect of providing the government with an additional summation" and "come dangerously close to usurping the jury's function").

The majority of Mr. Hendricks's report consists of his own (frequently inaccurate) descriptions of the facts in evidence, punctuated by occasional conclusory observations of a type that could easily be made by the jury. He describes, for example, the content of Mr. Ma's credit file (Ex. A at 4), actions allegedly taken by Equifax in response to Mr. Ma's disputes (*id.* at 2-5, 9-11), Equifax's procedures (*id.* at 4-11), Equifax's search-match process (*id.* at 5-7), the ACDV process (*id.* at 8-10), and Mr. Ma's alleged damages (*id.* at 11-15). Mr. Hendricks derives his description of Equifax's search-match process from testimony of Equifax's witnesses in other cases. (*Id*. at 4-7). Although the search match process involves a complex computer algorithm, Mr. Hendricks has no computer expertise. (Ex. C 31:17-32:2). His description is that of a lay person; it is not complicated and could easily be entered into evidence through the testimony of an Equifax representative—especially given that Mr. Hendricks himself has no first-hand knowledge of the process. In short, Mr. Hendricks's descriptions of the

facts will not assist the jury and, indeed, have the potential to prejudice Equifax by giving his spin on the facts a seemingly authoritative imprimatur.

### D.    Mr. Hendricks's Legal Opinions Are Improper.

An expert witness also "cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.,* 523 F.3d 1051, 1058 (9th Cir. 2008) (emphasis in original). "[T]estimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citations, quotations, and brackets omitted); *see also United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011); *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993) (holding that district court committed manifest error by admitting expert testimony on contested issues of law). No witness may testify to the "legal implications of conduct; the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co*., 898 F.2d 1537, 1541 (11th Cir. 1990).

Mr. Hendricks's proposed testimony includes several statements, phrased in broad language, containing legal conclusions in which he opines that Equifax did not comply with provisions of the FCRA. He states, for example, that "Equifax's

procedures were not adequate for assuring accuracy." (Ex. A at 2). He does not point to any particular deficiencies with Equifax's procedures and, indeed, does not discuss Equifax's procedures at all. Rather, he merely states that, because mixing occurred, Equifax violated the FCRA. That is not proper expert testimony. *See* Fed. R. Evid. 704(a) and 1972 Advisory Committee Note (stating that an expert's opinion "may embrace[ ] an ultimate issue," but the opinion cannot "merely tell the jury what result to reach").

It is also not the law. The FCRA "does not establish strict liability." *Johnson v. Equifax, Inc.*, 510 F. Supp. 2d 638, 646 (S.D. Ala. 2007). Liability, rather, is predicated on the reasonableness of the consumer reporting agency's procedures. *Id*. at 646-47. In other words, Equifax is not liable to Mr. Ma just because it may have combined his file with another. Where an expert's "legal conclusions not only invade[] the province of the trial judge, but constitute[] erroneous statements of law," the expert testimony would "not only [be] superfluous but mischievous." *Nationwide Transp*., 523 F.3d at 1059 (quotation marks omitted).

Mr. Hendricks also opines that Equifax acted recklessly: "It was ***also reckless*** for Equifax to have not taken adequate steps to prevent further mixing after receiving Plaintiff's notices and disputes." (Ex. A at 5). Thus, he is opining that Equifax acted with the requisite intent for the jury to impose punitive damages.

Mr. Hendricks's legal statements are deficient both because they are unreliable and because he attempts to tell the jury what result to reach. This Court should follow other courts in similar FCRA cases and exclude Mr. Hendricks's proposed testimony that are legal opinions. *See*, *e.g.*, *Zabriskie v. Fed. Nat'l Mortg. Ass'n*, No. CV-13-02260-PHX-SRB, 2016 WL 3653512, at *2 (D. Ariz. Apr. 22, 2016) (excluding testimony by Mr. Hendricks as to whether procedures should be considered "unreasonable" under the FCRA, because this is an ultimate issue that will be decided by the jury); *McDonough*, 2016 WL 4944099, at *3 (excluding legal analysis or conclusions of law, including any opinions regarding whether defendant's conduct conformed to a particular legal standard; excluding any opinions as to whether defendant's actions "were unreasonable, unreliable, inadequate, negligent, willful, or in any other manner violative of the FCRA").

## IV.   EVEN IF MR. HENDRICKS MAY PRESENT EXPERT TESTIMONY AS TO SOME ISSUES, THAT TESTIMONY SHOULD BE LIMITED.

Mr. Hendricks is not qualified to serve as an expert, his testimony will not assist the jury, and, for the reasons explained above, his testimony should be excluded in its entirety. If the Court were to permit Mr. Hendricks to testify about anything (and it should not), certain categories of Mr. Hendricks's proposed testimony clearly violate basic relevancy rules and should be excluded regardless. In particular, the Court should not admit Mr. Hendricks's proposed testimony regarding (1) verdicts against Equifax in other FCRA cases; (2) twenty-year old

consent decrees between Equifax, the other national consumer reporting agencies, and regulatory agencies; and (3) other unrelated administrative actions. The proposed testimony is not relevant, and any minimal probative value it might have is far outweighed by the prejudicial impact it would have on Equifax. *See* Fed. R. Evid. 403. For example, in *McDonough*, 2016 WL 4944099, at *3, the trial judge ordered the plaintiff to produce Mr. Hendricks to the Court to specifically identify the testimony it expected Mr. Hendricks to present to the jury so that the court could determine what additional material "was not relevant to the matter and should be precluded."

### A.   Mr. Hendricks's Discussions Of Past Cases Involving Equifax Should Not Be Allowed.

Mr. Hendricks discusses seven "prior" cases filed against Equifax over the past decade, only two of which (*Miller* and *Williams*) involved mixed files. (*See* Ex. A at 5, 7, 10, 16-20, n.5). The remaining five—*Drew*, *Valentine*, *Robinson*, *Sloane*, and *Kirkpatrick*—involved identity theft, which is not at issue here. (*Id.* at 17-20).

If Mr. Ma intends to use this evidence to argue that past errors support a finding that errors also occurred in this case, it must be excluded pursuant to Rule 404(b)(1), which prohibits evidence of prior acts for this purpose. *See* Fed. R. Evid. 404(b)(1). Furthermore, this case does not involve identity theft, like the majority of the cases Mr. Hendricks discusses, nor does it involve a series of

unsuccessful disputes. Mr. Ma actually made only one dispute.

At most, a few of the past cases provide anecdotal evidence of instances of inaccurate file mixing. But the fact that other consumer files may have been mixed in the past is not in dispute, and it certainly cannot prove that Equifax violated the FCRA in Mr. Ma's case. *See Jones v. Auto. Ins. Co. of Hartford, Connecticut*, 698 F. Supp. 226, 228 (N.D. Ga. 1988), *aff'd in part, rev'd in part sub nom. Jones v. Auto. Ins. Co. of Hartford, Conn.*, 917 F.2d 1528 (11th Cir. 1990) (excluding evidence of prior bad acts). Equifax maintains consumer reports on more than 210 million United States consumers, so the fact that a handful of those consumers have had favorable results in litigation against Equifax is not at all remarkable. Absent statistical evidence regarding error rates, this evidence has little, if any, probative value regarding the reasonableness of Equifax's procedures, and it certainly is incapable of proving that Equifax willfully violated the law.

Second, this evidence is far more prejudicial than it is probative, and it would create undue delay. *See* Fed. R. Evid. 403. When "other acts" evidence "would . . . require[] a separate mini-trial for each [incident] to determine whether the decision" was sufficiently similar to be relevant to the matter before the jury, courts routinely refuse to permit such evidence. *See Janes.*, 279 F.3d at 886 (affirming exclusion of evidence that employee, alleging wrongful termination, was fired eight years earlier for stealing cigarettes, where evidence was intended to

22

prove undisputed fact that employee knew that stealing could result in termination; the evidence "was of limited value" and a jury could have concluded employee was "a person of bad character"); *see also Phillips v. Palubicki*, 91 F.3d 154, 1996 WL 393516, at *1 (9th Cir. 1996) (holding that evidence of past investigations and lawsuits was inadmissible); *Turner v. Univ. of WA*, No. C05-1575RSL, 2007 WL 2984684, at *1 (W.D. Wash. Oct. 10, 2007) (excluding evidence of prior lawsuit because marginal probative value was substantially outweighed by risk of unfair prejudice and confusion). This Court should follow other courts in similar FCRA cases and exclude Mr. Hendricks's proposed testimony regarding past FCRA cases. *See*, *e.g.*, *Valenzuela*, 2015 WL 6811585, at *3.

## B.   Agreements Entered Into By Equifax In The Early 1990s, "Operation Busy Signal," And Reports Regarding Alleged Inaccuracy In the Industry Generally Are Not Relevant.

For similar reasons, Mr. Hendricks's discussion of agreements Equifax entered into with the attorneys general of 18 states in 1992 and the Federal Trade Commission ("FTC") in 1994 should be excluded. (*See*, *e.g.*, Ex. A at 2, 3, 7, 8, 15, 16, 20). These decades-old agreements are not relevant and, in any event, would be highly prejudicial to Equifax if admitted. *See Price v. Trans Union, LLC*, 839 F. Supp. 2d 785, 812 (E.D. Pa. 2012) (holding that probative value of a similar consent decree entered into by Trans Union and the FTC in 1992 was "substantially outweighed by the likelihood of jury confusion"); *see also Kramas*

*v. Security Gas & Oil, Inc.,* 672 F.2d 766, 772 (9th Cir. 1982) (excluding evidence of a consent decree entered in a prior SEC enforcement proceeding because decree involved no finding of culpability and no judgment of wrongdoing).

The agreements concern procedures used by Equifax in the late 1980s and early 1990s. Mr. Hendricks apparently believes, without any substantiation, that Equifax's policies and procedures have not changed in the intervening decades despite the huge advances in computer technology and changes in lending practices during that time period. Mr. Hendricks's report contains no discussion whatsoever of Equifax's current written policies or how they have changed, or not changed, over time. His blanket assertions have no basis in fact and cannot be relied upon for admission of this highly prejudicial evidence. *Cf. In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999) ("Because there is no evidence in the record establishing that Cargill's market share was constant between 1993 and 1995, any inference founded upon that factual assertion – even one drawn by an economic expert – is necessarily unreasonable."). Furthermore, any marginal probative value the 1990s agreements might have in this case is also substantially outweighed by their prejudicial effect. *See Price*, 839 F. Supp. 2d at 812. This Court should follow other courts in similar FCRA cases and exclude Mr. Hendricks's proposed testimony regarding administrative actions and consent decrees. *See*, *e.g.*, *Valenzuela*, 2015 WL 6811585, at *3.

24

Mr. Hendricks's discussions of "Operation Busy Signal" and an alleged "History of Significant Inaccuracy Problems" in the consumer reporting industry generally should be excluded for the same reasons. (*See* Ex. A at 20-24). Indeed, this evidence is even more remote from the facts of this case. Operation Busy Signal was an investigation conducted by the Federal Trade Commission in 2000 regarding the availability of agents to accept telephone calls from consumers. Mr. Ma does not allege that he was unable to speak with an agent. (Ex. C 69:22-70:14). In the "history" section, Mr. Hendricks discusses several reports issued by various organizations (some of questionable reliability) in the early 1990s. (*Id.* 21-24). These reports, like the consent agreements from that time period, have no relevance here.

## **CONCLUSION**

For the reasons discussed, Equifax's Motion to Exclude Mr. Ma's Proposed Expert should be granted.

DATED: August 25, 2017.

Respectfully submitted,

EQUIFAX INFORMATION SERVICES LLC

/s/ *Lewis P. Perling*
Lewis P. Perling
Georgia Bar No. 572379
KING & SPALDING LLP
1180 Peachtree Street N.E.
Atlanta, GA 30309-3521

Tel: 404-572-3079
Fax: 404-572-3100
Email: lperling@kslaw.com
*Attorneys for Equifax Information Services, LLC*

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this document was prepared with Times New Roman 14 point, and Times New Roman 14 point was approved by the court in LR 5.1C.

DATED: August 25, 2017.

*/s/ Lewis P. Perling*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send email notifications of such filing to the following attorneys of record:

Justin Michael Baxter
Baxter & Baxter, LLP
8835 SW Canyon Lane, Suite 130
503-297-9031
Portland, OR 97225
Email: justin@baxterlaw.com

Shimshon E. Wexler
Shimshon Wexler, Attorney at Law
315 West Ponce De Leon, Suite 250
Atlanta, GA 30030
212-760-2400
Email: swexleresq@gmail.com

***Attorneys for Plaintiff***

DATED: August 25, 2017.


*/s/ Lewis P. Perling*