IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

FOLEY MA,                            )
                                     )
                    Plaintiff,       )        Civil Action
v.                                   )
                                     )        No. 1:16-cv-01055-LMM-CMS
EQUIFAX INFORMATION                  )
SERVICES, LLC,                       )
                                     )
                    Defendant.       )

## PLAINTIFF'S EXPERT WITNESS DISCLOSURE

COMES NOW, Plaintiff Foley Ma, pursuant to FED. R. CIV. P. 26, Plaintiff

designates and discloses the following persons as expert witness at trial to present

evidence under Rule 702, 703 or 705 of the Federal Rules of Evidence:

> Evan Hendricks
> Privacy Times, Inc.
> P.O. Box 302
> Cabin John, MD 20818
> (301) 229 7002

Mr. Hendricks will give expert witness testimony set forth in plaintiff's

expert witness disclosure attached hereto.

DATED this 31st day of March, 2017.

_____
Justin M. Baxter, *admitted pro hac vice*

1

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Baxter & Baxter, LLP
8835 SW Canyon Lane, Suite 130
Portland, OR 97225
Telephone: 503-297-9031
Facsimile: 503-291-9172
Email: justin@baxterlaw.com

Shimshon Wexler, GA Bar No. 436163
315 W Ponce de Leon Ave Suite 250
Decatur, GA 30030
Telephone: (212) 760-2400
Facsimile: (917) 512-6132
Email: swexleresq@gmail.com

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the foregoing via first class mail, to the

following persons and on the date set forth below:

Lewis P. Perling
Ted E. Roethke
Phyllis B. Sumner
Kendall W. Carter
Meryl W. Roper
KING & SPALDING, LLP
1180 Peachtree Street N.E.
Atlanta, Georgia 30309-3521

*Attorneys for Equifax Information Services LLC*

DATED this 31st day of March, 2017.

_____
Justin M. Baxter, *admitted pro hac vice*
Baxter & Baxter, LLP
8835 SW Canyon Lane, Suite 130
Portland, OR 97225
Telephone: 503-297-9031
Facsimile: 503-291-9172
Email: justin@baxterlaw.com

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

**PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT OF
EVAN HENDRICKS**

I, Evan Hendricks, provide the following Expert Report in connection with the action entitled <u>Foley Ma v. Equifax Information Services, LLC</u>: U.S. District Court for the Northern District of Georgia [Atlanta Div.]. (Case No. 1:16-cv-01055-LMM-CMS.)

**Part 1** of this report addresses issues that are specific or relevant to this case.

**Part 2** includes my qualifications, list of prior cases in which I have testified, my fee, and more general opinions, such as the nature and purpose of credit scores and credit reports, and damages. If the Defendant discloses additional evidence after I have completed this expert report, and if appropriate, I reserve the right to supplement this report at a future date.  Since depositions have not yet been taken in this case, and depositions are very important to understanding what happened, I anticipate that I will need to supplement this report.

**Methodology**

As a specialized knowledge expert, a fundamental method that I employ and follow is to apply my experience with and specialized knowledge of such relevant matters as (1) the credit reporting and credit scoring systems and industries and standards associated with them, (2) standards of "Fair Information Practices," ("FIPs"),[1] and (3) the Fair Credit Reporting Act and operations thereunder, to the facts at hand.

The application of my experience- and specialized knowledge-based methodology has several important purposes. One is to help the jury understand the logistics of inaccuracy in Plaintiff's case in light of well-known and long-standing standards of accuracy, completeness, fairness and privacy. Another important purpose is to provide the proper context in order to help the jury determine if the Defendant's problematic actions in relation to Plaintiff were foreseeable due to prior notice to the Defendant of significant defects in its policies, practices and/or procedures. In addition, still another purpose is to help the jury evaluate whether Plaintiff's damages were foreseeable (provided that the jury determines Plaintiff was damaged). Finally, another purpose is to help the jury understand whether Defendant's actions damaged Plaintiff's creditworthiness under long-standing, well-known industry standards.

**Opinions -- Summary**

• One of the most well-known and long-standing causes of credit report inaccuracy is the "mixed file." A "Mixed File" is a "Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report." A well-known and long-standing cause of mixed files is similarity of key identifiers such as Social Security number ("SSN") and/or name.

---

[1] The standards of Fair Information Practices and their relation to credit reporting and the Fair Credit Reporting Act are explained in Appendix G.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

- The case of Plaintiff Foley Ma ("Plaintiff") had several telltale signs of mixed and/or multiple files. That he was a victim of a mixed and/or multiple file, and that specific corrective measures were necessary, should have become obvious to Defendant Equifax ("Equifax" or "Defendant") before his disputes, and even more so afterwards.

- Equifax caused Plaintiff to become a victim of a mixed file, and then failed to correct some of the inaccuracies it caused because it failed to adequately reinvestigate some of his disputes.

- Specifically, because of a one-digit difference in Social Security numbers (SSNs) between Plaintiff and a female consumer, Equifax merged information regarding the two consumers, despite what in fact were different SSNs, as well as different dates-of-births, ("DoBs"), different names and addresses, cities and states. Worse, Equifax continued merging data on Plaintiff and a female consumer even after Plaintiff notified Equifax of the mix and the damaging inaccuracies stemming from it.

- The severity of Equifax's failure in wrongly merging Plaintiff's file with a female consumer was underscored by the fact that neither Experian nor Trans Union committed such a wrongful merger involving Plaintiff.

- In other words, for Equifax to reasonably reinvestigate inaccuracies caused by mixed files, it is first necessary that its dispute operators consistently recognize/diagnose a dispute relating to a mixed file, and then evaluate each disputed tradeline accordingly. Equifax failed to do this with some of Plaintiff's disputes.

- Per it policies, practices and procedures ("PPPs"), Equifax declined to reinvestigate inquiries disputed by Plaintiff, even though some of them were associated with tradelines that were disputed and deleted/suppressed.

- Despite pledging more than 20 years ago to respect the importance of using full identifying information, Equifax mixed and merged the files of two consumer who had different SSNs, names, DoBs and addresses and sexes. This meant that Equifax's procedures were not adequate for assuring accuracy. "Full Identifying Information" was defined by Equifax's Agreement of Assurances with the State Attorneys General as "full last and first name; middle initial; full street address; zip code; year of birth, any generational designation; and Social Security number."

- Equifax has a history of failing to be adequately responsive to consumers disputing errors. This is evidenced by two enforcement actions/consent agreements by the Federal Trade Commission (FTC) in the 1990s. (See FTC's "Operation Busy Signal," below.) It is also evidenced by other cases in which I have served as a plaintiff's expert against Equifax, including several that went to trial. (See below)

- Equifax failed to inform its dispute operators how and why its partial matching algorithms cause mixed files in cases like Plaintiff's. Thus, even when there were important signs of a wrongful mix, Equifax disregarded the need to emphasize to its

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

dispute operators that they focus on discrepancies in identifying information such as SSNs, DoBs, addresses, and cities.  Given the context, Equifax's disregard was serious. Such a failure is particularly harmful in a case like Plaintiff's because the discrepancies in SSNs, DoBs, addresses, and cities are crucial factors to confirming that there was a mix, and what must be done to "unmix" the files.

• Even though Equifax deleted/suppressed several of the tradelines disputed by Plaintiff, it inexplicably failed to delete/suppress inquiries relating to those tradelines that were disputed by Plaintiff.

• Even though Equifax stated that it had deleted from Plaintiff's file the name "Mary L Williams," and deleted former addresses of 4424 Hubbard Ave in Suffolk, VA 2435 and 203 Green Point Ln in Portsmouth, VA 23702, Equifax actually did not delete this information. This meant that Equifax's statements on this to Plaintiff were false.

• Equifax's wrongful merger of Plaintiff's information with the other consumer meant that Equifax sent Plaintiff's private information to creditors when they requested the other consumer's Equifax file, even though those creditors had no business seeing Plaintiff's confidential information.

• In sum, it is vital that the jury understand that when it comes to mixed files, a problem that was formally addressed by the FTC, State AGs and Equifax more than two decades ago, Equifax once again created the problem by mixing the file, and then refused to correct the inaccuracies, in part because despite a plethora of notice, it stubbornly refused to change practices and procedures of which it was repeatedly notified were not reasonably calculated to effectuate adequate reinvestigations of mixed files disputes. Equifax's failures in Plaintiff's case reflected its disregard of decades-old, well-known standards for accuracy, fairness and privacy.

• It is well known in our field that victims of chronic credit report inaccuracy endure a common pattern of harms.  This meant that the damages suffered by Plaintiff, which were consistent with those experienced by other victims, were foreseeable.  In addition, Plaintiff suffered damages – both economic and non-economic – that were particular to her situation.  For example, she was associated with a bankruptcy that was not hers. As the context, history and this report make clear, all of Plaintiff's damages were, or should have been, foreseeable to Equifax.

## Plaintiff's Case

Plaintiff's case underscores that Equifax has failed to correct its systematic and procedural defects, both for reasonably and adequately understanding and responding to consumers' disputes, and for preventing mixed files. Given the damage this caused to previous Equifax victims, and the robust notice to Equifax that major corrections were needed, Equifax's disregard of the need to make such corrections, and its inadequate responsiveness in Plaintiff's case were not reasonable or justified.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

In the <u>Kirkpatrick</u> case in 2005 and the <u>Julie Miller</u> case in 2013, Equifax testified about aspects of algorithms that it uses to conduct partial matching.  Both that testimony and this case make clear that Equifax still fails to reasonably use and/or consider full identifying information to an adequate or reasonable extent.

The evidence thus far leads me to the conclusion that Equifax mixed the other woman's data into Plaintiff's file because there was a "partial SSN match" (8-out-of-9 digits). [Leslie depo., pg. 48]. It must be noted that not even Equifax cannot explain precisely why Plaintiff's file and Ms. Anderson's file were merged into one file.  [Leslie depo., pgs. 40-41].

To wit:

**Plaintiff:**                                          **Other Consumer, a Woman:**

Foley Ma                                               Mary Anderson/Mary L. Williams
1574 Country Squire Court                  1558 PASO FINO DR
Decatur, GA 30032                             Jacksonville, FL 32218; or

                                                            4424 Hubbard Ave
                                                            Suffolk, VA 23435; or

                                                            203 Green Point Lane
                                                            Portsmouth, VA 23702

DOB: ██/83                                      DOB: ██/83
SSN: ████-5189                              SSN: ████-5289

**[Make Sure the SSNs above are redacted if this report is ever filed publicly.]**

Given the context cited below, it was in no way acceptable – even egregious and inexcusable – for Equifax to disregard different SSNs, DoBs and addresses in different towns and states, clearly indicating that Plaintiff, a man, was not the other consumer, a woman.

One of the things that stood out in Plaintiff's case is that as a man, Plaintiff was being wrongly merged with a woman, who as noted above, not only had a different SSN, DoB, and address, but that Plaintiff and the other woman never lived in the same State.

Even more disturbing was that Equifax had "on-line combine reports" on the same day for both Plaintiff and Ms. Anderson [EIS 357-368] showing that a merger of two files occurred, and knew there was a SSN "variation." Nonetheless, Equifax disregarded this important information in its own system, despite the long history of Equifax wrongly mixing and merging consumers' data and files.

The severity of defects in Equifax's procedures was underscored by the fact that neither Experian nor Trans Union wrongly mixed Plaintiff with Mary Anderson/Mary L. Williams.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

This disregard was even more profound after Plaintiff informed Equifax that he was being wrongly mixed with the other woman. It was also reckless for Equifax to have not taken adequate steps to prevent further mixing after receiving Plaintiff's notices and disputes.

Given the context, Equifax's approach to partial matching reflected serious disregard for well-known, long-standing standards for accuracy, fairness and privacy.

### Partial Matching, Even After Notice of Inaccuracy

A systematic problem for victims of mixed files and its subcomponent, identity theft, is that Equifax continues using essentially the same "partial matching" algorithms to "build" consumers' files and to decide what information to sell to creditors – even after consumers notify Equifax of inaccuracies caused by mixed files. This is troublesome because inaccuracies stemming from mixed files are typically recurring and lingering. Thus, in these situations, Equifax's standards procedures not only do not assure accuracy, they greatly increase the likelihood of inaccuracy.

Accordingly, it is important that the trier of fact understand how Equifax uses partial matching of a consumer's identifying data, both to "build" a consumer's credit file and to "return" one to a credit grantor/user/subscriber when the consumer (or someone purporting or appearing to Equifax to the be the consumer) applies for credit.

Again, it is vital to remember that while Equifax's matching procedures in Plaintiff's case might not have been 100% identical to those in the Matthew Kirkpatrick case (2005) or the Julie Miller case (2013), those procedures were not improved sufficiently to prevent the wrongful merging and mixing that occurred in Plaintiff's case.

The following description of Equifax's matching algorithm is taken from page of the Second and Third Editions of my book, "Credit Scores and Credit Reports" (cited in "Background & Qualifications"), and is based upon the testimony of Equifax's Phyllis Dorman.

### *Beginning of Excerpt from Hendricks' Book*

**The Search Logic/Algorithm**

In the Matthew Kirkpatrick trial cited in the previous chapter, Equifax Vice President Phyllis Dorman said that when "building a file" after receiving data from a creditor, or when deciding what data to include on a credit report that will be disclosed to the creditor, the first factor considered by the Equifax system was geographic region.

Then its "matching algorithm," known as L90, relies on 13 matching elements. Two of the elements that constitute a distinct category are: (1) exact Social Security number (SSN) and (2) partial SSN (meaning that most,

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

but not all digits are the same).3  The remaining elements are (3) last name, (4) first name, (5) middle name, (6) suffix, (7) age, (8) gender, (9) street number, (10) street name,[2]  (11) apartment number, (12) City, state and zip, and (13) trade account number …

… Since the subscriber is buying the credit report in order to decide whether or not to grant you credit, the CRA wants to ensure that it does not leave out anything that *could* be relevant to that decision. After all, if the CRA failed to include evidence of late payments in your credit report, and you default, the credit grantor is going to blame the CRA.

Another factor is the credit grantor might only have limited information about the consumer, like name and address, and no SSN, or its employee might have written down the SSN incorrectly. Therefore, the ***CRA seeks to maximize disclosure of any possible information that might relate to the consumer*** about whom a subscriber inquires … [Emphasis added]

… To accomplish this, the CRAs' algorithms are designed to accommodate such errors as transposed digits within SSNs, misspellings, nick names, and changed last names (women who marry), and different addresses (people who move), by accepting "partial matches" of SSNs and first names, and in some circumstances, assigning less importance to last names. Thus, while you must provide an exact match of your SSN to obtain your own credit report, a subscriber can still obtain your credit report even if there is a match of only seven of the nine digits in your SSN.

What's more: if the SSN on the credit application exactly matches yours, the CRAs' algorithms often will tolerate major discrepancies in last name, street address, city, and state …

…In important ways, the CRAs algorithms have helped identity thieves. In "true-name fraud," the key moment occurs when the CRA discloses the innocent victim's credit report to a subscriber holding the identity thief's application for credit. This disclosure enables the fraudster to obtain credit in the name of the innocent victim.

Identity thieves often enter mistaken data when they fraudulently apply for credit. But if they have obtained the victim's SSN, it will help override other discrepancies in the application and convince the CRA algorithm to disclose the victim's credit report. Even if there are mistakes in the SSN, the "partial match" tolerance within the algorithm still gives the fraudster a chance of triggering release of the credit report …

***End of Excerpt from Hendricks' Book***

---

[2] Testimony of Phyllis Dorman, Matthew Kirkpatrick v. Equifax Credit Information Services, U.S. Dist. Ct., Oregon, CV-02-1197-MO; 1/20/05

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

In the July 2013 trial of <u>Julie Miller</u>, the testimony of Equifax's Margaret Leslie confirmed that Equifax uses the same or substantially similar algorithms.

Thus, under Equifax's system, the exact match of the SSN, meaning a 9-for-9 digit match, can permit its system to disregard important discrepancies in name, address, city, state, or date-of-birth. Meanwhile, a 7-for-9 match of SSN digits, or an 8-for-9 match, can cause Equifax to conclude that two consumers are the same person, if there is enough similarity among other identifiers. As in the <u>Julie Miller</u> case, Plaintiff's file was merged with a different individual – but in her case, another woman whose SSN, address and DoB were different.

Thus, in the case of either mixed files or "True Name" identity theft, it is the misapplication of identifiers that causes the inaccuracies and unfairly damages that victim's credit worthiness and ushering in the nightmare of repairing a polluted credit report. Accordingly, in my opinion, it is essential that after a consumer notifies a CRA like Equifax that she is a victim of mixed files or identity theft, the CRA adjusts towards more precise matching and not disregard important discrepancies in SSN, name, and address. If like Plaintiff, the consumer notifies Equifax of the wrongful mix, it needs to make a qualitative assessment of the environment in which it operates. Because mixed files and identity theft are long-standing and prevalent phenomena that systematically threaten to perpetuate credit report inaccuracy, CRAs like Equifax need to recognize this and adjust its practices and procedures accordingly, in my opinion. One way to actually ensure that a reinvestigation adequately resolves an identity theft or mixed-file dispute is to assign an experienced "case officer" to actually and *critically* review the result of a consumer's dispute. But unfortunately, as this case and so many other cases illustrate, that too often happens only after a lawsuit is filed.

In the case of Plaintiff and other victims of credit report inaccuracy caused by mixed files or identity theft, one of Equifax's and most critical shortcomings was that it did not adjust towards more precise matching criteria after it knew or should have known that partial matching was contributing to the inaccuracies.[3] In other words, Equifax knew that a mixed file was often an ongoing and recurring phenomenon. This meant that Equifax's system was likely to continue to mix inaccurate, highly damaging into Plaintiff's file. Equifax should have moved toward a more precise matching approach to ensure that accounts associated with the other woman were blocked from mixing into Plaintiff's credit file. At a minimum, after Plaintiff's disputes, Equifax should have allocated sufficient attention to her case to ensure inaccuracies were corrected/deleted and would neither persist nor reappear. But it did not.

### Equifax's Model & Approach

Traditionally, Equifax's' customers are the creditors and debt collectors that purchase its credit reports. Like most businesses, Equifax aim to keep their customers satisfied. Thus, Equifax sees its fundamental role as ensuring that the credit reports it sells include all

---

[3] CRAs like Equifax sometimes cite a 2004 preliminary study by the FTC to supports its use of partial matching, but the FTC only examined partial matching from a general perspective and did not address the important issue in this case and the one about which I am expressing an opinion here: Whether adjustments towards a more precise match should be made after the CRA knows that partial matching is causing errors in a particular consumer's report.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

information that might possibly relate to the consumer in question. In other words, through their "partial matching" approach, which will be discussed below, Equifax aim to include on the reports it sell *maximum possible information* about the consumer in question. However, problems arise when Equifax's goal clashes with the goals of the Fair Credit Reporting Act (FCRA), which include *maximum possible accuracy*.

Plaintiff became mixed with the other woman, who had some similar identifiers, because of Equifax's approaches to partial matching disregarded important discrepancies in their identifiers – namely, their SSNs, dates-of-birth and addresses, cities, states and zip codes. Equifax also disregarded the importance notice it should have heeded from history, including the consent agreements with the State AGs and FTC (see below).

### Equifax Did Not Adequately Consider Plaintiff's Disputes

For a CRA like Equifax to adequately resolve a consumer's dispute, it is necessary to understand the nature of the dispute – to diagnose correctly the cause of the inaccuracies – so it can deduce what investigative and steps its needs to take.  For an investigation to be adequate, it must be able to identify what corrective actions need to be taken and ensure they are taken.

This did not happen for some of Plaintiff's disputes. Even though Equifax deleted/suppressed some of the tradelines disputed by Plaintiff, it failed to delete/suppress the disputed Citi and Wells Fargo tradelines. Moreover, Equifax could not explain why these tradelines were not deleted/suppressed. [Fluellen depo., pgs. 143-147.]

### Equifax & The 'ACDV Exchange'

Equifax relies on the ACDV exchange as its principal means of reinvestigating a consumer's dispute. As Equifax is well aware, I have been critical that it relies on the ACDV exchange for disputes that require careful consideration, analysis or true investigation in order to be resolved satisfactorily. Such types of disputes include but are not limited to, mixed files and identity theft.

The ACDV-exchange is inadequate for many disputes in these categories because it essentially consists of an exchange of messages known as "Automated Consumer Dispute Verifications" (ACDVs). When consumers sends their dispute to the CRA, the CRA populates the ACDV form with their identifying information (name, address, city-state-zip, SSN, sometimes previous address), and a two-or three-digit, or alpha-numeric code that cryptically describes the dispute (e.g., "not mine" or "fraud"). In a "not mine," or "fraud" dispute, as well as other types of disputes, the ACDV instructs the furnisher to provide "complete ID."

Upon receipt of the ACDV form, the furnisher will advise the CRA if a sufficient number of identifiers (i.e., name, Social Security number) match up and then "instruct" the CRA to either delete, modify, or "verify" the information that remains.

Thus, this process is better described as a ***comparison*** of each entity's existing data on the consumer, rather than an independent evaluation or investigation of the consumer's dispute.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

As this case illustrates, there can be several problems with the ACDV-exchange serving as the principal means of responding to consumer disputes. First, a cursory exchange of messages does not amount to an investigation under any normal sense of the word. The Webster's New Collegiate Dictionary defines "investigate" as, "v. To observe or study by close examination and messages is neither a "study by close examination" nor "marked by thoroughness and regularity," in my opinion.

Second, in cases like this, where Equifax's misinterpretation and/or misapplication of the victim's identifying information *is the cause* of the inaccuracy in the victim's credit report, and likely will cause future inaccuracies, the ACDV-exchange, as operated by Equifax, is not reasonably calculated to facilitate adequate reinvestigation, or to prevent predictable, future inaccuracies.

This is because Equifax is the entity that has the most information relevant to Plaintiff's disputes and which supports the conclusion the disputed information should be removed from his Equifax files and reports.

For example, Equifax had "on-line combine reports" on the same day (June 8, 2014) for both Plaintiff and Ms. Anderson [EIS 357-368] showing that a merger of their two files occurred. Equifax also knew there was an SSN "variation." Nonetheless, Equifax's dispute operators not only never considered this information, per Equifax's PPPs, they never even considered looking at this important information.

A glaring irony is that Equifax's ACDVs instructed furnishers to "verify complete ID," but Equifax never determined – or even considering determining – that Equifax, rather than verifying it had the correct ID, was mis-assigning it.

Third, and importantly in Plaintiff's case, the ACDV-exchange occurs in a hurried, conveyor-belt styled atmosphere in which dispute operators are under pressure to process disputes quickly and to meet production quotas.  This hurried, conveyor-belt styled atmosphere is conducive to a dispute operator overlooking, missing or just "whiffing" on any given dispute due to volume, speed or attention issues.

This is what happened in Plaintiff's case: Equifax inexplicably "whiffed" on his disputes of the Citi and Wells Fargo tradelines, and even failed to follow its own policies. Moreover, Equifax could not explain why it "whiffed" and failed to follow its own policies in regards to these disputes. [Fluellen depo., pgs. 139-40, 143; EIS-MA-000063, EIS-MA-000167.]

Moreover, even several furnishers instructed Equifax to delete from Plaintiff's file tradelines that belonged to Mary Anderson/Williams, Equifax failed to consider that when it whiffed on his disputes of the Citi and Wells Fargo tradelines.

Equifax's actions exhibited a troubling lack of care and concern, and reflected serious disregard for long-standing standards or accuracy, fairness and privacy.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Fourth, as this case and so many past cases demonstrate, Equifax's operation is prone to mistakes, which Equifax keeps repeating.

For example, while Equifax deleted the inaccurately termed "former name" of "Mary Williams," from Plaintiff's credit file, it failed to delete the name "Mary Anderson." Furthermore, Equifax sent ACDV forms to various data furnishers, indicating to each of the furnisher's that Plaintiff's "AKA" or "former name" was "Anderson Mary" even though Mr. Ma had disputed that name in his dispute letter. In addition, Equifax falsely told Plaintiff, "The disputed name Mary Anderson and employment Save-A-Lot store are currently not reporting on the Equifax credit" file.

Fifth, per it policies, practices and procedures, Equifax declined to reinvestigate inquiries disputed by Plaintiff, even though some of them were associated with tradelines that were disputed and deleted/suppressed. [Fluellen depo., pgs. 145-146.]

Sixth, because the ACDV-exchange is central to Equifax's method of operation, it very likely did not consider taking other reasonable investigative steps that could have been more effective. For example, in his disputes, Plaintiff provided contact information to Equifax. But Equifax did not use the contact information to resolve the problem effectively.

It is worth noting that Plaintiff's disputes to Equifax, which resulted in inadequate reinvestigations, came well after the jury's $1 million verdict and Judge Susan Illston's opinion in Eric Drew, and well after the jury's $18 million verdict in the Julie Miller case.

### Equifax Was Advised of Shortcomings in the ACDV-Exchange Process

I previously advised the three CRAs of the shortcomings in the ACDV-exchange process. In December 2003, I sent Experian, Equifax and Trans Union letters detailing the problems I saw with the process from a standpoint of removing inaccurate data disputed by consumers and achieving accuracy. (One letter concerned Capital One; the other, MBNA.)

Moreover, I have advised Equifax of the inadequacies of the ACDV-exchange in my trial testimony on seven occasions, and in the dozens upon dozens of expert reports I wrote in cases that did not go to trial because Equifax agreed to settle.

### Resource Allocation

Equifax prefers to confine its dispute handling as much as possible to the automated system of ACDV-exchange because it lowers costs by reducing the amount of employee time and effort required to handle consumer disputes. CRAs and furnishers view consumer dispute handling as a "cost center," i.e., the priority is to reduce costs.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

**Absent Lawsuit, Errors Would Have Persisted Indefinitely**

Under Equifax's systems, inaccuracies in Plaintiff's credit files would have persisted indefinitely, in my opinion. As was the case with other victims of chronic inaccuracy, it was only by filing a federal lawsuit that she was able to prompt the beginnings of an adequate reinvestigation. [Ma depo., pgs. 171-82.] This is because the "attorney-directed" reinvestigation comported more closely with the definition of "investigation," as opposed to the defects stemming from Equifax's standard "ACDV-exchange." As with the cases of other victims, the "attorney-directed" reinvestigation inspired by Plaintiff's lawsuit was superior to the ACDV-exchange because it entailed, for the first time, (1) careful consideration of, and reflection on, the cause of the inaccuracy, (2) a concern for the underlying truth, (3) the taking of necessary investigative steps to determine the underlying truth, and (4) the goal of ensuring that the underlying truth was reflected in Plaintiff's credit report.

Unless some new dynamic is introduced into Equifax's world view, Equifax will continue to harm consumers by (1) failing to cross-check suspect information in order to prevent it from entering the consumer's file in the first place; and (2) failing to remove disputed, inaccurate information because of the inadequacies in Equifax's policies and practices regarding consumer disputes.

**Damaging Nature of Inaccuracies**

The inaccurate data, which were caused by the wrongful mixing of the other woman's data into Plaintiff's file, were damaging to Plaintiff and his creditworthiness.

Specifically, Equifax's wrongful mixing of Ms. Anderson's/Williams' tradelines into Plaintiff's file cause his credit score to drop significantly.  For instance, on the January 28, 2016 tri-merge report, Plaintiff's FICO score when there was not wrongful mixing was excellent: 773 for Trans Union and 769 for Experian. But his Equifax FICO score was 679. The primary reason for his comparably dismal Equifax score was "Derogatory public record or collection filed." [PLAINTIFF 000283.]

As Plaintiff testified, when he was seeking to purchase his home, he had to "put a larger down payment in order to compensate for the debt that this Mary Anderson had on there to reduce my debt-to-income ratio." [Ma depo., pg. 9.]

**'Non-Economic' Damages**

The above cited "economic" damages are simpler to identify and sometimes quantify, and therefore easier for some people to understand.

In my experience, however, in the cases of victims of chronic credit report inaccuracy, the damage to one's well-being and lifestyle are often much more profound.  For starters, the vast majority of Americans are very concerned about maintaining their good names, a fact that is reflected in FTC complaint statistics.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

To fully understand the nature of the damage, it is necessary to recognize the interrelationship between the "economic" and "non-economic" damage. The inaccurate data set off a chain reaction that ultimately cast a dark shadow over her life.

As their credit reputations were besmirched, victims of chronic inaccuracy find that opportunities once taken for granted are vanishing.  Plaintiff was a case in point.  Plaintiff felt that the walls figuratively were closing in around her, assuredly resulting in her having feelings of helplessness.

This assuredly impacted how Plaintiff was able to interact with his family, and how he felt about himself in particular and about life in general. Like other victims of chronic inaccuracy, Plaintiff's plight symbolizes the nature of, and interrelationship between, "economic" and "non-economic" damage.

Now consider the impact that such an environment would have on a reasonable person's psyche, inter-personal relationships, ability to concentrate, organize and perform at work, and ability to enjoy life.  Clearly, any reasonable person would be negatively impacted.

Greatly compounding the harm is the frustration, stress, and trepidation that victims such as Plaintiff endure as they are unsuccessful in their reasonable attempts to restore accuracy to their credit life.  The truth was that Plaintiff should not have been depicted by as having a Chapter 7 bankruptcy in Indiana. The truth was that Equifax should not have associated Plaintiff with Mary Anderson/Williams' data or tradelines. Yet Equifax failed to delete her personal data from Plaintiff's file.  Moreover, Equifax failed to delete the Citi and Wells Fargo tradelines.

### Understanding Credit Reporting-Related Damages & Their Foreseeability

**To be clear, I want to emphasize that most, if not all, of the testimony regarding Plaintiff's specific actual damages will come from fact witnesses. Accordingly, when I discuss below the issue of "emotional distress," or frustration, anger, mental anguish, I am, of course, not "diagnosing" or attempting to diagnose whether Plaintiff experienced emotional distress (Category #8).**

**My point is that all or nearly all victims of chronic inaccuracy about whom I have accumulated specialized knowledge have complained and/or testified credibly that the experience caused them emotional distress, mental anguish, and/or frustration. So, for example, if the jury concludes from the fact testimony that Defendant caused Plaintiff to experience emotional distress, mental anguish, and/or frustration, then my expert testimony on typical damages will help them determine if that was or should have been foreseeable to Defendant. The same goes for the other Categories listed below.**

**Importantly, the analysis below provides important "context," and is relevant for several reasons, including the foreseeability of the types of damages that Equifax knew or**

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

should have known it would inflict on Plaintiff if, as it did in his case, made his a victim of chronic credit report inaccuracy.

Moreover, if the jury determines that the Plaintiff was damaged, then the Factors listed below the Categories will help the jury evaluate the severity of Plaintiff's damages.

### Areas of Testimony: Damages Known & Common To Victims of Chronic Credit Report Inaccuracy

It is important that the trier of fact understands that victims of chronic credit report inaccuracy or identity theft often experience a series of several known and common types of negative impacts.

### Some Categories of Typical Negative Impacts of Chronic Inaccuracy

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit or employment because of inaccurate data, or only able to obtain credit under less favorable circumstances [Ma depo., pg. 9; Plaintiff 000178-180]
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity. [Ma depo., pgs. 77-78]
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms [Ma depo., pgs. 75, 79, 183]
(7) Sense of helplessness, loss of control over personal data [Ma depo., pgs. 75]
(8) The emotional distress stemming from, and associated, with all of the above [Ma depo., pgs. 74-76]

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

### Plaintiff' Damages Were Consistent with Other Victims of Credit Report Inaccuracy

In my opinion, Plaintiff' damages were consistent with other victims of chronic credit report inaccuracy. Her experience touched on most of the eight categories cited above.

In addition to the categories above, it is important for the trier of fact to understand that it can be very distressful not knowing everyone who may have associated you with highly

13

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

derogatory credit data. Moreover, in my opinion, it can be difficult to maintain constructive personal relationships under stress.[4]  It can be difficult to perform adequately at one's job.

### Defendant Damaged Plaintiff's Privacy

In addition to the damages described above, Defendant damaged Plaintiff's privacy.

As the U.S. Supreme Court has recognized, "To begin with, both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." (See *U.S. Dept. Of Justice v. Reporters Committee*, 489 U.S. 749 [1989].)

And, as the Supreme Court also has recognized, "… the concept of personal privacy … is not some limited or 'cramped notion' of that idea." (See *Favish v. National Archives & Records Administration*, 541 *U.S.* 157 [2004].)

These are some of well-known, long-standing privacy interests of Plaintiff that Defendant damaged:

- The Right To Be Let Alone – The Right To Protection of Private Life
- Reasonable Control Over Personal Information
- Intrusion upon seclusion or solitude, or into private affairs
- Public disclosure of embarrassing private facts
- Publicity which places a person in a false light in the public eye

### Equifax Knew or Should Have Known It Actions Would Have Negative Impact

The history of credit reporting cited above, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, made it abundantly clear to Equifax that failing to prevent Plaintiff from becoming a victim of chronic inaccuracy would have a highly negative impact on him. Equifax also should have known this because she specifically informed it more than once in her disputes.

### Context

Context is extremely important in this type of case, in part because credit reporting, along with inaccuracies stemming from furnisher mistakes, mixed files or misinterpretation of public records, is a long-standing and well-known problem. An important role of experts in FCRA cases is to help the trier of fact understand the relevant context.[5] Accordingly, I provide a brief history. An important theme emerging from this history is that consumer reporting agencies (CRAs) like Equifax

---

[4] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifying its use of credit reports in setting insurance rates.  (See comments of Allstate Insurance General Counsel Steven Sheffey, "Credit Scores and Credit Reports," *op cit.*)

[5] <u>Kirkpatrick v. Equifax</u>, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

were consistently provided notice in one form or another of the importance of ensuring the accuracy of information it reports and promptly restoring accuracy when the consumer disputes inaccuracies. This history also notified Equifax of the potential damage to consumers of reporting erroneous information and failing to correct it.

## Past Litigation Provided Important Notice to Equifax

This section is not intended to express any legal conclusions or opinions.  Instead, it is intended to address the issues of notice to Equifax of problems in its routine practices and procedures and the foreseeability of the fact that Equifax would continue inflicting damage on innocent consumers like Plaintiff if it failed to change its routine practices and procedures.

When it comes to "mixed files," Equifax ("Defendant," or "Equifax,") is a recidivist violator of the Fair Credit Reporting Act ("FCRA"). I have testified seven times at trial as a plaintiff's witness against Equifax in cases in which Equifax was found guilty of violating the FCRA because, among other things, (1) it mixed information on another consumer into the Plaintiff's credit file, and then (2) failed to correct it timely after receiving the Plaintiff's disputes.  The first trial was in 2005; the most recent was in 2013.

Throughout this period and before, Equifax wrongly mixed files and caused inaccuracies because it stubbornly continued procedures/practices/policies, like its version of "partial matching," (see below) that were known to cause mixed-file-related inaccuracies.

Moreover, Equifax failed to correct disputed information because it stubbornly continued procedures/practices/policies, like the "ACDV-exchange, a/k/a, "parroting," (see below) that were known to be inadequate.

In July 2013, I testified at trial for the seventh time as a plaintiff's witness against Equifax in the Julie Miller case. (D. Oregon, Case No.: 3:11-CV-01231-BR).  This case features many of the same issues as Julie Miller – i.e., (1) the wrongful mix of another person's data into Plaintiff's file, and *vice versa*, (2) the dumping of the of other person's derogatory credit history into Plaintiff's file without Equifax flagging it in any way, and (3) failure to reinvestigate.

In the Julie Miller case, I testified about Equifax's four failures numerated above and, importantly, how they were foreseeable, given the robust notice to Equifax of problems with its routine practices and procedures via enforcement actions/consent agreements with the Federal Trade Commission ("FTC") and State Attorneys General ("AG") [see below], and via prior litigation, and via Congressional hearings and actions, and through news media coverage.  I also testified about Mrs. Miller's damages.  The jury inferred from my testimony that Equifax

---

rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman, ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury." (January 18, 2005; Transcript available upon request.)

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

repeatedly had been notified on the need to changes several of its routine practices and procedures, but had refused to make the much needed changes.  Following my testimony, Equifax's witnesses and expert defended Equifax's routine practices and procedures as they applied to Mrs. Miller, and firmly indicated that no changes were in the offing.  The jury found Equifax guilty of violating the FCRA, and assessed actual damages of $180,000 and punitive damages of $18 million.  [**See Appendix A, Court's Opinion and Order re: Remittitur in Julie Miller**.]

Two years before, on Wednesday, July 21, 2010, in the trial of **_Eric Drew v. Equifax_**, as Plaintiff Drew's expert, I testified that despite what Equifax did to Eric Drew, it had no intention of changing its routine practices and procedures because Equifax was " … very satisfied with the way its system works.  It's made a calculation that it's the right thing for it to do."

The following week the jury returned a verdict awarding Mr. Drew $700,000 in punitive damages, $315,000 in emotional distress damages, and $6,326.60 in economic damages, for a total of $1,021,326.60.  In response to Equifax's subsequent motion to vacate the jury award, Judge Susan Illston, denying the motion, wrote:

> Moreover, Mr. Hendricks testified that defendant long ago acknowledged these problems when it entered into agreements with the FTC and several states about reinvestigation of mixed files. TR 620:20–621:4, 621:16–621:24. And while Mr. Hendricks agreed that identity theft was not a problem at the time of the FTC order and the Agreement of Assurances, he also testified that defendant faces the same general problems with reinvestigating mixed files and identity theft because in both instances the reporting banks are confused about identity.  Mr. Hendricks concluded his direct examination by saying the following:

> Everything in my experience, including other cases I've worked and the history I've talked about and what we see here, leads me to the inescapable opinion that Equifax is very satisfied with the way its system works. It's made a calculation that it's the right thing for it to do. And it has no intention of making the changes that I think are necessary to avoid the kind of problems that happened to Mr. Drew. TR 624:14–624:20.

> Defendant objects to the admissibility of the FTC and state Agreement of Assurances documents, and to Mr. Hendricks's testimony regarding them. Defendant argues that the documents are irrelevant, since they relate to mixed files and not identify theft, and because they predate any serious problems with identity theft. As discussed above, however, Mr. Hendricks's testimony explained why mixed files and identity theft present problems that are similarly difficult to resolve for a credit reporting agency. _See_ TR 621:5–621:15. This shows that the documents are, in fact, relevant to the question of foreseeability and thus the question of willfulness.3

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Even if the agreements themselves (and Mr. Hendricks's testimony regarding them) were not admissible, the logic of Mr. Hendricks's conclusion would be supported by his expertise and the record. A reasonable jury could determine that a credit reporting agency runs an unjustifiable risk of violating FCRA's reinvestigation requirement when it asks a bank to reconfirm the existence of a challenged account simply by asking the bank to reconfirm the account, without even indicating that the consumer has reported that his identity was stolen. Such a conclusion would be particularly reasonable in this case, where fraud alerts were placed on the account and other credit cards had been deleted.4 Defendant is not entitled to JMOL on the question of willfulness.

**[See Appendix B, Order Denying Defendant's Renewed Motion For Judgment As A Matter Of Law And Alternative Motion For A New Trial in Eric Drew.]**

Apart from Julie Miller and Eric Drew, Here are the other five cases I testified at trial against Equifax. They all concerned the wrongful mixing of another person's data into Plaintiff's file and Equifax's failure to reinvestigate adequately. Hence, these trials and verdicts all provided important notice to Equifax:

Plaintiff's case underscores how Equifax continued to fail to make obviously needed changes to avoid inflicting foreseeable damage on consumers. It also underscores how the verdicts in Miller, Eric Drew and five previous verdicts were not sufficient to prompt such changes. Those five cases are described below:

1. Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida.

Angela Williams was wrongly mixed with another woman whose last name was Williams. Plaintiff spent year disputing the inaccuracies, but Equifax consistently failed to correct/delete errors. In 2007, a Florida jury awarded her $2,919,000 – most of which was in punitive damages. **[See Appendix C, Judgment in Angela Williams; Appendix D, Motion for Leave to File Amended Complaint.]**

2. Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO.

Equifax sold credit reports containing false and derogatory accounts and information on Mrs. Valentine, an identity theft victim. Equifax failed to delete false information in spite of countless phone calls and dispute letters over many years. Even when Equifax would delete some accounts, the accounts would later reappear. Equifax falsely told Mrs. Valentine that it had deleted accounts and information when it had not done so. Equifax's outsourced vendors were trained in Equifax's procedures, and Equifax assumes responsibility for their conduct. Equifax admits that it and its outsource vendors repeatedly ignored Equifax's own procedures for handling credit reports and credit report disputes. Equifax failed to follow its "verified victim" procedure whereby the deletion of one fraudulent account is supposed to cause

17

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

all disputed accounts to be deleted. Equifax also knowingly used fraudulent identifying information to "verify" the false accounts belonged to Mrs. Valentine, when they did not.

While her case started as identity theft, it later became mixed file as well. In 2007, an Oregon jury found Equifax guilty of violating the FCRA and awarded her $200,000. **[See Appendix E, Plaintiff's Trial Memorandum in Rebecca Valentine.]**

3.   Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.

Ms. Robinson was a victim of identity theft.  She devoted considerable time to disputing fraud-related data, but Equifax consistently failed to correct/delete all of the disputed data. After her disputes, Equifax continued to mix the fraud-related data into Ms. Robinson's file.  In 2007, a Virginia jury found Equifax guilty of violating the FCRA and awarded her $200,000 in actual damages.

4.   Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.

Ms. Sloane was a victim of identity theft.  She and her husband devoted considerable time to disputing fraud-related data, but Equifax consistently failed to correct/delete all of the disputed data. After their disputes, Equifax continued to mix the fraud-related data into Ms. Sloane's file.  In 2007, verdict against Equifax, awarding Suzanne $106,000 for economic loss and $245,000 for mental anguish, humiliation, and emotional distress.

Specifically, the jury found that Equifax violated the FCRA by negligently: (1) failing to follow reasonable procedures designed to assure maximum accuracy on her consumer credit report; (2) failing to conduct a reasonable investigation to determine whether disputed information in her credit report was inaccurate; and (3) failing to delete information from the report that it found after reinvestigation to be inaccurate, incomplete, or unverified.

Moreover, Equifax appealed the case to the U.S. Court of Appeals for the Fourth Circuit. In its appeal, Equifax did not challenge the jury's findings that Suzanne proved that it violated the FCRA in all of these respects.  "Rather, the company simply insists that, despite its numerous statutory violations, the jury erred in awarding Suzanne damages and the court erred in awarding attorney's fees," the Fourth Circuit observed.

"The evidence at trial in this case clearly demonstrates that on numerous occasions Suzanne attempted to secure lines of credit from a variety of financial institutions, only to be either denied outright or offered credit on less advantageous terms that she might have received absent Equifax's improper conduct. At times, these financial institutions consulted credit reports from other agencies, but at other times these institutions relied exclusively on the erroneous credit information provided by Equifax. Based on these incidents, we find that there is a legally sufficient evidentiary basis for a reasonable jury to have found that Equifax's conduct resulted in economic losses for Suzanne. Therefore, the district court did not err in denying Equifax's motion regarding this award," the Court wrote.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

"Moreover, Equifax does not deny that Suzanne suffered emotional distress. Nor does Equifax contend that Suzanne failed to produce sufficient evidence to sustain some award for this injury. Rather, Equifax simply proposes replacing the jury's number with one of its own invention — offering $25,000 in place of $245,000. Yet when asked at oral argument to explain the basis for the proposed remittitur, Equifax's counsel could offer no legal or factual basis for this amount, conceding that the number had been taken 'out of the air.' Not only is such an unprincipled approach intrinsically unsound, but it also directly contravenes the Seventh Amendment, which precludes an appellate court from replacing an award of compensatory damages with one of the court's own choosing. *See Cline*, 144 F.3d at 305 n.2 (citing *Kennon v. Gilmer*, 131 U.S. 22 (1889)). In short, the issue before us is neither whether Suzanne offered sufficient evidence at trial to sustain an award for emotional distress nor whether we believe that Equifax's 'out of the air' $25,000 represents a fair estimate of those damages, but whether the jury's award is *excessive* in light of evidence presented at trial. *See id.* 144 F.3d at 305," the Court continued.

"In the present case, Suzanne offered considerable objective verification of her emotional distress, chronic anxiety, and frustration during the twenty-one months that she attempted to correct Equifax's errors. First, her repeated denials of credit and continuous problems with Equifax furnish an objective and inherently reasonable 'factual context' for her resulting claims of emotional distress. Suzanne also corroborated her account in two ways. She offered 'sufficiently articulated' descriptions of her protracted anxiety through detailed testimony of specific events and the humiliation and anger she experienced as a result of each occurrence. She also provided evidence that the distress was apparent to others, particularly her family; Tracey, for instance, described in detail his wife's ongoing struggles with Equifax and the emotional toll these events took upon her. In addition, substantial trial evidence attested to the direct 'nexus' between Equifax's violations of the FCRA and Suzanne's emotional distress. Furthermore, Suzanne's emotional distress manifested itself in terms of physical symptoms, particularly insomnia," the Court continued.

The Court reduced Mrs. Sloane's emotional distress damages to $150,000. It was the only case of which I know that a federal appeals panel issued an opinion regarding a jury award against Equifax. In my opinion, the Court's opinion provided Equifax with important notice regarding its liability and the economic and non-economic damages its FCRA violations cause consumers.

5. <u>Matthew Kirkpatrick v. Equifax, LLC</u>, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO.

In January 2000, after he applied for a mortgage loan, Matthew Kirkpatrick and his wife received an Equifax report with false, derogatory accounts indicating that his identity had been stolen. Equifax later mixed his identity with individual who had different SSNs.

After experiencing some difficulty merely obtaining his Equifax report, the one he finally obtained in 2001 had 19 false, derogatory accounts. He sent in a thorough, detailed dispute package. On March 19, 2001, he called Equifax, but Equifax told him it had never received his

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

dispute package. On March 22, he resubmitted his dispute package, but Equifax ignored it.  On that day he received a letter from Equifax indicating the credit agency had received his first dispute package but had "shredded" it.  On March 24, he resubmitted his dispute package for a third time, but Equifax again ignored it. On April 6, 2001, he again called Equifax and the credit agency again told him it still had not received any dispute package and to call back in a week. When the same exchange occurred five days later, Mr. Kirkpatrick followed Equifax's advice and re-sent his dispute package via registered mail.  On April 30, 2001, he received the U.S. Postal Service return receipt card indicating Equifax had received the fourth dispute package. But when he called Equifax on May 7 and May 15, Equifax told him both times that it did not have any record of receiving any dispute package. [**See Appendix F, Plaintiff's Trial Memorandum in Matthew Kirkpatrick.**]

In 2005, an Oregon jury found Equifax guilty of violating the FCRA and awarded Kirkpatrick $210,000 in actual damages.

Moreover, in rejecting Equifax's Motion in *Limine* to exclude me or my testimony, Judge Michael W. Mosman stated from the bench that an important role of experts in FCRA cases is to help the trier of fact understand the relevant context.  ("As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury." [January 18, 2005; Transcript available upon request.]

## Operation Busy Signal

Prior to any of these trials at which I testified, Equifax had stood out for its non-responsiveness to consumer disputes. In the 1996 amendments to the FCRA, Congress required the "Big Three' CRAs, including Equifax, to provide toll free numbers that consumers could call to dispute errors on their credit reports.  The Amendments also required them to have adequate staff to assist consumers.  Just a few years after the effective date, however, the FTC's "Operation Busy Signal" investigation found that Equifax, as well as Experian and Trans Union,  had again failed to be adequately responsive to consumer disputes because they were not doing a good enough job answering the phones.  In January 2000, the FTC imposed a combined $2.5 million in civil penalties on the three CRAs for failing to comply with these new customer service duties.  In addition to the fines, the CRAs were enjoined from further violations. (www.ftc.gov/opa/2000/01/busysignal.shtm)

But again, Equifax stood out.  In 2003, the FTC brought a second action against Equifax and reached a follow-up consent agreement, singling out Equifax for "blocking and delaying consumers' dispute calls" in violation of the 2000 Consent Decree.  This time the FTC singled out Equifax for a fine of $250,000 to settle the charges.  (See attached FTC materials.)

Plaintiff's case underscores how on the issue of responsiveness, Equifax continues to fail to make obviously needed changes to be sufficiently responsive to consumers' disputes and to

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

avoid inflicting foreseeable damage on consumers.  It also underscores how the jury verdicts mentioned above were not sufficient to prompt such changes.

## History of Significant Inaccuracy Problems

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data. Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of inaccuracy, and that can potentially be detrimental to the credit system as well.[6] This history is covered in Chapter 10 of my book, "Credit Scores and

---

[6] See discussion of credit report errors in "Consumer Reporting Reform Act of 1994," Report of the House Committee on Banking, Finance & Urban Affairs, (Rpt. No. 103-486, 103rd Congress, 2nd Session), "Consumer advocates, state law enforcement officials, and federal regulators all testified that the number of errors in consumer reports was unacceptably high and that the process for reinvestigating consumer disputes was lengthy and inefficient.  The FTC testified that the number of complaints about the credit reporting industry exceeded the number of any other category of complaints in both 1991 and 1992 … "  The committee report also cited several studies, starting with (1) James Williams (CIS), "Credit File Errors, A Report," August 7, 1989 -- A survey of 1,500 consumer reports and found serious error rate of 42% to 47%; and (2) Consumers Union, "What Are They Saying About Me?  The Results of A Review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.  [I currently do not have copies of these two studies.]  The committee report also cited the three U.S. PIRG studies listed below, as well as various consent agreements, discussed below, between the three major credit bureaus and/or the FTC and/or State Attorneys General.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993, Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" *ConsumerReports.org,* July 2000.

Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers*, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," *Federal Reserve Bulletin*, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Credit Reports." As that Chapter notes, in the early 1990s, problems with inaccuracy and "mixed files," CRA non-responsiveness and inadequate reinvestigations became the cause of complaints to the FTC. These and other complaints prompted the FCRA's oversight authorities – the FTC and State Attorneys General – to launch investigations and take enforcement actions.

These actions resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the reappearance of previously deleted data, being more responsive and conducting adequate reinvestigations.

On June 22, 1992, Equifax signed an "Agreement of Assurances" with 18 State Attorneys General (AGs). In 1994, it signed an "Agreement Containing Consent Order To Cease and Desist" with the FTC.  (See attached Agreements.) The first problem identified by the 1992 State AG Agreement was the need to avoid the occurrence or reoccurrence of mixed files. The Agreement defined "Mixed File" as a ***Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report."*** The 1994 FTC Consent Order's definition of Mixed File was identical. The Agreement also emphasized the importance of using "full identifying information," defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

The 1994 FTC Consent Order also emphasized the prevention of mixed files. In highlighting the need for adequate reinvestigations, the Order stated that such reinvestigations shall include…:

> … Accepting the Consumer's version of the disputed information and correcting or deleting the disputed information, when the Consumer submits to Equifax documentation obtained from the source of the information in dispute which confirms that the disputed information on the Consumer Report was inaccurate or incomplete …

---

Jill Riepenhoff & Mike Wagner, ""Credit Scars: Mixed and marred. When credit-reporting agencies blend your files with others', the financial damage can be devastating;" *Columbus Dispatch*, May 7, 2012.  "… About six percent of nearly 21,500 consumers who complained to the FTC during a 30-month period beginning in 2009, and nearly 8 percent of 1,842 who complained to state attorneys general in 2009 and 2010, said their credit reports had been mixed with another person's.  Consumers' files had been merged with those of their mothers, fathers, brothers, sisters, in-laws and neighbors. They were mixed with strangers with the same name, a similar name, a similar Social Security number or no known similarities whatsoever." www.dispatch.com/content/stories/local/2012/05/07/mixed-and-marred.html

Federal Trade Commission, "Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003." (December 2012)

"40 Million Mistakes: Is your credit report accurate? : A government study indicates as many as 40 million consumers have a mistake on their credit report and Steve Kroft finds it's hard to get them fixed." (http://www.cbsnews.com/news/40-million-mistakes-is-your-credit-report-accurate-25-08-2013/) (August 25, 2013)

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

## History: Increased Attention on Role of Furnisher

These Consent Agreements are relevant because (1) they created widespread publicity about the problems of credit report inaccuracy, (2) they articulated (an agreed upon) higher and more specific standard of care to ensure accuracy and fairness, and (3) they formed the foundation for the 1996 Amendments to the FCRA. However, Congress knew that to ensure accuracy, it needed to go beyond the Consent Agreements by placing duties on furnishers to report information accurately.

The April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary: "Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. ***Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors."*** [Emphasis Added]

Importantly, the Consent Agreements' language on preventing reinsertion was incorporated and expanded upon in the 1996 Amendments to the FCRA. Under Sect. 1681 (a)(5)(B), information cannot be reinserted unless it is "certified" as complete and accurate by the furnisher. Moreover, a CRA, five business days prior to any reinsertion, must notify the consumer, and also provide the name and address of the furnisher and inform her or her of his right to add a statement.

Despite these Consent Decrees, the problems of mixed files, inadequate reinvestigations and reappearance did not go away. Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations. This resulted in the 1996 legislative amendments to the FCRA.

In fact, in 2015, 31 State AGs reached another agreement with Equifax in which Equifax pledged to improve its procedures for assuring accuracy and reinvestigating disputes.

Even more recently, on March 2, 2017, the Consumer Financial Protection Bureau (CFPB) released a 23-page "Supervisory Highlights Consumer Reporting Special Edition" discussing numerous problems and deficiencies that it found during its examinations at the "Big Three" nationwide consumer reporting companies (CRCs), *i.e.* Equifax, Experian, and TransUnion. Of even greater significance, the report set out reforms that the Big Three must implement.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

The CFPB report did not identify which nationwide CRCs had what problems, as supervision exams are considered confidential. The Bureau could only note that "one or more" of the Big Three CRCs were guilty of the problems described in the report.

The CFPB directed the Big Three to undertake the following reforms:

- Formalize and centralize data governance policies
- Establish robust quality control programs
- Enhance standards for public records data including greater frequency of updates and stricter identity-matching criteria
- Monitor furnishers on an ongoing basis, including a process to temporarily stop accepting data from furnishers that have accuracy problems or that fail to provide regular updates
- Track furnisher dispute data
- Provide data-quality reports to data furnishers at no cost
- Correct the deficiencies in dispute handling by ensuring appropriate review of consumer proof documents, and proper provision of notices to both furnishers and consumers.

Under the robust quality control programs, the CFPB directed the Big Three CRAs to:

> … as part of the quality control program, development of tests to identify whether consumer reports are produced regarding the wrong consumer and whether consumer reports contain mixed file data, and development of systems designed to measure the accuracy of consumer reports and identify patterns and trends in errors;

I cite this brief history because it makes clear that for well over 10 years, Equifax was on notice from Congress, the FTC, State AGs, and the public that there were serious shortcomings in their routine practices for producing credit reports, reinvestigating, preventing reappearance of previously deleted data and being responsive to consumers complaining about disputes. Equifax was also on notice that these shortcomings caused damage to consumers. The expectation of Congress, the FTC, State AGs, and the public was that Equifax would improve their procedures and practices for ensuring accuracy, adequately reinvestigating, preventing reappearance and being more responsive to consumers, in my opinion.

## Areas of Testimony: General Issues, Context

**A. The Nature and Purpose of Credit Scores**
**B. The Nature and Purpose of Credit Reports**

## Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems. If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

A credit score is a number that reflects a consumer's creditworthiness at a given point in time. The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others. The scoring range for the FICO "classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union, are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (740 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com,[7] gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $500,000 30-year, fixed-rate mortgage:

| FICO® Score | Interest Rate | Monthly Payment | Total Interest Paid |
|---|---|---|---|
| 760 - 850 | 3.263 % | $2,180 | $284,656 |
| 700 - 759 | 3.485% | $2,241 | $306,774 |
| 680 - 699 | 3.662% | $2,291 | $324,665 |
| 660 - 679 | 3.876% | $2,351 | $346,530 |
| 640 - 659 | 4.306% | $2,476 | $391,403 |
| 620 - 639 | 4.852% | $2,639 | $450,064 |

A similar chart exists for auto loans. Moreover, major credit card companies practice conduct account reviews of their cardholders' credit reports and will lower credit limits if their cardholders' credit scores drop below certain levels.

The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters are publicly available:[8]

**35% -- Payment history.** Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

---

[7] Visited June 8, 2016; http://www.myfico.com/CreditEducation/Calculators/loanrates.aspx

[8] These parameters are published in Chpr 1 of both Editions of "Credit Scores and Credit Reports," op. cit.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

**15% -- Length of Credit History.** The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?** This relates to "inquiries" that creditors make when you apply for credit.

**10% -- Healthy Mix of Credit?** The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months.  The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has the greatest negative impact, while a major delinquency between 1-2 years-old still has a major negative impact.  The negative impact declines with age.



Copyright © 2003 Fair Isaac Corporation. All rights reserved.

## Nature & Purpose Of Credit Reports

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports. Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, and identifying information, such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies,

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1) A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.

(2) A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.

(3) If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.

(4) A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is:

(1) A form for disputing errors, and

(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format. A fundamental purpose of the credit report is to describe a consumer's creditworthiness. For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan). The code for someone who always paid his credit card on time would be "R1." Here are the numeric codes:

• 2 : 30-59 Days Past Due
• 3 : 60-89 Days Past Due
• 4 : 90-119 Days Past Due
• 5 : Over 120 Days Past Due
• 7 : Included in Wage Earner Plan
• 8 : Repossession
• 9 : Charge Off
• Blank : No Data available for that month
• 0 : Too new to rate, or unrated
• 1 : On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

27

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries. It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score. Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

### FEE

My fee is $300 per hour for preparation of expert report, consulting, or trial testimony; $400 per hour, or a minimum of $1,200 per day, for deposition testimony, plus reasonable travel time, plus travel costs and expenses.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

**Background & Qualifications (Curriculum Vitae Attached)**

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covered credit reporting, Fair Information practices and related matters, for 33 years;

(2) Author of the book Credit Scores and Credit Reports: How The System Really Works, What You Can Do, 3rd Edition, (Privacy Times 2007), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, and who has testified before State legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

From January 1981 to December 2013, I was Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007). The book has 23 Chapters, 403 pages and 369 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets. To my knowledge, the best (and possibly only)

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation. Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

From 1998 to 2007, I served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues. (Please consult the attached CV for additional information.)

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

## Evan D. Hendricks
### CURRICULUM VITAE

**Professional Activities**

**January 1981- December 2013        Editor/Publisher** of *Privacy Times*

From January 1981- December 2013, I was Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reported on privacy and information law, including the Fair Credit Reporting Act (FCRA).  The newsletter ranged from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present        Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases.  (List attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**May 2014 – Present      Member, Board of Directors, Privacy Rights Clearinghouse**

**1998 – 2008        Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004     Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

**July – October 2002        Consultant to U.S. Postal Service**

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks          P.O. Box 302          Cabin John, MD 20818**
        **(301) 229 7002  (301) 229 8011 [fax]  evan@privacytimes.com**

---

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

**Testimony Before Congress & The FTC**

"Keeping Score on Credit Scores: An Overview of Credit Scores, Credit Reports and their Impact on Consumers," House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit Hearing, March 24, 2010.

"What Borrowers Need to Know About Credit Scoring Models and Credit Scores," House Financial Services Subcommittee on Oversight, July 29, 2008.

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006.

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005.

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005.

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information," Senate Banking Committee, March 15, 2005.

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003.

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003.

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003.

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003.

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**
Credit Scores and Credit Reports: How The System Really Works, What You Can Do [3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

<u>Former Secrets: Government Records Made Public Through The Freedom of Information Act</u>
(Campaign For Political Rights, 1982)

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales –
Presentation published in conference proceedings, 2002)

The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne –
Presentation published in conference proceedings, 2001)

The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)

The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).

In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and
Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**

"Symposium on Credit Scoring and Credit Reporting," Suffolk University Law School and
National Consumer Law Center; June 6-7, 2012; Boston, MA.

"From Credit Scores & Credit Reports To Info Security: Why Personal Data Matters," Financial
Planning Conference for Maine Professionals; Finance Authority of Maine and Maine Securities
Bureau; Nov. 15, 2011; Portland, Maine**.**   [CLE & CPE]

"Credit Scores, Credit Reporting & The FCRA: Why Jury Verdicts Keep Rising**,**" ABA General
Practice, Solo & Small Firm Division 2011 National Solo & Small Firm Conference.
October 21-22, 2011; Denver, CO.

"Key Privacy Statutes - FCRA and Background Check Problems," Conference on Effective
Consumer Privacy Enforcement, Univ. of California-Berkeley Samuelson Law, Technology &
Public Policy Clinic. Oct. 13-14, 2011. Berkeley, Calif.

"Annual FCRA Conference," National Association of Consumer Advocates. May 20-21, 2011.
Memphis, Tenn.

"91st Annual New York Meeting," Commercial Law League of America (CLLA)
November 12, 2010

"2010 NCLC Consumer Rights Litigation Conference," National Consumer Law Center.
November 13, 2010.  Boston, Mass.

"26th Annual Consumer Bankruptcy Course," State Bar of Texas. June 3, 2010. Dallas.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

"Consumer Protection Law Comm. Representing Main Street: A Consumer Law Primer"
Florida Bar Association; June 26, 2009.  Orlando.

"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in
the Information Society," Presenter, "Credit Report Cases – Effective Remedies?"  Center on
Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)[9]

"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How
can victims of privacy violations prove that they have been harmed?  The George Washington
University Law School, Washington, DC, June 12-13, 2008.[10]

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21,
2006 (New York City)

"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer
Law Center, October 27, 2005

"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005

"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute,
February 28- March 1, 2005 (New York City)

"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004

"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process,"
Glasser LegalWorks, Sept. 28-29. 2004

"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

**Professional Societies**

Past President & Board Member, American Society of Access Professionals www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996,
I am quoted regularly by major and small newspapers (including The Washington Post, New
York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money
Magazine), regarding issues of privacy generally and the privacy implications of consumer

---

[9] http://law.fordham.edu/ihtml/eventitemPP.ihtml?id=37&idc=8943&template=clip
[10] http://privacyscholars.com

34

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

### Testimony & Expert Reports

I have testified in at least 25 times in Federal or State trials, and at least five times in federal court in class action "fairness hearings," or been deposed as an expert, in the following cases:

<u>Andrews v. Trans Union Corp. et al.</u>, Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies.  Expert report, deposition, trial testimony.  Judge Lourdes Baird presiding.  The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures.  (see 225 F.3d 1063 (2000)).

<u>Julie Miller v. Equifax Credit Information Services, LLC</u>: U.S. District Court for the District of Oregon.  Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony.  Judge Anna J. Brown rejected Equifax's <u>Daubert</u> motion to exclude me from testifying.

<u>Richard Alexander Williams v. First Advantage LNS Screening Solutions, et al.</u>: U.S. District Court Northern District of Florida [Gainesville Div.]. (Case No. 1:13-cv-00222-MW-GRJ). Judge Mark E. Walker rejected Equifax's <u>Daubert</u> motion to exclude me from testifying. (2016)

<u>Rachael Macik v. JP Morgan Chase, N.A., et al.</u>: U.S. District Court for the Southern District of Texas (Case 3:14-cv-44). Expert report and affidavit. Trial Testimony. Judge George C. Hanks, Jr. presiding. (2016)

<u>David M. Daugherty v. Equifax Information Services, Ocwen Loan Servicing, et al.</u>: U.S. District Court for the Southern District of West Virginia (Beckley Div.); No.: 5:14-cv-24506. . Deposition. Trial Testimony. (2016)  In rejecting Ocwen's <u>Daubert</u> motion, Judge Irene C. Berger ruled:

> I find that he has experience, related experience, counsel, and that he should be allowed to give expert testimony … I find that that testimony could be helpful to the jury …
> I specifically find that in order for him to have specialized knowledge that's useful to the jury, it is not necessary that he have first-hand experience with working with one of the credit reporting agencies.

<u>Richard and Kristin Zabriskie v. Federal National Mortgage Association, et al</u>: U.S.  District Court for the District of Arizona – (No. 2:13-cv-02260-DKD). Expert Report. Trial Testimony (2016). Deposition. (2015). Judge Susan Bolton rejected Defendant "Fannie Mae's" <u>Daubert</u> motion to exclude me from testifying.

<u>Angela P. Williams vs. Equifax Information Services, LLC, et al.</u>, Circuit Court for the Ninth Judicial Circuit, Orange County Florida.  Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony.  Judge George A. Sprinkel IV presiding.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California, Case No.  CV 07-00726-SI.  Expert report, Deposition, Trial Testimony.  Judge Susan Illston rejected Equifax's Daubert motion to exclude me from testifying.

April K. Barnett v. Chase Bank (USA) N.A. et al.: U.S. District Court for the Northern District of Alabama [Eastern Div.] (1:12-CV-1745-VEH). Expert disclosure and report. Deposition.  Judge Virginia  Emerson Hopkins rejected Chase's Daubert motion to exclude me from testifying.

Terry D Toler & Donna R. Toler v. PHH Mortgage Corp., Experian Information Solutions, Inc., et al.: U.S. District Court for the Western District of Arkansas [Hot Springs Div.]; (Case No. 6:12-cv-  06032-RTD) Expert Report. Deposition. Trial Testimony. (2014) Judge Robert T. Dawson  rejected  Experian's Daubert motion to exclude me from testifying.

Dennis Hollidayoke v JBL Mortgage Network: In the Circuit Court for Anne Arundel County, Maryland, No. 02C10155944.  Expert report, Deposition, Trial Testimony.

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.:  07-9322 CA 09.  Judge Jerald Bagley presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri  (No. 07-2514).  FCRA.  Expert report, deposition. Trial Testimony.  Judge Nanette K. Laughrey rejected Experian's Daubert motion to exclude me from testifying

Laura Jones v. Capital One:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case 09-14499-BFK, Chapter 7. Post-bankruptcy credit reporting. Expert report. Trial Testimony.  Judge Brian F. Kenney presiding, said from the bench:

> "Before we begin with Mr. Hendricks, a brief disclosure. I had a case a few years ago. Mr. Hendricks may recall that I was representing a creditor in which Mr. Hendricks was identified as an expert witness in the Eastern District of Virginia. I believe it was the Sloane case, Mr. Hendricks. I took Mr.  Hendricks' deposition and I subsequently moved to exclude him as an expert in the case on a Daubert challenge. I lost the Daubert challenge. The court allowed him to testify as an expert witness; and I will say, during the course of his deposition and the Daubert challenge, I learned quite a bit about credit reporting. Just in the interest of full disclosure, I'll disclose that to the parties."

In Re: MicroBilt Corp. et al., U.S. Bankruptcy Court for the District of New Jersey (Trenton Div.); Case No.  11-18143 (MBK).  Deposition, Trial Testimony.  (I was retained by MicroBilt counsel Bruce Luckman, who in previous years as counsel for TransUnion, unsuccessfully opposed me with Daubert challenge in the Sandra Cortez Myra Coleman cases (see below).

Steven W. Haberman v. PNC Mortgage Company, et al.: U.S. District Court for the Eastern District of Texas [Sherman Div]. Case No. 4:11cv126.  FCRA, identity theft. Expert report. Deposition. Trial Testimony.  Magistrate Judge Amos L. Mazzant presiding.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO).  FCRA, identity theft.  Expert report.  Deposition.  Trial Testimony.  Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc.; U.S. District Court for the District of Connecticut.  3:07-cv-01035-JCH.  FCRA.  Expert report, deposition.  Trial Testimony.  Judge Warren W. Eginton presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft.  Expert report.  Deposition.  Trial Testimony.  Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports.  Deposition.  Trial Testimony   Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports.  Deposition.  Trial Testimony   Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick v. Equifax, LLC,  U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO.  FCRA  Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF.  FCRA.  Expert Report.  Daubert Hearing.  Trial Testimony.  Senior Judge John P. Fullam qualified me to testify at trial.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.).  FCRA. Expert report. Deposition. Trial Testimony.  Chief District Judge Todd J. Campbell presiding.

Tracy Terry v. Cheryl Shepard, Eve Shepard, Frank Ferro, and STAR Consulting, LLC, CAL08-03428 -- In the Circuit Court for Prince George's County, Maryland, Michele D. Hotten, Associate Judge presiding.  Breach of contract. Damage to credit. Trial testimony.  September 22, 2009.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D.  FTC Section 5.  Expert Report.  U.S. Magistrate Judge William C. Beaman rejected Defendant's motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia:  No. 4:04CV82.  FCRA.  Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Joi Helmes v. Wachovia Bank N.A.:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD.  FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report.  Fairness hearing testimony.  Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA.  Expert report, deposition, trial testimony.  Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE.  FCRA. Expert report, deposition, trial testimony.  Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition.  Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr.  v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition.  On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me.  The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony.  Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22.  Affidavit, Supplemental Affidavit (both

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

Kirk McDonough v. JPMorgan Chase Bank, N.A., Trans Union LLC, et al., in the U.S. District Court for the Eastern District of Missouri [Eastern Div.]; No. 4:15-cv-00617-JCH. Expert Report. Deposition. (2016). Judge Jean C. Hamilton rejected Chase's Daubert motion to exclude me from testifying. (Case settled shortly thereafter.)

Tammy Brown v. Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union LLC: U.S. District Court for the Middle District of North Carolina [Durham Div.]. (Case No. 1:16-cv-00488-LCB-JLW.) Expert Report. Deposition. (2017)

Angela Anderson v. Equifax Information Services, LLC: U.S. District Court for the District of Kansas. (Case No. 2:16-cv-02038). Expert Report. Deposition. (2016)

Jim M. Peckey v. Bank of America, et al.: U.S. District Court for the District of Maryland [Baltimore Div.]; No.: 1:14-cv-00433- RDB. Expert Report. Deposition. (2016)

Marci Curliss, v. Ocwen Loan Servicing, LLC: U.S. District Court for the Western District of Missouri [Western Div.]; Case No. 4:14-cv-00428-SRB. Expert Report. Deposition. (2016)

Robert James Anthony v. Experian Information Solutions: U.S. District Court for the Eastern District of California (No. 2:14-cv-01230-MCE-EFB). Expert Report. Deposition. (2016)

Peter Blasi, Jr., et al., v. United Debt Services, LLC, et al.: U.S. District Court for the Southern District of Ohio [Eastern Div.]; (Case No.: 2:14-cv-0083). Expert Report. Deposition. (2016)

Henry L. Farrin, Jr., et al. v. Ocwen Loan Servicing, LLC, in the United States District Court for the District of New Hampshire (Case No. 1:15-cv-00145-JL) Expert Report. Deposition. (2016)

Karen Duell v. First National Bank of Omaha; and, The Dunning Law Firm: U.S. District Court for the Southern District of California; No.: 14-cv-2774 WQH (JLB). Expert Report. Deposition. (2016)

Martin Valenzuela v. Equifax Information Services, LLC: U.S. District Court for the District of Arizona. (Case No. CV-13-02259-PHX-DLR). Expert Report. (2015) Judge Douglas L. Rayes rejected Equifax's Daubert motion to exclude me from testifying.

Debra B. Croft v. Bayview Loan Servicing, LLC: in the United States District Court for the District of South Carolina [Columbia Div.] (Case No. 3:14-cv-04630-MGL). Expert Report. Deposition. (2015)

Carlos A. Vasquez-Estrada v. Collecto Inc.: U.S. District Court for the District of Oregon [Portland Div.]; No. 3:14-CV-01422-ST. Expert Report. Deposition. (2015)

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Charles Edward Steed, on behalf of himself and all others similarly situated, and Amy Summers, on behalf of herself and all others similarly situated: U.S. District Court for the Northern District of Georgia [Atlanta Div.] (Case 1:14-cv-00437-SCJ-ECS). Expert Report. Deposition. (2015)

Johnnie Teresa Marchisio & Adrian Marchisio v. Carrington Mortgage Services, LLC: in the United States District Court for the Southern District of Florida (Case # 14-cv-14011-KAM). Expert Report. Deposition. (2015)

Elizabeth Roberts v. Vincent St. John & Safeco Insurance Co. of America: In the District Court of Oklahoma County, State of Oklahoma (Case No. CJ-2012-1051). Expert Report. Deposition. (2015)

Roy Jack Williams v. Allstate Fire & Casualty Co., U.S. District Court for the Eastern District of Oklahoma (Case No. 5:13-cv-00828-D). Expert Report. Deposition. (2015)

John Mark Cowan v. GE Capital Retail Bank, et al.: U.S. District Court for the Northern District of California [San Jose Division]; 5:13-cv-3935-BLF-PSG. Expert Report. Deposition. (2015)

Martin Kevin Sammy v. Equifax Information Services, LLC: U.S. District Court for the Eastern District of Pennsylvania. (Case No. 2:14-cv-00307-BMS) Expert Report. (2014) Deposition. (2014)

Richard G. Beck, et al. v. Eric K. Shinseki, et al.: U.S. District Court for the District of South Carolina [Columbia Div.] (No. 3:13-cv-999-TLW). Expert Report. Deposition. (2014)

Roberto Sevi v. Experian Information Solutions, Inc., Trans Union LLC & Nationstar Mortgage, LLC.: U.S. District Court for the Middle District of Florida [Orlando Div.]; No. 6:13-cv-1433-Orl-37KRS. Expert Report. Deposition. (2014)

Jean Gardy Lacroix v. Equifax Information Services, LLC: U.S. District Court for the Southern District of Florida. (Case No. 9:14-cv-80334) Expert Report. Deposition. (2014)

Thanh Cham Thi Thach v. Virginia. U.S. District Court for the Eastern District of Virginia [Alexandria Div.] (Case No. 3:14-cv-00070-HEH) Expert Report. Deposition. (2014)

Lee Pele v. Pennsylvania Higher Education Authority, Inc., U.S. District Court for the Eastern District of Virginia [Alexandria Div.] (Case No. 1:13-cv-01531-JCC-TRJ) Expert Report. Deposition. (2014)

Terry D Toler & Donna R. Toler v. PHH Mortgage Corp., Experian Information Solutions, Inc., et al.: U.S. District Court for the Western District of Arkansas [Hot Springs Div.]; (Case No. 6:12-cv-06032-RTD) Expert Report. Deposition. (2014)

Anthony Peck v. Equifax Information Services, LLC, Experian Information Solutions, Inc., & DTE Energy Co.: U.S. District Court for the District of Colorado (No. 13-cv-02924-PAB-CBS). Expert Report. Deposition. (2014)

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

<u>Timothy Lawrence v. National Grid USA Service Co., National Recovery Agency, et al.</u>: U.S. District Court for the Eastern District of New York (13 CV 4979 – CBA/VMS).

<u>Rockwell Scharer III v. OneWest Bank, Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union LLC, et al.,</u>: U.S. District Court for the Central District of California; No.: 2:13-cv-00080-DSF-AGR.  Expert report. Deposition. (2014)

<u>Ronald A. Jackson, et al. v. Equifax Information Services, LLC, et al.</u>: U.S. District Court for the Southern District of Florida. 1:13-cv-21691-DLG

<u>James A. Davenport v.  Sallie Mae, Inc., et al.</u>: U.S. District Court for the District of Maryland; PJM 12-1475. Expert report. Deposition. (2014)

<u>Steven Strong v. Collecto, et al., Experian Information Solutions, LLC</u>: U.S. District Court for the Northern District of Texas [Dallas Div.]; No. 3-12-cv-05115-P. Expert report. Deposition. (2014)

<u>Kovalerchik v. Experian Information Solutions, LLC</u>: U.S. District Court for the Central District of California (No. 2:13-cv-05419 – GHK-FFMx).  Expert report. Deposition. (2014)

<u>Michael Dreher v. Experian Information Solutions, Inc., et al.</u>: U.S. District Court for the Eastern District of Virginia (Case 3:11-cv-00624-JAG). Expert report. Deposition. (2014)

<u>Gary Wright v. Equifax Information Solutions, LLC, et al</u>: U.S. District Court for the District of Colorado (No 1:12-cv-3268). Expert Report. Deposition. (2013)

<u>Patriot General Insurance Company v. Lisa Krebs and Carmen McReynolds</u>: U.S. District Court for the Northern District of Georgia [Atlanta Div.] (1:12-CV-0997-RWS). Expert Report. Deposition.  (2013)

<u>Gary Wright v. Equifax Information Solutions, LLC, et al</u>: U.S. District Court for the District of Colorado (No 1:12-cv-3268). Expert report. Deposition.  (2013)

<u>Amanda Ellis v. Experian Information Solutions, Inc., Trans Union LLC, Equifax Information Services, LLC</u> &: U.S. District Court for the Northern District of Alabama [Middle Div.]; No.: 4:12-cv-02779 RBP.  Expert report. Deposition.

<u>Denese Toliver v. Experian Information Solutions, Inc., Trans Union LLC, et al.</u>: U.S. District Court for the Southern District of Texas [Houston Div].  No. 4:12-cv-02436; Expert report. Expert rebuttal report. Declaration. Deposition.

<u>Patriot General Insurance Company v. Lisa Krebs and Carmen McReynolds</u>: U.S. District Court for the Northern District of Georgia [Atlanta Div.] (1:12-CV-0997-RWS).

<u>David Osada, et al. v. Experian Information Solutions, Inc</u>.: U.S. District Court for the Northern District of Illinois (Eastern Division), No. 11-CV-02856. Expert report. Deposition.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Kathleen Jane Ferguson v. Asset Acceptance Services, LLC., et al.: U.S. District Court for the District of Missouri [Eastern Div.]. (4:11-cv-00425--AGF).  Expert report. Deposition.

Arin A. Bovay, et al. v. Sears, Roebuck, and Co.: U.S. Circuit Court of Cook County, Illinois [County Dept., Chancery Div.]; Case No. 01-CH-18096; consolidated with Case Nos. 02-CH-4693 & 03-CH-07605. Expert report. Deposition.

Mary Perkins White v. Green Tree Servicing LLC, GMAC Mortgage LLC, Trans Union LLC, Equifax Information Services, LLC & Experian Information Solutions, Inc.,: U.S. District Court for the Western District of Washington [Tacoma Div.]; No.: 3:11-CV-005439RBL  Expert report. Deposition.

Ilene Modica v. American Suzuki Financial Services, TransUnion, LLC, & Equifax Information Services, LLC: U.S. District Court for the District of Arizona. (2:11-CV-02183-PHX-DGC) Expert report. Deposition.

Denise Acquafredda v. Experian Information Solutions, et. al: U.S. District Court for the District of Arizona – (No. CV 2011-054368).  Expert report. Deposition.

Jose Calderon v. Experian Information Solutions: U.S. District Court for the District of Idaho (No. 1:11-cv-00386-EJL).  Expert report. Deposition.

First Carolina Bank v. Charles S. McCue, et al.:  In The Court of Common Please, Fourteenth Judicial Circuit, State of South Carolina, County of Beaufort.  Civil Action No: 07-CP-07-03027. Deposition.

Maria Pintos v. Pacific Creditors Assoc., et al.:  U.S. District Court for the Northern District of California [Oakland Div.]  C 03-5471 CW. Expert report. Deposition.

Marie Ann Fuges v. Southwest Financial Services, LTD: U.S. District Court for the Eastern District of Pennsylvania (No 09-699).  Expert report. Deposition.

Alisha Wilkes v. Experian Information Solutions, et al.: U.S. District Court for the Eastern District of Virginia (CV- 1:10-cv-01160-CMH -TRJ).  Expert report. Deposition.

Serena Beachley v. PNC Bank N.A.: U.S. District Court for the District of Maryland [Northern Div., Case No. CCB-10-1774. Expert report. Deposition.

In re: Pammalla Shannon Uplinger v. Rees Broome, P.C.,: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria Div.); Case No. 90-13129-RGM. Expert report. Deposition.

Jose Soto v. Capital One Auto Finance, et al.: U.S. District Court for the District of Western Washington (2:08-cv-01838-RSM).  Expert report, deposition.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Terri N. White, Jose Hernandez, et al. v. Experian Information Solutions, et al.: USDC-Central Dist. Of California; Case No. 05-cv-1070- DOC (MLGx).  Declarations, Deposition.

Tara Andrews v. Equifax Information Solutions, Inc., et al.: U.S. District Court for the Western District of Washington; (No. 2:09–CV–00817–JJC).  Expert report. Deposition.

Michelle Jansen v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. 05-CV 0385-BR.  Expert report. Deposition.

James Byrd v. TransUnion LLC, Experian Information Solutions, Inc., Equifax Credit Information Services, LLC: U.S. District Court for the District of South Carolina [Columbia Div.].  Expert report. Deposition.

David L. Jackson v. Trans Union, et al.: U.S. District Court for the District of Oregon. FCRA. No. CV-08-0060-MO. Expert report. Deposition.

Richard Chakejian v. Equifax Information Services, LLC. : U.S. District Court for the Eastern District of Pennsylvania; No. 07-2211.  Bruce A. Summerfield v. Equifax Information Services, LLC. : U.S. District Court for the District of New Jersey; No. 08-1450.   FCRA.  Expert reports. Consolidate deposition.

Marlos Uzzell v. Experian Information Systems, Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 2:08-CV-02538-CMR). Expert report. Deposition.

Baxter Robinson v. Chase Mortgage Services, Inc., et al.: U.S. District Court for the District of South Carolina (Charleston Div.) (2:08-cv-02087-PMD).  Expert report, deposition.

Risa Joyce Deutsch v. Arrow Financial Services LLC, et al: U.S. District Court for Middle the District of Florida [Tampa]; No. 8:08-cv-01469. Damage to credit.  Expert report, deposition.

Michael D. Scott, et al. v. Graphic Center, CalPERS, et al.:  Superior Court of the State of California, County of Los Angeles.  Case No. BC390593397636.  Data breach. Declaration.

Christopher K. Jung v. Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 07-2514). Expert report, deposition.

Robert Saindon v. Equifax Information Services, et al.: U.S. District Court for the Northern District of California (08-cv-01744 WHA).  Expert report, declaration. Deposition.

Christina Lee v. TransUnion, et al.: U.S. District Court for the District of Oregon (CV-07-0998-MO).  Expert report, deposition.

Emelia Pasternak v. TransUnion, et al.: U.S. District Court for the Northern District of California. Case No. 4:07-cv-04980-CW Expert report, deposition.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

<u>Stacy Fiano v. Experian Information Solutions, et al.</u>, U.S. District Circuit Court of the Southern District of Florida 9:08-cv-80555.  Expert report, deposition.

<u>Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC, & Resurgent Capital Services L.P.</u>: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM.  Expert report, deposition.


**MATERIALS CONSIDERED**

In specific preparation for this case, in addition to the material cited in this report, I have reviewed the following:

Plaintiff's Complaint
Plaintiff's credit reports
Bates-Stamped documents produced by Plaintiff and Defendant, as of the date of this report.
Plaintiff's Responses to Equifax's Interrogatories
Depositions of Plaintiff, Alicia Fluellen, Mary Margaret Fortson Leslie

For foundational purposes, I also generally rely upon:

The Fair Credit Reporting Act
<u>Fair Credit Reporting Act</u>, National Consumer Law Center, 2013 – 8th Edition (Boston)

<u>Fair Credit Reporting</u>, [6th Edition], National Consumer Law Center, 2006 (Boston)

<u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007)

 My opinions in this case are also based on my 38-year profession of following privacy developments including those relating to the consumer reporting and information broker industry and the criminal justice system as a journalist, editor, publisher and privacy expert. My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 31st Day of March 2017, in Bethesda, Maryland**


**/s/  Evan D. Hendricks**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JULIE MILLER,                                    3:11-CV-01231-BR

          Plaintiff,

                                                 OPINION AND ORDER

v.

EQUIFAX INFORMATION SERVICES,
LLC.,

          Defendant.


**MICHAEL C. BAXTER**
**JUSTIN M. BAXTER**
**KACHELLE A. BAXTER**
Baxter & Baxter, LLP
8835 S.W. Canyon Lane
Suite 130
Portland, OR 97242
(503) 297-9031

**MAUREEN LEONARD**
P.O. Box 42210
Portland, OR 97242
(503) 224-0212

          Attorneys for Plaintiffs



1  - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

**IAN E. SMITH**
**LEWIS P. PERLING**
**PHYLLIS B. SUMNER**
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309
(404) 572-4600

**JEFFERY M. EDELSON**
Markowitz Herbold Glade & Mehlhaf, PC
1211 S.W. Fifth Avenue
Suite 3000
Portland, OR 97204
(503) 295-3085

         Attorneys for Defendant

**BROWN, Judge.**

     This matter comes before the Court on Defendant Equifax
Information Services, LLC's Motion (#91) for Reduction of
Punitive Damages.

     For the reasons that follow, the Court **GRANTS** Equifax's
Motion (#91) for Reduction of Punitive Damages as herein
specified and **REDUCES** the jury's punitive-damages award from
$18,420,000 to **$1,620,000,** which produces a 9-to-1 ratio between
the amount of punitive damages the Court finds constitutionally
permissible on this record and the $180,000 of compensatory
damages the jury awarded.


                    **BACKGROUND**

     Plaintiff Julie Miller brought this action for actual
damages and punitive damages pursuant to the Fair Credit

2  - OPINION AND ORDER

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq*.  Miller alleged

Equifax negligently violated FCRA by (1) failing to follow

reasonable procedures to assure the maximum possible accuracy of

the information contained in her credit report; (2) failing to

conduct a reasonable reinvestigation of disputed information in

Miller's credit file after she notified Equifax of the disputed

information; (3) failing to disclose to Miller the entire

contents of her credit file upon her request; and (4) furnishing

Miller's consumer credit report to persons or businesses who did

not have a permissible purpose to receive her credit report.

In particular, Miller sought "actual damages" damages under

§ 1681n to compensate her for emotional distress, including

humiliation, mental anguish, loss of reputation, invasion of

privacy, and fear of lost credit opportunities that she alleged

she sustained as a result of Equifax's FCRA violations.  Miller

also contended Equifax acted willfully in violating her rights

under FCRA, and, accordingly, Miller sought an award of punitive

damages under § 1681n.

During the three-day jury trial beginning July 24, 2013, it

was undisputed that Equifax merged Miller's credit file with the

file of a different person who had the same name and a similar

Social Security number as Miller but who lived in a different

state and who had a negative credit record and a significantly

different credit record than Miller had.  According to Margaret

3  - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Leslie, Vice President of Equifax's Technology Area, this kind of
file-merger was a "reasonable combination" that occurs with
"regularity."  Trial Transcript (Tr.) 583.

When Miller learned about the erroneous merger of her file,
she reported the problem to Equifax and began a two-year saga to
resolve it.  Despite Miller's repeated notices to Equifax and
Equifax's numerous reports to Miller that it had investigated her
complaints, Equifax did not correct the problem.  Tr. 152-53.  In
fact, Equifax did not take steps to correct the information in
Miller's file until she filed this action after her two years of
efforts proved fruitless.  Nevertheless, Equifax argued to the
jury that taking corrective steps only after a civil action is
filed complied with its "policy."  Tr. 530.

During the two years that Miller attempted to get Equifax to
fix her file, she was frustrated, overwhelmed, angry, depressed,
humiliated, fearful about misuse of her identity, and concerned
that her reputation would be damaged as a result of Equifax's
conduct.  Tr. 152-54, 156-58.  Miller did not, however, seek
medical or mental-health services for these issues.

The jury had the benefit of two expert witnesses to assist
them in assessing Equifax's alleged FCRA violations:  Evan
Hendricks, Miller's expert, testified about other mixed-file
cases in which juries had found Equifax violated FCRA, and Anne
Fortney, Equifax's expert, testified that "only" one-to-two

4  - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

percent of consumer files contain inaccurate information, which means approximately two-to-four million Americans have inaccurate information in their credit reports because of mixed files. Tr. 306-07, 384.

The jury returned a verdict in favor of Miller and found Equifax had negligently and willfully violated FCRA in one or more of the ways Miller alleged. The jury awarded Miller $180,000 in compensatory damages and $18,400,000 in punitive damages.

During oral argument on Equifax's Motion for Reduction of Punitive Damages on December 20, 2013, Equifax took issue with the "extra-record" evidence that Miller submitted in support of her Opposition (#93) to the Motion, which included copies of judgments in a number of FCRA cases and a declaration from a plaintiff's attorneys in one of those cases. To ensure both parties had the same opportunity to complete the record on this Motion, the Court granted Equifax leave to file a Supplemental Brief limited to arguments the Court should consider as to the appropriate punitive-damages ratio and the third *Gore* guidepost. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). Equifax filed its Supplemental Brief (#103) on January 3, 2014, but Miller filed a Motion (#104) to Strike that submission on January 9, 2014, on the grounds that it exceeded the scope of the Court's instructions and prejudiced Miller.

5  - OPINION AND ORDER

Appendix A
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

In its Supplemental Brief, Equifax cites a number of FCRA
cases to support its argument that the Court should adopt a 1:1
ratio of punitive to compensatory damages.  In support of its
position that the available civil penalties do not support the
jury's punitive-damages award, Equifax also submitted a December
2004 Federal Trade Commission (FTC) report regarding the FTC's
approval of Equifax's process for matching consumers to credit
reports.

The Court has considered Equifax's supplemental arguments
and materials and concludes they do not exceed the scope of the
Court's instructions.  In any event, the Court notes Miller has
not been prejudiced by Equifax's supplemental filing in light of
the Court's conclusion that a ratio significantly greater than
1:1 is warranted and that, as explained below, the Court
concludes the third *Gore* guidepost is not helpful in the context
of this case.

Accordingly, the Court **DENIES** Plaintiff's Motion (#104) to
Strike.


## STANDARDS

A punitive-damages award that is grossly excessive violates
"[e]lementary notions of fairness enshrined in our constitutional
jurisprudence." *Gore*, 517 U.S. at 574.  In *Gore* the Supreme
Court set forth three "guideposts" for determining excessiveness

Appendix A
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

of a punitive-damages award:  (1) "the degree of reprehensibility of the defendant's conduct"; (2) the "ratio to the actual harm inflicted on the plaintiff"; and (3) the "civil or criminal penalties that could be imposed for comparable misconduct."  *Id.* at 575-83.  Although these guideposts provide an analytical framework, they must be viewed in the context of the case and need not be "rigidly or exclusively applied."  *In re Exxon Valdez*, 472 F.3d 600, 613 (9th Cir. 2006).

## DISCUSSION

In its Motion for Reduction of Punitive Damages, Equifax moves the Court to reduce the jury's punitive-damages award "to within constitutional limits as a matter of law."  Thus, the Court turns first to the *Gore* Guideposts.

**I.   The First *Gore* Guidepost:  Reprehensibility**

It is well-established that the most important of the three *Gore* guideposts is the reprehensibility of the defendant's conduct.  *Gore*, 517 U.S. at 575 ("Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.").  When determining the reprehensibility of a defendant's conduct for purposes of evaluating the constitutionality of a punitive-damages award, courts should consider whether

(1)  the harm caused was physical as opposed to

7  - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

economic;
(2)  the tortious conduct evinced an indifference to or
     a reckless disregard of the health or safety of
     others;
(3)  the target of the conduct had financial
     vulnerability;
(4)  the conduct involved repeated actions or was an
     isolated incident; and
(5)  the harm was the result of intentional malice,
     trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419

(2003).

## A.    Physical v. Economic Harm

When the harm to the plaintiff arises from "a transaction in

the economic realm" and "not from some physical assault or

trauma" and "there are no physical injuries," this subfactor

weighs against finding the defendant's conduct was sufficiently

reprehensible to warrant significant punitive damages.  *State

Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003).

When the plaintiff suffers both economic, emotional, and

psychological harm, however, some courts have found this

subfactor weighs in favor of finding the defendant's conduct was

reprehensible and, therefore, warrants an award of punitive

damages.  *See Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261,

1283 (11th Cir. 2008)(The plaintiff, who brought an employment-

discrimination case, sought counseling as a result of emotional

distress, and the court found "[o]ne factor that suggests that

the misconduct of [the defendant] was reprehensible is that [the

plaintiff] suffered both economic harm and emotional and

8  - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

psychological harm.").

To support its argument that this reprehensibility subfactor weighs in its favor, Equifax relies heavily on *Bach v. First Union National Bank*, 149 F. App'x 354, 362 (6th Cir. 2005)(*Bach I*). In *Bach I* the plaintiff sued the defendant bank for FCRA violations. The trial evidence established the plaintiff lost credit opportunities as a result of the defendant's conduct in the form of a second denial of a mortgage application and a denial of a credit-card application, and she sustained injuries in the form of pain, suffering, and humiliation. When assessing the reprehensibility of the defendant's conduct, the court found emotional distress resulting from the alleged harm was "not the sort of physical injury the *State Farm* case contemplates, and thus, the first [reprehensibility subfactor, was] not present." *Id.* at 364. *See also Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003)("Although the plaintiffs in *State Farm* alleged emotional distress, the reprehensibility of the fraudulent business practices at issue . . . is different in kind from the reprehensibility of intentional discrimination on the basis of race or ethnicity.").

Here Equifax emphasizes its conduct did not cause Miller to suffer any physical harm and the emotional distress she described to the jury arose from a purely economic transaction. Thus, Equifax asserts this case is like *Bach I*, and this Court should

9  - OPINION AND ORDER

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

follow the Sixth Circuit's analysis in *Bach I* and conclude the reprehensibility factor does not apply because the jury's verdict for compensatory damages was for "emotional distress from an economic harm."

In response Miller relies on the Eleventh Circuit's analysis in *Goldsmith* in which the court found "emotional and psychological harm" in an employment discrimination case weighed in favor of the reprehensibility subfactor. Miller asserts she too suffered "personal injuries in the form of psychic harm," and, as already noted, the jury heard evidence that "for two years she was frustrated, overwhelmed, angry, depressed, humiliated, fearful about misuse of her identify [*sic*], and concerned for her damaged reputation." Pl.'s Opp'n Mem. at 9. Unlike the plaintiff in *Goldsmith* who sought medical attention for her emotional distress, however, the Court notes there was not any trial evidence in this case that Miller sought such treatment for her emotional distress.

In *White v Ford Motor Co.* the Ninth Circuit reviewed the "hallmarks of particularly reprehensible conduct" from *Gore*:

> Nonviolent offenses are less blameworthy than those that involve violence or the threat of violence. "Similarly, 'trickery and deceit' are more reprehensible than negligence." *Conduct that causes economic harm alone is less reprehensible than conduct that injures (or risks injuring) the health and safety of others. Id.* "[R]epeated misconduct is more reprehensible than an individual instance of malfeasance."

312 F.3d 998, 1029 (9th Cir. 2002)(citing *Gore*, 517 U.S. at 576-

10 - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

77)(emphasis added)).  Because the Court has not found any Ninth
Circuit case in which the court concludes emotional injuries
arising in an "economic realm" are categorically insufficient as
a matter of law to preclude a finding of reprehensibility, the
Court declines Equifax's invitation to apply the Sixth Circuit's
reasoning in *Bach I* to this matter.  Instead the Court expects
the Ninth Circuit would recognize emotional injuries are on a
continuum of harm affecting at least the "health and safety of
others" and that conduct causing such injuries, even in the
absence of bodily harm, is, in fact, more reprehensible than
conduct that causes "economic harm alone."

Thus, for purposes of this reprehensibility subfactor, the
Court concludes Miller's emotional injuries are sufficient to
trigger a reprehensibility finding, and, therefore, the Court
concludes this reprehensibility subfactor weighs in Miller's
favor when considering the record as a whole.

**B.    Indifference to or a Reckless Disregard of the Health
or Safety of Others**

Equifax argues this reprehensibility subfactor weighs
against Miller because Equifax did not act in reckless disregard
for anyone's health or safety because its conduct occurred in the
"economic realm."  According to Equifax, any potential harm to be
expected from the violations that Miller asserted would have been
purely economic, and, as a result, its conduct should not be
viewed as reckless.  *See State Farm*, 538 U.S. at 426.  *See also*

11 - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

*Bach I*, 149 F. App'x at 364. Although the Court agrees FCRA
violations are most likely to cause primarily economic harm, the
Court has already found Miller's emotional-distress injuries are
on the continuum of harm affecting the "health and safety of
others," and, therefore, the fact that she sustained "only"
emotional and non-economic harm does not rule out a conclusion
that Equifax acted in reckless disregard of the "health and
safety of others."

When evaluating this subfactor, Miller first asserts the
Court should consider "the possible harm to other victims that
might have resulted if similar future behavior were not
deterred."  *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S.
443, 460-61 (1993)(In a slander-of-title case, the Court found
the defendant's "pattern of behavior 'could potentially cause
millions of dollars in damages to other victims.'").  *See also*
*Philip Morris USA v. Williams*, 549 U.S. 346, 357 (2007)
("[C]onduct that risks harm to many is likely more reprehensible
than conduct that risks harm to only a few.  And a jury
consequently may take this fact into account in determining
reprehensibility.").

Miller also argues Equifax's recklessness was proven by
trial evidence that showed Equifax's mixed-file errors were not
rare or isolated problems, and, in fact, Equifax's industry
"matching" criteria produced errors in two-to-four million

12 - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

consumer files.  As noted, Miller's expert testified about cases
in which juries returned verdicts against Equifax based on
allegations of mixed files, and Equifax's own representative
testified it is Equifax's policy to investigate and to correct
files only after a lawsuit is filed.  Miller contends the jury
could have regarded Miller as an "'exemplar' of the harm that
Equifax is prepared to inflict on many other consumers."  Pl.'s
Opp'n Mem. at 10.

As noted, the jury found Equifax acted willfully when it
violated Miller's FCRA rights.  The Court agrees with Miller that
the jury's Verdict supports a conclusion that Equifax's conduct
was more than merely indifferent to Miller's rights and, in fact,
resembled reckless disregard of those rights in light of the fact
that Miller's repeated efforts over two years to get Equifax to
correct its errors went completely unheeded.

Accordingly, the Court concludes this subfactor weighs in
favor of Miller.

C.   **Financial Vulnerability**

Equifax argues Miller was not financially vulnerable because
she is not elderly, poor, or enfeebled:  "[S]he is a middle-aged
woman who is employed, earned a college degree, owns her own
home, . . . is active in her community," and "was knowledgeable
about her rights, represented by counsel, and exercised those
rights - both by complaining to Equifax and also by filing suit

13 - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

against other consumer credit reporting agencies." Def.'s Mem.
at 8. Equifax also contends this subfactor does not weigh
against it because it did not intentionally target Miller.

When a plaintiff is of "limited means" and is "subject to
the recklessness or malice of a large corporate bureaucracy,"
this subfactor is satisfied. *Arizona v. ASARCO, LLC,* 733 F.3d
882, 887 (9th Cir. 2013). Contrary to Equifax's contention,
however, this subfactor does not require the defendant to have
targeted the plaintiff. *See Bach I,* 149 F. App'x at 365 ("[This]
factor . . . does not require that the defendant target the
victim specifically because of her vulnerability, but rather
requires only that the target be financially vulnerable."). *See
also Dixon-Rollins v. Experian Info. Solutions, Inc.,* 753 F.
Supp. 2d 452, 465 (E.D. Pa. 2010). According to Miller, this
subfactor has been satisfied because Miller "had limited
resources compared to Equifax, and Equifax's errors and
intransigence destroyed her access to credit and rendered her
financially vulnerable." Pl.'s Mem. at 9. In addition, Miller
established at trial that she delayed the refinancing of her home
while interest rates were low and did not apply for a loan to
help her disabled brother due to the errors in her credit file.
Tr. 155-56.

Miller compares her situation to that of the plaintiff in
*Saunders v. Branch Banking & Tr. Co. of VA,* 526 F.3d 142 (4th

14 - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Cir. 2008).  In *Saunders* the plaintiff prevailed on her claims against the defendant bank for willfully breaching its FCRA obligations.  The Fourth Circuit found the plaintiff was financially vulnerable compared to the bank:  "[The plaintiff] has a modest income and limited resources compared to [the defendant].  Furthermore, [the defendant's] conduct rendered [the plaintiff] significantly more financially vulnerable."  *Id.* at 153.  The court in *Dixon-Rollins* reached a similar conclusion: "[B]ecause Trans Union was well aware of [the plaintiff's] specific disputes and repeatedly failed to conduct proper reinvestigations with respect to them . . . .  We shall take into account [the plaintiff's] financial vulnerability in our reprehensibility analysis."  753 F. Supp. 2d at 465.

In light of the significant disparity between the parties' financial resources in this case and the fact that Miller was subjected to two years of Equifax's repetitive, wrongful conduct that violated FCRA and affected Miller's credit and her financial condition, the Court concludes this subfactor weighs in favor of Miller.

### D.    Repeated Actions or an Isolated Incident

In *Gore* the Court noted:  "[P]ersist[ing] in a course of conduct after it had been adjudged unlawful," acting in bad faith, and making deliberate false statements all increase the reprehensibility of defendant's conduct.  517 U.S. at 579.

15 - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Equifax argues even if Miller encountered the same conduct repeatedly and even if juries may have returned verdicts against Equifax in other cases involving mixed files as Miller's expert testified, Equifax's conduct in this instance is not considered "repetitive" within the meaning of *State Farm* and *Gore* because it involved only "isolated" violations of FCRA as to Miller personally, and, in any event, there was not any specific evidence offered as to similar conduct by Equifax in relation to other parties.

As noted by the Ninth Circuit in its recent decision in *ASARCO*, however, this subfactor is satisfied when the defendant's wrongful conduct is repetitive and directed solely at the plaintiff, and, therefore, such evidence as to similar conduct in relation to others is not necessary.  *ASARCO*, 733 F.3d at 887. Specifically, in *ASARCO* the court found this subfactor was satisfied, and "there was nothing 'isolated' about the [defendant's] conduct" when it "involved repeated harassment" and "cruel treatment [of the plaintiff] . . . over a lengthy period" and the plaintiff's many complaints "went repeatedly unaddressed."  *Id.*

Here, as in *ASARCO*, Equifax's conduct was repetitive and Miller's repeated complaints went unaddressed for two years until she filed this lawsuit.  Accordingly, the Court concludes this subfactor weighs in favor of Miller.

16 - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

### E.   Intentional Malice, Trickery, or Deceit or Mere Accident

Equifax also argues its conduct was not the product of "intentional malice, trickery, or deceit."  In particular, Equifax relies on the Court's decision at trial not to instruct the jury on malice because Miller had not introduced evidence of "actual ill will directed to the plaintiff, or spite, or something that was directed to her to purposefully injure her." Tr. 217.  Although Miller does not dispute this jury-instruction analysis, she, nevertheless, argues this subfactor is satisfied because Equifax consistently gave Miller false information in response to her complaints and repeatedly gave her incorrect information about the extent to which Equifax had investigated and resolved her complaints.

In light of the Court's trial rulings that Miller did not establish there was a jury question as to whether Equifax acted with actual ill will towards her, the Court concludes this subfactor weighs in favor of Equifax.

### F.   Summary of Analysis under the First *Gore* Guidepost

As noted, only one of the first *Gore* guidepost subfactors weighs in favor of Equifax (*i.e.*, the lack of intentional malice, trickery or deceit), and all of the other subfactors weigh in Miller's favor.  In particular, the Court finds Miller's emotional injuries are sufficient to trigger a reprehensibility finding; Equifax's conduct was not isolated in that Equifax

17 - OPINION AND ORDER

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

repeatedly ignored Miller's complaints over a period of two years; Equifax acted with more than mere indifference to the harm caused by its conduct; and Miller was a financially vulnerable victim.

Accordingly, the Court concludes Equifax's conduct was sufficiently reprehensible to support a substantial award of punitive damages.

## II.  Second *Gore* Guidepost:  Ratio to Actual Harm

As noted by the Ninth Circuit in *ASARCO*:

> The Supreme Court has noted that "[punitive] damages must bear a reasonable relationship to compensatory damages." *Gore*, 517 U.S. at 580 (internal citations and quotation marks omitted). Further, the Court has stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *State Farm*, 538 U.S. at 425, 123 S. Ct. 1513. Nonetheless, the Court has steadfastly refused to create a bright-line ratio and has emphasized that a higher ratio is justified when "a particularly egregious act has resulted in only a small amount of economic damages."

733 F.3d at 888.  "Although single digit multipliers are more likely to be constitutional, a greater ratio may be appropriate where an egregious act results in only a small amount of economic damages." *Dixon-Rollins*, 753 F. Supp. 2d at 466 (citing *State Farm*, 538 U.S. at 425).  "Ultimately, the appropriate ratio must be based on the particular facts and circumstances of the defendant's conduct and the plaintiff's injury."  *Id.*

In cases involving FCRA violations, courts have determined

18 - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

ratios exceeding 1:1 are constitutional.  For example, in
*Dixon-Rollins* the court characterized as "modest" the jury's
$30,000 compensatory damages award for non physical, emotional-
distress injuries arising from willful FCRA violations, but, in
reducing the punitive-damages award from a 16:1 ratio, the court
chose a 9:1 ratio, primarily because of "recidivist" conduct on
the part of the defendant.  753 F. Supp. 2d 452, 467 (E.D. Pa.
2010).  *See also Cortez v. Trans Union*, LLC, 617 F.3d 688, 723-24
(3d Cir. 2010)("An award that is twice the compensatory damages
award falls well within the Supreme Court's standard for ordinary
cases of a single-digit ratio"); *Mullins v. Equifax Info. Servs.,
LLC*, No. 3:05-cv-888, 2007 WL 2471080, at *7 (E.D. Va. 2007)("[A]
five-to-one punitive damages ratio is well within the
constitutionally permissible ratios.").

Equifax emphasizes there is not a bright-line rule for the
permissible ratio and insists the 102:1 ratio of punitive damages
to compensatory damages in this case is "indefensible."  Equifax
relies on *Bach v. First Union Nat. Bank (Bach II)* in which the
court found "alarming" the punitive-damages award of $2,268,600,
which was 6.6 times the compensatory-damages award of $400,000.
486 F.3d 150, 156 (6th Cir. 2007).  Equifax also relies on *Paul
v. Asbury Automotive Group, LLC*, a workplace harassment case
based on race in which the court reduced the compensatory damages
for each plaintiff to $150,000 and the multi-million dollar

Appendix A
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

punitive-damages award to $150,000 (a 1:1 ratio) on the basis that "$150,000 in compensatory damages [is] substantial, particularly in light of the fact that plaintiffs suffered no long-term effects and the damages are based on emotional harm, something not easily quantified."  No. 3:06-cv-01603-KI, 2009 WL 188592, at *11 (D. Or. Jan. 23, 2009)(case settled at trial level).  Equifax argues a 1:1 ratio is appropriate here because Miller, like the plaintiff in *Paul*, did not suffer long-term effects from her experiences with Equifax and was awarded compensatory damages based entirely on emotional distress and not on out-of-pocket losses.

Miller, on the other hand, argues there are a number of considerations in this case that justify a ratio higher than 1:1, including the fact that Equifax has numerous opportunities as a credit-reporting agency to jeopardize a consumer's credit status. Accordingly, Miller argues the penalty in this case should be a reflection of "the public wrong rather than the private injury." *See St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919).  *See also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 494 (2008)("Regardless of culpability, however, heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect.")(citing *Gore*, 517 U.S. at 582); *Sloane v. Equifax Info. Servs.*, 510 F.3d 495, 506 (4th Cir. 2007)(FCRA violations, "while unquestionably harmful, are difficult to

20 - OPINION AND ORDER

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

translate into monetary terms.").

Miller also contends the Court should take into account the potential harm that Miller would have faced if she had not been able to find an attorney to represent her and had not filed this lawsuit after two years of attempting to have Equifax correct the errors in her credit file. Because this point raises speculative issues, however, the Court does not find it helpful.

Finally, for purposes of the ratio analysis of her "actual damages," Miller asks the Court to include the attorneys' fees and litigation costs she incurred, which total approximately $250,000, but the Court notes there is not any clear authority on this point. *Compare Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224, 237 (3d Cir. 2005)("an award of attorney fees and costs . . . is an apt term in the *Gore/Campbell* ratio analysis") *with Sun Pacific Farming Co-op., Inc. v. Sun World Intern., Inc.*, No. 1:01-cv-61022009, 2009 WL 900751, at *7 (E.D. Cal. 2009)("No consideration may be given to the amount of costs recovered, attorneys fees, which were not recovered, or any sum other than the compensatory damages actually awarded to calculate the *State Farm* ratio."). Here the Court concludes the appropriate denominator on which to determine a constitutionally-permissible punitive-damages ratio is the amount of actual damages the jury awarded Miller to compensate her for the harm she suffered. Accordingly, the Court declines to include the

21 - OPINION AND ORDER

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

attorneys' fees and costs incurred by Miller in the ratio analysis.

In any event, there is not any question that the 102:1 ratio of punitive damages to compensatory damages awarded by the jury in this case is constitutionally excessive and inconsistent with due process.  Accordingly, the Court must reduce the award of punitive damages to bring it within constitutional limits.

### III. Third *Gore* Guidepost:  Penalties that Could Be Imposed

In a FCRA case the third *Gore* guidepost is not particularly helpful to the due-process analysis of a punitive-damages award. "The maximum civil penalty the FTC can pursue for knowing violations of the FCRA is $2,500 per violation.  15 U.S.C. § 1681s(a)(2)(A).  However, because this limit does not apply to actions brought by private citizens, the third guidepost is not particularly helpful in assessing the constitutionality of punitive damages awards under the FCRA." *Dixon-Rollins*, 753 F. Supp. 2d at 466 (citing *Cortez*, 617 F.3d at 724).  *See also Bach I*, 149 F. App'x at 367.

Accordingly, the Court concludes this guidepost does not provide any assistance in the Court's analysis of the constitutionality of the punitive-damages award in this case.

### IV.  Deterrence

When determining the appropriateness of a punitive-damages award in a FCRA case, the Court must consider not only the three

22 – OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

*Gore* guideposts, but also the effect the punitive-damages award will have on deterring future misconduct.

### A.    Considerations

"The threat of punitive damages under § 1681n of the FCRA is the primary factor deterring erroneous reporting by the credit reporting industry." *Brim v. Midland Cred. Mgmt.*, 795 F. Supp. 2d 1255, 1265 (N.D. Ala. 2011)(citing *Yohay v. City of Alexandria Employees Cred. Union*, 827 F.2d 967, 972 (4th Cir. 1987)).    In *Brim* the court upheld a punitive-damages award of $623,180.00 even though the plaintiff had been awarded only $100,000 in compensatory damages.    The *Brim* court reasoned:    "Any reduction . . . of an award that was decided by a jury who were fully instructed regarding all relevant aspects and the economic ability (substantial net worth) of the offending defendant to withstand such an award while forcing it to acknowledge the award's legitimate punitive and deterrent purpose, would be purely arbitrary."    *Id.*

In *Bains LLC v. ARCO Products Company* the Ninth Circuit explained the extent to which a defendant's wealth can be considered when determining the amount of punitive damages that will deter future conduct:

> A punitive damages award is supposed to sting
> so as to deter a defendant's reprehensible
> conduct, and juries have traditionally been
> permitted to consider a defendant's assets in
> determining an award that will carry the
> right degree of sting.  But there are limits.

23 - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

> "The wealth of a defendant cannot justify an
> otherwise unconstitutional punitive damages
> award," and "cannot make up for the failure
> of other factors, such as 'reprehensibility,'
> to constrain significantly an award that
> purports to punish a defendant's conduct."

405 F.3d 764, 777 (9th Cir. 2005)(quoting *State Farm*, 538 U.S. at
427-28).

### B.    Analysis

Here Equifax's worth is substantial:  It has a net operating
revenue of close to one billion dollars.  A punitive-damages
award that is sufficient to "sting" economically would,
therefore, exceed constitutional limits in this FCRA case.
Nevertheless, the Court must determine a punitive-damages amount
that is high enough to serve as the deterrence intended in FCRA's
punitive-damages provision while, at the same time, ensuring the
award comports with due-process requirements, which, in essence,
means it must fall within a single-digit ratio.

As noted, the Court has concluded under the first *Gore*
guidepost that Equifax's conduct was sufficiently reprehensible
to justify a substantial award of punitive damages.  Certainly
the jury's 102:1 ratio, while constitutionally excessive,
nevertheless, conveys that message.  Moreover, although the Court
agrees with Equifax that the jury's $180,000 compensatory-damages
award is "substantial" in light of the fact that Miller did not
sustain any out-of-pocket losses or "physical injury," there is
not any reason to think that award is not supported by the

24 - OPINION AND ORDER

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

evidence or is inconsistent with the jury instruction to compensate Miller "reasonably" for the real, but noneconomic, harm she sustained as a result of Equifax's wrongful conduct.

The difficulty with Equifax's arguments in favor of a 1:1 ratio is that those arguments do not focus on Equifax's wrongful behavior or the need to deter Equifax from future misconduct. Instead, because the jury chose to award compensatory damages in a "substantial" sum (consistent with the evidence and the law), Equifax focuses on that amount and the fact this case arises in an "economic realm" to argue that a 1:1 ratio is enough.  The Court is not aware of any legal standard, however, that directs it to reduce the awarded punitive damages to the lowest possible amount that survives constitutional scrutiny.

On the other hand, the Court has not found any explicit authority for the proposition that the Court should reduce an excessive award to the highest amount within constitutional limits.  Nevertheless, the Court agrees with the trial judge in *Brim* that it would be arbitrary not to adopt a jury's punitive-damages award to the extent that it is constitutional.

For purposes of this constitutional analysis and based on the record as a whole, the Court concludes Equifax engaged in reprehensible conduct that caused real harm to Miller; Equifax should be punished financially for that wrongful conduct; and the amount of the punitive-damages award, although within

25 - OPINION AND ORDER

Appendix A

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

constitutional limits, nevertheless, should be enough to deter
Equifax and others similarly situated from repeating this type of
conduct in the future.

For all of these reasons, the Court concludes it should
reduce the jury's punitive-damages award to the highest single-
digit ratio ordinarily accepted as within constitutional limits;
that is, a 9:1 ratio of punitive damages to the compensatory
damages that the jury awarded in this case.

Accordingly, the Court reduces the jury's punitive-damages
award from $18,420,000 to $1,620,000 in order to reach a 9-to-1
ratio between the amount of punitive damages that the Court finds
constitutionally permissible on this record and the $180,000 of
compensatory damages the jury awarded.


## CONCLUSION

For these reasons, the Court **GRANTS** Equifax's Motion (#91)
for Reduction of Punitive Damages as specified herein, **DENIES**
Miller's Motion (#104) to Strike, and **REDUCES** the jury's
punitive-damages award from $18,420,000 to **$1,620,000,** which
reflects a 9-to-1 ratio between the amount of punitive damages
the Court finds constitutionally permissible on this record and
the $180,000 of compensatory damages the jury awarded.

The Court directs counsel to confer on an appropriate form
of Judgment and to submit **no later than February 7, 2014,** a

26 - OPINION AND ORDER

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

stipulated form of Judgment for the Court's consideration.

If the parties are unable to agree on the form of Judgment, each party shall separately submit by the same deadline a proposed form of Judgment together with a concise explanation supporting that proposal.

IT IS SO ORDERED.

DATED this __29th__ day of January, 2014.

ANNA J. BROWN
United States District Judge

27 - OPINION AND ORDER

Appendix A
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ERIC R. DREW,

          Plaintiff,

  v.

EQUIFAX INFORMATION SERVICES, LLC

          Defendant.

_____/

No. C 07-00726 SI

**ORDER DENYING DEFENDANT'S
RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW AND
ALTERNATIVE MOTION FOR A NEW
TRIAL**

On November 12, 2010, the Court heard argument on defendant Equifax Information Services LLC's renewed motion for judgment as a matter of law or, in the alternative, motion for new trial. Having considered the arguments of counsel and the papers submitted, the Court hereby DENIES defendant's motion.

**BACKGROUND**

Plaintiff Eric Drew is a cancer survivor whose identity was stolen while he was undergoing treatment in Seattle in late 2003. The instant case arises from fraudulent credit accounts opened by the identity thief. In his initial complaint, plaintiff named as defendants three banks and three credit reporting agencies. The only defendant remaining in the case is Equifax Information Services, LLC ("Equifax"), one of the credit reporting agencies.

After going through eight months of intense cancer treatment at Stanford University, plaintiff was told that "that there wasn't anything else that they could do but refer [him] to hospice care." TR 168:6–24. Plaintiff found and enrolled in an experimental bone-marrow transplant program in Seattle in September 2003. TR 170:19–171:12. In "late October, early November" plaintiff "started receiving

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

letters from financial institutions thanking [him] for credit applications that [he] had submitted." TR 176:1–176:3. He had not submitted any. TR 176:3–176:4.

In December, before going through the bone-marrow transplant, plaintiff called the police department in his hometown, Los Gatos, California, to file a report. TR 182:20–182:23. In early January, after completing treatment, plaintiff asked a friend to order a credit report for him. TR 185:6–185:22. Plaintiff discovered that multiple fraudulent accounts had been opened in his name, with thousands of dollars of balances, at an address in Seattle that was not his. TR 186:6–186:10. (The parties agree that three banks issued fraudulent credit cards to the identity thief in plaintiff's name. Citibank issued a Citibank card. Chase issued a Chase card and a Bank One/First USA card. And FIA issued a Fleet/Bank of America card. *See* Doc. 327 at 1–2.)

Plaintiff was convinced that a hospital employee had stolen his identity, and he feared for his life. TR 188:4–188:7; TR 196:20–196:21. He called news agencies, newspapers, the FBI, police, and even the Mayor to ask for help. TR 195:19–195:25. Eventually a local television station picked up the story, and the publicity from the story helped plaintiff track down the identity thief, Richard Gibson, a phlebotomist at the Cancer Center treating plaintiff. TR 196:6–196:14, TR 201:6–203:5. At plaintiff's urging, Mr. Gibson was eventually charged with and convicted of criminal violation of the Health Insurance Portability and Accountability Act ("HIPAA"). TR 222:11–223:22; TR 223:11–223:14. It was the first HIPAA conviction in the country. TR 223:13–223:14.

Plaintiff's cancer treatment in Seattle was also unsuccessful, and he was told that he needed to go to hospice. Again, however, plaintiff found and enrolled in an experimental program, this time one in Minnesota that would save his life. TR 204:16–204:19; 214:21–217:2.

In addition to tracking down the identity thief and moving to a new hospital for a new treatment, plaintiff contacted the banks that had issued the credit cards in his name and the credit reporting agencies that reported the fraudulent accounts and incorrect address as belonging to plaintiff. The dispute in this case relates to plaintiff's contentions that for the next two years he was largely thwarted in his attempts to convince (1) the banks to stop reporting and making inquiries about the fraudulent accounts and (2) the credit reporting agencies to stop including the fraudulent accounts and incorrect address on plaintiff's credit reports. Plaintiff filed this action in San Francisco County Superior Court

2

**United States District Court**
For the Northern District of California

on December 18, 2006, alleging a number of state and federal claims against the banks and credit reporting agencies. The defendants removed to this Court on February 5, 2007.

By the time of trial, one defendant and one claim remained. Plaintiff alleged that defendant Equifax, one of the credit reporting agencies, willfully violated the Fair Credit Reporting Act ("FCRA"). Plaintiff argued that defendant failed properly to reinvestigate and thereafter accurately report the status of the disputed Bank of America card and disputed Seattle address in the manner required by FCRA, and failed to maintain reasonable procedures to do so.

At trial, Plaintiff testified about his attempts to contact defendant to report the identity theft and request a reinvestigation in 2004 and 2005, and the results of his requests. He called as supporting witnesses his mother Cynthia Kay Drew, his former wife Nicole Floor Drew, and his friend and former colleague Fred Kotrozo. Plaintiff's expert witness, Evan Hendricks, testified not only as to the unreasonableness of defendant's reinvestigation procedures, but also as to the foreseeability of the problems that arose in this case. As part of his testimony, and over defendant's objection, Mr. Hendricks discussed a 1995 consent order between defendant and the Federal Trade Commission and a 1992 "Agreement of Assurances" between defendant and a number of states. Plaintiff also testified about significant psychological stress that he suffered due in part to defendant's FCRA violation, and he called two of his treating doctors, Drs. Spiegel and Gore-Felton, to testify as well. Plaintiff requested economic damages for money he spent on therapy and money he spent hiring an outside firm to pursue his reinvestigation requests with defendant. He also requested damages for emotional distress and punitive damages.

During the course of the trial it became clear that plaintiff was arguing that defendant had violated not only a number of FCRA requirements contained in subsections of 15 U.S.C. § 1681i, but also one contained in a subsection of 15 U.S.C. § 1681c-2. Although Section 1681c-2 was not specifically listed in the complaint, the Court determined in a written order that the operative facts in the complaint encompassed a claim under Section 1681c-2. The Court therefore permitted plaintiff to pursue its FCRA claim based on both sections of the statute. *See* Doc. 436.

Throughout the trial, the Court permitted plaintiff to present evidence that he suffered economic losses as a result of defendant's actions in relation to two investment properties in Chico that plaintiff

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court
For the Northern District of California

1    had considered buying.  Ultimately, the Court determined that defendant had presented insufficient

2    evidence of economic loss related to the Chico properties and instructed the jury that it could not award

3    economic damages in connection with them.  TR 1283:19–1283:21.

4         After a nine day trial, the jury returned a verdict finding defendant liable for willfully violating

5    FCRA.  Doc. 446 at 1.  The jury awarded plaintiff $6,326.69 in economic damages, $315,000 in non-

6    economic compensatory damages, and $700,000 in punitive damages.

7         Currently before the Court is defendant's renewed motion for judgment as a matter of law

8    ("JMOL") or, in the alternative, motion for new trial.

9

10                                        **LEGAL STANDARD**

11   **I.    Renewed Motion for Judgment as a Matter of Law**

12        Federal Rule of Civil Procedure 50(b) provides:

13        If the court does not grant a motion for judgment as a matter of law made under Rule
          50(a), the court is considered to have submitted the action to the jury subject to the
14        court's later deciding the legal questions raised by the motion. No later than 10 days
          after the entry of judgment . . . the movant may file a renewed motion for judgment as
15        a matter of law and may include an alternative or joint request for a new trial under Rule
          59. In ruling on the renewed motion, the court may: (1) allow judgment on the verdict,
16        if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment
          as a matter of law.
17
     Fed. R. Civ. Pro. 50(b).  The party moving for judgment as a matter of law bears a heavy burden.
18
     Granting a renewed motion for judgment as a matter of law is proper when the evidence construed in
19
     the light most favorable to the non-moving party permits only one reasonable conclusion as to the
20
     verdict and that conclusion is contrary to the jury's verdict.  *Air-Sea Forwarders, Inc. v. Air Asia Co.*,
21
     880 F.2d 176, 181 (9th Cir. 1989).
22
          The question in a motion for judgment as a matter of law is whether there is substantial evidence
23
     to support the jury finding for the non-moving party.  *See Johnson v. Paradise Valley Unified School*
24
     *Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901,
25
     909 (9th Cir. 1978).  In ruling on such a motion, the trial court may not weigh the evidence or assess
26
     the credibility of witnesses in determining whether substantial evidence exists to support the verdict.
27
     *See Mosesian v. Peat, Marwick, Mitchell*, 727 F.2d 873, 877 (9th Cir. 1984).  Substantial evidence is
28

                                                    4

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court

For the Northern District of California

more than a "mere scintilla." *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Chisholm Bris. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974). Rather, it is defined as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

## II.    Remittance

The Ninth Circuit has held that a jury's finding on the amount of damages should be reversed only if the amount is "grossly excessive or monstrous," *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003), or if the amount is "clearly unsupported by the evidence" or "shocking to the conscience," *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988). In making this determination, the Court must focus on evidence of the qualitative harm suffered by plaintiff. The same consideration applies to emotional distress damages. "The severity or pervasiveness of the conduct is relevant insofar as it provides probative evidence from which a jury may infer the nature and degree of emotional injury suffered, but direct evidence of the injury is still the primary proof." *Velez v. Roche*, 335 F. Supp. 2d 1022, 1038 (N.D. Cal. 2004); *see also Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513-14 (9th Cir. 2000) (focusing on evidence of harm suffered by the plaintiff, such as anxiety and rashes).

## III.    Motion for a New Trial

Federal Rule of Civil Procedure 59(a) states, "A new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a)(1). As the Ninth Circuit has noted, "Rule 59 does not specify the grounds on which a motion for a new trial may be granted." *Zhang*, 339 F.3d at 1035. Instead, the court is "bound by those grounds that have been historically recognized." *Id.* "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 728 (9th

Cir. 2007) (*quoting Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino*, 212 F.3d at 510 n. 15.

# DISCUSSION

## I. JMOL regarding liability

Defendant argues that JMOL should be entered in its favor with respect to three different aspects of plaintiff's claim. First, it argues that JMOL should be entered regarding three of the four fraudulently issued credit cards: the First USA/Bank One card; the Chase card; and the Citibank card. Second, it argues that JMOL should be entered on plaintiff's FCRA claims made under three subsections of FCRA: 1681i(a)(5)(B), 1681i(a)(5)(c), and 1681(a)(6). Third, it argues that JMOL should be entered on the wilfulness question, which would mean that plaintiff would not be entitled to punitive damages. *See* 15 U.S.C. § 1681n(a)(1)(2).

### A. The three cards and the three claims

Plaintiff argues, correctly, that JMOL is inappropriate where any bases for liability remain. This case proceeded to trial on a single FCRA claim. Although the Court instructed the jury regarding a variety of FCRA provisions that could give rise to liability, plaintiff made a single FCRA claim and the verdict form asked for a single finding as to whether defendant violated FCRA willfully, negligently, or not at all. *See* Doc. 446. Defendant concedes that plaintiffs presented sufficient evidence at trial to support the jury's verdict, at least with regard to negligent violation of FCRA. Therefore, defendant is not entitled to the entry of a verdict in its favor.[1]

---

[1] To the extent that defendant believes that it is entitled to a new trial, the three cards and three claims are discussed in more detail below.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

**B.     Willful violation of FCRA and punitive damages**

Defendant argues more narrowly that it is entitled to JMOL on the question of willfulness and, therefore, punitive damages.

"Any person who willfully fails to comply with any requirement imposed [by FCRA] with respect to any consumer is liable to that consumer [for] . . . punitive damages." 15 U.S.C. § 1681n(a)(1)(2). "[R]eckless disregard of a requirement of FCRA would qualify as a willful violation within the meaning of § 1681n(a)." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 71 (2007).

Defendant argues that it did not act recklessly. Defendant acknowledges, for example, that its response to plaintiff's April 2005 dispute of the Bank of America card was erroneously to show that the account had been closed with zero balance. But it argues that this error posed little risk of damage to plaintiff or his credit rating, and in fact did not result in any denial of credit. Defendant argues that the risk of harm was decreased further when it removed the card entirely from the report two months after receiving a police report from plaintiff.

Defendant's position seems to arise out of the *Safeco* Court's discussion of recklessness. The *Safeco* Court explained that recklessness generally is an "action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 68 (internal quotation marks omitted). Defendant reads this to require that a plaintiff consumer show that a credit reporting agency risked harming the plaintiff consumer economically before being entitled to punitive damages. As the rest of *Safeco* makes clear, however, FCRA is concerned with whether the defendant ran an unjustifiably high risk of *violating the law*. *See id.* at 69 ("Thus, a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.").

Plaintiff presented sufficient evidence for a reasonable jury to find that defendant ran an unjustifiably high risk of violating FCRA. Plaintiff's expert, Evan Hendricks, testified regarding the reasonableness of defendant's reinvestigation procedures. He testified that defendant's violation of FCRA was foreseeable. *See* TR 620:18–624:20. In particular, he testified that defendant had long had a policy of deferring to the reporting bank rather than performing independent investigations of

7

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

consumer disputes.  TR 593:11–593:22.[2]  He testified that defendant was on notice regarding the possible problems with this method of reinvestigation, particularly where the consumer dispute stems from confusion over the identity of the person utilizing credit rather than confusion over the fact of or timing of payments.  TR 621:5–621:15 (discussing defendant's earlier problems preventing mixed files—"when information on Consumer B was mixed into the file of Consumer A"—and problems reaching "timely resolution" through the "reinvestigation process").

Moreover, Mr. Hendricks testified that defendant long ago acknowledged these problems when it entered into agreements with the FTC and several states about reinvestigation of mixed files.  TR 620:20–621:4, 621:16–621:24.  And while Mr. Hendricks agreed that identity theft was not a problem at the time of the FTC order and the Agreement of Assurances, he also testified that defendant faces the same general problems with reinvestigating mixed files and identity theft because in both instances the reporting banks are confused about identity.  Mr. Hendricks concluded his direct examination by saying the following:

> Everything in my experience, including other cases I've worked and the history I've talked about and what we see here, leads me to the inescapable opinion that Equifax is very satisfied with the way its system works. It's made a calculation that it's the right thing for it to do. And it has no intention of making the changes that I think are necessary to avoid the kind of problems that happened to Mr. Drew.

TR 624:14–624:20.

Defendant objects to the admissibility of the FTC and state Agreement of Assurances documents, and to Mr. Hendricks's testimony regarding them.  Defendant argues that the documents are irrelevant, since they relate to mixed files and not identify theft, and because they predate any serious problems with identity theft.  As discussed above, however, Mr. Hendricks's testimony explained why mixed files and identity theft present problems that are similarly difficult to resolve for a credit reporting agency.  *See* TR 621:5–621:15.  This shows that the documents are, in fact, relevant to the question of foreseeability and

---

[2]  Defendant argues in its reply that it presented evidence demonstrating that its investigative procedures go beyond the mere "parroting" described by Mr. Hendricks.  Defendant's evidence regarding what other procedures it may utilize to combat identity theft does not compel the Court to conclude that the jury's verdict is wrong.

8

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

1   thus the question of willfulness.[3]

2       Even if the agreements themselves (and Mr. Hendricks's testimony regarding them) were not

3   admissible, the logic of Mr. Hendricks's conclusion would be supported by his expertise and the record.

4   A reasonable jury could determine that a credit reporting agency runs an unjustifiable risk of violating

5   FCRA's reinvestigation requirement when it asks a bank to reconfirm the existence of a challenged

6   account simply by asking the bank to reconfirm the account, without even indicating that the consumer

7   has reported that his identity was stolen. Such a conclusion would be particularly reasonable in this

8   case, where fraud alerts were placed on the account and other credit cards had been deleted.[4]

9       Defendant is not entitled to JMOL on the question of willfulness.

10

11  **II.    Challenges to damages**

12      **A.     Due process and punitive damages amount**

13      Defendant argues that even if it is not entitled to JMOL on the questions of liability or

14  willfulness, the actual amount of punitive damages in this case is so excessive as to violate defendant's

15  right to due process.

16      "The Constitution imposes certain limits, in respect both to procedures for awarding punitive

17  damages and to amounts forbidden as 'grossly excessive.'" *Philip Morris USA v. Williams*, 549 U.S.

18  346, 353 (2007). No "simple mathematical formula" exists in this area. *BMW of N. Am., Inc. v. Gore*,

19  517 U.S. 559, 582 (1996). Nevertheless, the Supreme Court has pointed to three guideposts: "(1) the

20  degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or

21

22      [3]     In its reply brief, defendant argues that the documents are inadmissible under Federal
    Rule of Evidence 408. Defendant did not raise this objection in its motion in limine, in its oral objection
23  at trial, or in its opening brief, and the Court considers it waived. *See* Doc. 395 at 12–13; TR
    618:1–620:5.
24

25      [4]     Defendant also argues that evidence regarding its handling of the other three cards should
    not have been admitted, and had it not been admitted, no reasonable jury would have found its handling
26  of the Bank of America card to be a willful FCRA violation. The Court disagrees. Assuming that
    defendant objected to the mention of the three cards at trial, and assuming that the any discussion of the
27  cards was improper, defendant still was not prejudiced. Defendant relied on its arguably proper
    handling problems with the three cards as evidence that its complaint system and reinvestigation process
28  are reasonable and effective. *E.g.* TR 1334:21–1335:2 ("It worked exactly the way it's supposed to
    work.").

9

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court
For the Northern District of California

potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). "In considering them," the Ninth Circuit has explained, a court's "goal is to determine whether the punitive damages achieved their ultimate objectives of deterrence and punishment, without being unreasonable or disproportionate." *Southern Union Co. v. Irvin*, 563 F.3d 788, 791 (9th Cir. 2009).

Defendant argues that its conduct was not reprehensible, because it did not threaten or cause physical harm to plaintiff or others, or otherwise act with intentional malice, trickery, or deceit. It argues that the punitive damages are excessive in light of the compensatory damages, because the compensatory damages provided plaintiff with complete compensation, especially considering the brief period of time of any FCRA violation. Finally, it argues that the award far exceeds civil penalties that would be available if the Federal Trade Commissioner brought suit against defendant for engaging in unfair or deceptive practices under the Federal Trade Commission Act.

### 1.      Reprehensibility

Courts are "to determine the reprehensibility of a defendant by considering whether:

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell,* 538 U.S. at 419. "[R]epeated misconduct is more reprehensible than an individual instance of malfeasance." *Gore*, 517 U.S. at 577.

Mr. Hendricks testified that defendant's violation of FCRA was the result of a policy chosen after a careful cost benefit analysis, with full knowledge of the risks to those seeking credit. TR 624:14–624:20.[5] Plaintiff and Drs. Spiegel and Gore-Felton all testified that plaintiff suffered serious

---

[5]       Defendant argues that it is being punished for earlier, dissimilar acts that were the subject of the FTC order and the Agreement of Assurances about which Mr. Hendricks testified. Any danger that defendant was punished for the actions that were subject to the FTC order and the Agreement of Assurances is outweighed by the relevance of the documents and Mr. Hendricks's testimony to the question of foreseeability and thus willfulness, which are properly considered by a jury when calculating

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

psychological harm from the credit reporting issues. TR 375:22–377:17; TR 392:22; TR 427:17–427:25; TR 454:8–454:12; TR 233:18–235:10. Although "targeted" might be too strong a word to use, plaintiff does fall squarely within the class of individual consumers that defendant knowingly puts at risk with its reinvestigation policies.

The evidence strongly supports a finding that the harm plaintiff suffered was not the result of mere accident. Plaintiff testified that, while he was away from home being treated for near fatal cancer, he singlehandedly caught the individual who had stolen his identity even though the police and hospital personnel had not believed him or wanted to help him. TR 180:7–180:10; 182:14–193:1; 195:19–197:8; 201:15–202:8; 203:16–203:22; 917:19–919:5. When he was told to go to hospice for the second time, he instead found a hospital to provide him with an experimental treatment that saved his life. TR 204:16–204:19; 214:21–217:2. When he finally recovered from his cancer and discovered that the state prosecution of the identity thief had not proceeded, he convinced the federal authorities to commence an unprecedented criminal HIPAA prosecution. TR 222:6–223:14. But he couldn't navigate the system that defendant had set up to correct his credit report.[6]

## 2. Actual or potential harm suffered versus punitive damages

The second guidepost as to whether a punitive damages award violates a defendant's due process rights is whether the award is disproportionate to the actual or potential harm suffered by the plaintiff. One way that courts address this question is by comparing punitive and compensatory damage awards. Although the Supreme Court has hesitated to lay down any bright line rules, it has hinted that a single-digit ratio between punitive and compensatory damages is most likely to satisfy due process. *See Campbell*, 538 U.S. at 424–25.

---

punitive damages.

[6] Additionally, as the Third Circuit has explained, there is "nothing wrong with a jury focusing on a defendant's seeming insensitivity in deciding how much to award as punitive damages." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 718 n. 37 (3d Cir. 2010) (internal quotation marks omitted). Defendant argued to the jury that its system generally "worked perfectly." TR 1335:8–1335:9. It blamed Bank of America for providing them with incorrect information. *E.g.* TR 1341:24–1342:3. It also blamed plaintiff for failing to communicate the exact details of the problems. *E.g.* TR 1338:8–1338:17. This last defense was perhaps the most difficult for a jury to accept.

Appendix B

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Defendant argues that the compensatory damages compensated plaintiff completely, and therefore that the punitive damages award should have been at or near the amount of compensatory damages, rather slightly more than double the amount.  Defendant's argument takes a quote from *Campbell* out of context.  After considering *all* of the guideposts, not merely this second guidepost, the *Campbell* Court concluded that the facts of the case "likely would justify a punitive damages award at or near the amount of compensatory damages."  *Id.* at 429.  Moreover, the phrase "at or near" was intended to contrast with the overturned punitive damages award, which was 145 times higher than the compensatory damages award.  *See id.* at 426.  In this case, the ratio of punitive damages to compensatory damages is close to 2:1, which falls well within the case's single-digit rule of thumb.  Although the *Campbell* Court noted that the compensatory damages in that case had compensated plaintiff in full, there is no reason to think that *Campbell* stands for the proposition that anytime a compensatory damages award fully compensates a plaintiff then the punitive damages cannot exceed the compensatory damages.

### 3.     Difference between punitive damages and available civil remedies

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness."  *Gore*, 517 U.S. at 583.  Defendant argues that the Federal Trade Commissioner can obtain $10,000 per FCRA violation by suing under the Federal Trade Commission Act, and that the punitive damages award in this case is clearly excessive in light of that small number.

Plaintiff points to Third, Fourth, and Sixth Circuit opinions that have all held that this factor is not particularly useful to the due process analysis in a FCRA case.  *See Cortez*, 617 F.3d at 724 (explaining that "there is no 'truly comparable' civil penalty to a FCRA punitive damages award"); *Saunders v. Branch Banking & Tr. Co. of VA*, 526 F.3d 142, 152 (4th Cir. 2008) (concluding that Congress specifically chose not to limit punitive damages); *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 154 n.1 (6th Cir. 2007) (noting that FCRA does not limit compensatory damage awards in suits brought by private citizens).  The Ninth Circuit has not considered the question.

The Court agrees with plaintiff and the appellate courts.  As the Fourth Circuit explained,

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court
For the Northern District of California

1  "Although FCRA does place limits on civil penalties when suit is brought by the government, Congress

2  specifically chose not to limit punitive damages in suits brought by private parties. *Saunders*, 526 F.3d

3  at 152 (internal citations omitted).

4    The $700,000 punitive damages award in this case does not violate defendant's due process

5  rights.

6

7    **B.**   **Remittance of damages awards**

8    Defendant also argues that the compensatory and punitive damages awards are excessive and

9  should be remitted to $200,000 and $50,000 respectively.[7]

10

11     **1.**   **Remittance of compensatory damages**

12     **a.**   **Non-economic damages**

13    Defendant argues that the weight of the evidence does not support a large award of emotional

14  distress damages because defendant's role in any of plaintiff's suffering was minimal and there was only

15  a short amount of time during which defendant could be found to have been neglectful. In support of

16  its argument, defendant cites *Sloane v. Equifax Info. Servs. LLC*, 510 F.3d 495 (4th Cir. 2007).

17    The defendant in *Sloane*, who is notably the defendant in this case as well, was chastised for

18  taking a remittitur number "out of the air." *Id.* at 503. The *Sloane* court explained that "Not only is

19  such an unprincipled approach intrinsically unsound, but it also directly contravenes the Seventh

20  Amendment, which precludes an appellate court from replacing an award of compensatory damages

21  with one of the court's own choosing." *Id.* Ultimately, in reliance on Fourth Circuit precedent that does

22  not appear to have a corollary line of cases in the Ninth Circuit, the court remitted the emotional distress

23  award slightly. *Id.* 506–07; *see also id.* (explaining that the Fourth Circuit reviews emotional distress

24  awards by looking at a variety of very specific factors).

25  _____

26     [7]  In the heading of its argument regarding compensatory damages, defendant states that
   a new trial should be granted. Defendant states that a new punitive damages trial should be granted as

27  well. But the defendant's substantive arguments all focus on remittitur. To the extent that defendant
   does, in fact, seek a new trial on damages and not merely a new trial nisi remittitur, the Court denies

28  defendant's request for the same reasons that it denies remittitur.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court
For the Northern District of California

1    Here, defendant leaves the Court to speculate where its $200,000 figure comes from. It does not

2    explain why $315,000 is shocking to the conscience or unsupported by the evidence while $200,000 is

3    a proper number.

4    More importantly, plaintiff has presented significant evidence of emotional distress that he

5    suffered as the result of his unique circumstances. Plaintiff testified regarding his own anxiety, fear,

6    sleeplessness, nightmares, and depression. TR 233:18–235:10. Dr. Spiegel, a specialist in

7    psychological treatment of cancer patients at Stanford, testified that plaintiff was diagnosed with an

8    adjustment disorder with anxious mood, and he confirmed a causal connection to defendant's FCRA

9    violation. TR 375:22–377:17; TR 392:22; TR 427:17–427:25. Dr. Gore-Felton also related the

10   psychological circumstances to the credit reporting problems. TR 454:8–454:12. Of particular

11   relevance to the questions of causation and of the severity of the emotional distress damages is the

12   following testimony from Dr. Spiegel:

> Well, what happened in his case, and happens in many cases, is that if a . . . problem you think was resolved is not, and it comes up again, or you face another threat, it does a couple of things. It triggers all of your network of memories and associations, as it did with Eric, to what happened the first time.
>
> So it's like . . . somebody who comes back from combat and has post-traumatic stress disorder, and then gets in a minor car accident, just a little fender-bender, and all the memories and feelings of the combat trauma start to come back.
>
> So in his case, the second frustration started to trigger his memories of what happened when his identity was fi[r]st stolen and what he had to do about it.
>
> Secondly, the essence of stress like this is helplessness, that you don't feel you can do anything about it. Something is happening to your identity or your credit or something else, and there's nothing you can do about it. Things aren't going the way you want them to.
>
> So he then did something rather out of the ordinary to do something about it. And that, I think, for a while made him feel more in control of his life and his future. And then you find out that it didn't work, that there's more trouble, you hadn't resolved it. So it tends to make you feel helpless. And that's when Eric thought he got it figured out, he did something unusual, and then he finds out that it didn't work.
>
> So it adds to the sense of helplessness, which makes you anxious, instead of feeling that you have mastered the stressor. And that's what happened to him.

TR 386:3–387:6.

The non-economic portion of the compensatory damages award is supported by the evidence and

is not grossly excessive, monstrous, or shocking to the conscience.

14

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

**b.      Economic damages**

Defendant also argues that the economic damages award is unsupported because of a problem with plaintiff's evidence.  Defendant argues that plaintiff should not have been permitted to introduce medical bills and expenses from Dr. Saito-Perry, since Dr. Saito-Perry did not testify at trial and evidence of his treatment was hearsay.  Without this evidence, defendant argues, plaintiff could not have proven that he was entitled to nearly $6,000 in economic damages.

Defendant states that the bills themselves were admitted into evidence and should not have been. Plaintiff states that they were stipulated to, and that in any event plaintiff authenticated the bills and testified as to the relationship between the bills and the FCRA violations.[8]  On this record, the Court does not find that the economic damages award were "clearly unsupported by the evidence."  *Brady*, 859 F.2d at 1557.

**2.      Remittance of punitive damages**

Defendant argues that the punitive damages award should be reduced to $50,000.  As with defendant's JMOL and due process arguments regarding the punitive damages award, defendant's remittance argument is based on the premise that the evidence, at most, shows a careless oversight for a single account during a short time period.  For the reasons explained above, the Court disagrees with defendant's characterization of the evidence and finds that the punitive damages award is supported by the evidence and is not grossly excessive, monstrous, or shocking to the conscience.

Defendant is not entitled to remittance of any of the damages awards.

**III.      Motion for a new trial**

Defendant argues in the alternative that it is entitled to a new trial because the first trial was manifestly unfair for several reasons.  The Court addresses each contention in turn.

---

[8]      With respect to this claim, neither side cites to the record to demonstrate what evidence was admitted, where, how, over whose objection, and why.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

**A.     Unsupported claims**

Defendant argues that it was prejudiced by the Court's failure to grant JMOL with respect to claims related to the First USA, Chase, and Citibank cards, and claims made under subsections 1681i(a)(5)(B), 1681i(a)(5)(c), and 1681i(a)(6) of FCRA.

**1.     The three cards**

Defendant has pointed to no place where plaintiff argued to the jury that liability should be premised on actions relating to the First USA, Chase, and Citibank cards.  In fact, plaintiff made clear in his opening statement that his claims related to the Bank of America card, *e.g.* TR 123:8–123:21, and plaintiff's case focused on his attempts to get defendant to reinvestigate the Bank of America report. To the extent that the other cards were mentioned during the course of the case, defendant clarified in its closing statement that they did not form the basis of plaintiff's liability argument.  *See, e.g,* TR 1331:23–1331:24 (Bank One); TR 1335:5–1335:8 (Citibank); TR 1339:6 (Chase).  Defendant was not prejudiced by the alleged presence of these claims in this case after defendant's JMOL motion was filed.

**2.     The three subsections**

Subsection 1681i(a)(5)(B) states a variety of requirements relating to the reinsertion of previously deleted material.  Subsection 1681i(a)(5)(c) requires a credit reporting agency to maintain reasonable procedures designed to prevent the reappearance of deleted information in a consumer's file. Subsection 1681i(a)(6) requires a credit reporting agency to provide notice of the results of its reinvestigation, and includes content and timing requirements.

Defendant argues that plaintiff presented no evidence that defendant violated any of these subsections, and that it was prejudiced because the jury was permitted to consider them even after defendant filed a JMOL motion.  Plaintiff argues that defendant reinserted a previously deleted address without proper certification and then failed to notify plaintiff within five business days, as required by 15 U.S.C. § 1681i(a)(5)(B)(ii).  Plaintiff argues that defendant's notice of the results of its reinvestigation contained false information, in violation of 15 U.S.C. § 1681i(a)(6).

Plaintiff cites to evidence that defendant deleted and then reinserted derogatory information

16

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

*United States District Court*
*For the Northern District of California*

regarding the Bank of America card and a notation that the Bank of America card was an open account, and that it deleted and reinserted the false Seattle address, without proper notice or certification. Defendant does not reply to plaintiff's argument to show how this is not sufficient evidence of a violation of 15 U.S.C. § 1681i(a)(5)(B)(ii) (and thus circumstantial evidence of a violation of subsection 1681i(a)(5)(C)'s requirement that defendant maintain reasonable procedures). Plaintiff cites to evidence that defendant misrepresented that it had deleted the fake address when in fact it had made the fake address into a former address, and that later it again misrepresented that it had deleted the fake address when it had not. Defendant does not reply to plaintiff's argument to show how this is not sufficient evidence of a violation of subsection 1681i(a)(6)'s notice requirement.

In any event, even if these theories of liability were not properly before the jury after defendant filed its JMOL motion, defendant was not prejudiced. Had the motion been granted, it would have been too late to impact the presentation of evidence in the case, and plaintiff did not focus on these subsections during closing argument. These were not independent, stand alone claims, but rather theories of liability. And the jury was instructed as to six other theories of liability, some of which were supported by fairly strong evidence of violation.

### B.    Chico properties

Defendant argues that the Court should have instructed the jury not to award any emotional distress damages in connections with plaintiff's attempt to buy investment properties in Chico.

At the close of evidence, the Court determined that plaintiff had not presented sufficient evidence that he suffered economic damages in relation to the Chico properties. Therefore, the Court instructed the jury that "Plaintiff is not making a claim for, and you should not award, monetary-loss damages related to the Chico real estate properties." TR 1283:19–1283:21. Defendant acknowledges that the Court instructed the jury not to award economic damages in relation to the Chico properties, but argues that the Court did not go far enough. Defendant argues that the Court should have instructed the

17

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court
For the Northern District of California

1   jury that it could not award non-economic damages either.[9]  Defendant believes that it cannot be liable

2   for emotional damages stemming from any denial of credit if it was not responsible for any denial of

3   credit.

4          Although economic damages can only be substantiated by evidence of actual economic harm,

5   such as a denial of credit, non-economic damages need only be substantiated by evidence of emotional

6   distress suffered because of a violation of FCRA.  No actual denial of credit is necessary.  In this case,

7   plaintiff testified about his anger and frustration at having to deal with continuing errors on his credit

8   report when attempting to invest in real estate in Chico, which plaintiff said impacted his relationship

9   with his then-fiancée, now former wife.  TR 254:21–259:23.  To the extent that any portion of the jury

10  award was based on non-economic damages related to the Chico properties, plaintiff's testimony that

11  he was angry and frustrated and that his romantic relationship was suffering because of his credit

12  problems is sufficient to support the award, even if he never applied for a loan.[10]

13

14  **C.      FTC Consent Decree and Agreement of Assurances**

15         Defendant again argues that Mr. Hendricks should not have been permitted to testify about the

16  FTC consent decree or the Agreement of Assurances, because they did not support plaintiff's claim in

17  any way.  Defendant argues that it was prejudiced even at the liability stage by the introduction of this

18  evidence and testimony.  The Court addressed this argument above in the context of defendant's

19  punitive damages argument, and it rejects defendant's liability argument for the same reasons.

20

21

22

_____

23       [9]      Defendant did make this argument at trial, TR 1049:1, though defendant did not object
      to the final instruction or ask that it be augmented, and in fact defendant highlighted it in its closing
24    argument.  TR 1345:7–1345:9 ("And as the Judge told you, and as Mr. Keating told you, Mr. Drew is
      not seeking any money related to those Chico properties or any aspect of those mortgages.").
25
         [10]     Defendant also argues that the only evidence that could possibly support an award are
26    tri-merge documents, which are hearsay and cannot be used to prove the contents of plaintiff's Equifax
      file.  But other evidence—such as plaintiff's testimony—shows that plaintiff's Equifax file contained
27    erroneous information both before and after plaintiff considered investing in the Chico properties.  The
      jury was free to deduce from that evidence and from plaintiff's testimony that his emotional distress
28    damages were caused by defendant's FCRA violation.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court

For the Northern District of California

**D.      Trans Union and Experian**

In the introduction to its request for a new trial, defendant argues that the Court admitted evidence relating to Trans Union and Experian in order to prove defendant's liability in this case, contrary to the Court's own ruling on defendant's motion in limine.  Defendant does not identify any such evidence.  In the body of the motion, defendant argues generally that plaintiff testified regarding the results of the reinvestigations undertaken by Trans Union and Experian, although it does not identify any specific testimony.  Defendant does not claim that it objected to the evidence or testimony; rather, it states simply that the jury should not have been allowed to use the results of Trans Union and Experian's reinvestigations as a yardstick for the reasonableness of defendant's reinvestigation.[11]

The Court notes that defendant tried to deflect responsibility for plaintiff's emotional distress onto the banks and other credit reporting agencies.  TR 428:25–429:9.  In any event, to the extent that plaintiff testified that the other credit reporting agencies had resolved his complaints properly and timely, plaintiff's testimony was relevant to the question of damages.

**E.      Doctor Christopher Saito-Perry**

Defendant argues that it was prejudiced by plaintiff's introduction of medical bills and expenses from Dr. Saito-Perry.  As explained above, the Court does not find that defendant was prejudiced by this evidence.

**F.      Section 1681c-2 claim**

Finally, defendant argues that the Court permitted plaintiff to amend his complaint mid-trial to state a claim under Section 1681c-2 of FCRA, and that this was improper.  Defendant argues that the sole claim remaining in the case at the beginning of the trial was brought under Section 1681i (which relates to reinvestigation generally), and that plaintiff should not have been permitted to make a claim under Section 1681c-2 (which relates to identity theft in particular).

Section 1681c-2(a) requires credit reporting agencies to "block the reporting of any information

---

[11]      As to this point, defendants provided no citations to the record.

19

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court
For the Northern District of California

in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of" certain documents from the consumer. By way of comparison, Section 1681i requires credit reporting agencies to take certain actions within 30 days of the receipt of a consumer dispute, and pertains to disputes that do not expressly arise from identity theft. Thus, a consumer dispute will trigger duties under either Section 1681c-2(a) or Section 1681i, depending on whether it includes notice of identity theft.

The Court has already issued a written order explaining that the operative version of the complaint *already* encompassed a claim under Section 1681c-2. Doc. 436. Plaintiff alleged in the complaint that he gave notice to defendant that certain information in his credit file was the result of identity theft and that defendant "failed to block" the fraudulent information. Am. Comp. ¶¶ 202-06. This is sufficient to state a claim under Section 1681c-2(a) even though plaintiff did not specifically name that section in the complaint. Thus, contrary to defendant's argument at this juncture, the Court did not permit plaintiff to amend his complaint midtrial.

Even if the Court technically did permit plaintiff to amend his complaint midtrial, such amendment was proper and non-prejudicial. Federal Rule of Civil Procedure 15(b)(1) provides that:

> [i]f, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

The Court has discovered practically no case law discussing Rule 15(b)(1) specifically.[12] In one case discussing Rule 15(a), which concerns amendments before trial, the Fourth Circuit explained that amendment shortly before trial would be improper if "[t]he proof required to defend against this new claim would be of an entirely different character than the proof which the defendant had been led to believe would be necessary" or if the "[b]elated claims . . . change the character of [the] litigation."

---

[12] Rule 15(b)(1) is the appropriate subsection to apply given the unique facts of this case. At trial on July 22, 2010, plaintiff attempted to introduce certain evidence in support of a claim under 15 U.S.C. § 1681c-2(a). Equifax objected on the ground that this trial solely concerns a claim under 15 U.S.C. § 1681i. Plaintiff then moved to amend his complaint to add a claim under § 1681c-2(a) in order to conform to the proof at trial, or alternatively to clarify that his existing complaint already includes a claim under § 1681c-2(a).

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court

For the Northern District of California

1   *Deasy v. Hill*, 833 F.2d 38, 42 (4th Cir. 1987).  In an unpublished opinion, the Fourth Circuit applied

2   this reasoning to a 15(b)(1) ruling.  *See Dank v. Shinseki*, 374 Fed.Appx. 396, * 4 (4th Cir. 2010).  The

3   Ninth Circuit held, in a slightly different context, that even a post-trial amendment is non-prejudicial

4   where the objecting party "clearly understood that the issue . . . was before the court."  *Galindo v.*

5   *Stoody Co.*, 793 F.2d 1502, 1513 (9th Cir. 1986).  And, in another slightly different context, the Ninth

6   Circuit explained that granting a request for a continuance has the potential to cure any prejudice from

7   what it called a "surprise pleading amendment."  *See Consolidated Data Terminals v. Applied Digital*

8   *Data Systems, Inc.,* 708 F.2d 385, 396 (9th Cir. 1983).  Similarly, the Second Circuit has explained,

9   while discussing Rule 15's provisions about post-trial amendment, that "[g]enerally, introducing new

10  claims for liability on the last day of trial will prejudice the defendant."  *Gussack Realty Co. v. Xerox*

11  *Corp.*, 224 F.3d 85, 94 (2d Cir. 2000).

12          Defendant argues generally that it was prejudiced because it was not on notice of this claim, did

13  not have the opportunity to conduct discovery on the claim, and did not have the opportunity to prepare

14  its witnesses to defend against the claim.  As the Court's previous order has explained, defendant was

15  long on notice of the factual basis of plaintiff's claims.  Defendant is familiar with the different

16  requirements of FCRA.  Moreover, the evidence developed and presented at trial with respect to the

17  Section 1681c-2 claim was largely the same as that presented for the Section 1681i claim.  Liability

18  under each statute arises from the same dispute, with the only factual question as to which statute is

19  triggered being whether the dispute resulted from an alleged identity theft.  The issue arose on the fourth

20  day of a nine day trial, and just before a three day break.  Defendant did not request a continuance or

21  ask for permission to call any new witnesses.  The Court finds that defendant was not prejudiced by any

22  midtrial amendment that may have occurred.

23          Defendant also argues that FCRA's two year statute of limitations prevented plaintiff from

24  asserting a Section 1681c-2 claim in 2010.  Defendant's argument rests of the assumption that plaintiff

25  was amending him complaint in 2010 rather than asserting the claim in his original complaint.  Even

26  if defendant's view of what happened is correct, the amendment does not violate the statute of

27  limitations.  The Section 1681c-2 claim undeniably arises from the same "conduct, transaction, or

28  occurrence set out . . . in the original pleading," and therefore any amendment adding a Section 1681c-2

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

United States District Court
For the Northern District of California

claim relates back to the date of the original pleading.  *See* Fed. R. Civ. P. 15(c)(1)(B).  Defendant

identifies the alleged violation as occurring in the fall of 2005.  This suit was filed in December 2006.

There is no statute of limitations problem.[13]

   Defendant is not entitled to a new trial.


# CONCLUSION

  For the foregoing reasons and for good cause shown, the Court hereby DENIES defendant's

renewed motion for JMOL and alternative motion for a new trial.  (Doc. 464.)


**IT IS SO ORDERED.**


Dated: December 3, 2010

                 SUSAN ILLSTON
                 United States District Judge

---

[13]  Defendant argues in the introduction to the section of its motion arguing for a new trial that it was prejudiced by the admission of certain other unspecified evidence over its objections.  The defendant does not develop or even mention this argument in the body of the motion, and the Court considers it waived.

22

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

ANGELA P. WILLIAMS,                    CASE NO.:   48-2003-CA-9035-0

  Plaintiff,

v.

EQUIFAX INFORMATION SERVICES, LLC,

  Defendant.

_____/

## JUDGMENT

**Pursuant to the jury verdict rendered in this action:**

It is hereby **ORDERED AND ADJUDGED** that:

Plaintiff, **ANGELA P. WILLIAMS**, 97055 Huntington Court, Yulee, Florida 32097, shall

recover from Defendant, **EQUIFAX INFORMATION SERVICES, LLC**, 1550 Peachtree Street

NW, Atlanta, GA 30309, the sum of Two Hundred Nineteen Thousand Dollars ($219,000.00) for

actual damages and Two Million Seven Hundred Thousand Dollars ($2,700,000.00) for punitive

damages, for a sum of Two Million Nine Hundred and Nineteen Thousand Dollars ($2,919,000.00),

together with interest thereon at the statutory rate of eleven percent (11%) per annum from the date

of this Judgment, for which sum let executions issue.

  Plaintiff is entitled to reasonable attorney's fees and costs pursuant to the Fair Credit

Reporting Act. 15 U.S.C. Section 1681n and 1681o. The Court reserves jurisdiction to determine

**Page 1 of 2**

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

the amount of attorney's fees and costs.

DONE AND ORDERED in Chambers, at Orlando, Orange County, Florida on this ___ day of December, 2007.

ORIGINAL SIGNED

JAN 08 2008

_____
George A. Sprinkel, IV
Circuit Court Judge

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Judgment has been delivered via U.S. mail to: Steven M. Fahlgren, Attorney for Angela P. Williams, 552382 U.S. Highway 1 North, Hilliard, Florida 32046; Robert Sola, Attorney for Angela P. Williams, 8835 SW Canyon Lane, Suite 130, Portland, OR 97225; Stewart Haskins, Lewis Perling and Ann Broussard, Attorneys for Equifax, at 1180 Peachtree St, NE, Atlanta, GA 30309-3521; Jona J. Miller, Attorney for Equifax, at 5156 Siesta Woods Dr., Sarasota, FL 34242; and Ernest H. Kohlmyer, III, Co-counsel for Equifax, at 2816 East Robinson St., Orlando, FL 32803, by U.S. Mail to this ___ day of December, 2007.

_____
Judicial Assistant/Attorney

M:\Williams v. Equifax\Pleading\Final Judgment.wpd SMF

**Page 2 of 2**

Appendix C

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NO.: 48-2003-CA-9035-0
DIVISION: 33

ANGELA WILLIAMS,

      Plaintiff,

v.

EQUIFAX INFORMATION SERVICES, INC.,
EXPERIAN INFORMATION SOLUTIONS, INC.,
and AMERICAN RECOVERY SYSTEMS, INC.

      Defendants.

_____/

## PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT AND CLAIM FOR PUNITIVE DAMAGES

COMES NOW the Plaintiff, **ANGELA WILLIAMS**, by and through her undersigned counsel, and hereby moves this Court for leave to amend her Complaint in order to include violations of the Fair Credit Reporting Act after her original Complaint was filed and to add a claim for punitive damages **Equifax Information Systems, LLC** (hereinafter "Equifax"), and as grounds therefore states as follows:

    1.    On or about October 4, 2003, Plaintiff filed a Complaint and Demand for Jury Trial against the defendant named herein as well as other defendants. Equifax is the only remaining defendant. The Complaint alleged claims against Equifax for compensatory and punitive damages under the federal Fair Credit Reporting Act. Since filing the Complaint, Plaintiff has learned of additional violations of the Fair Credit Reporting Act by Equifax and seeks to recover for those damages as well. In addition, Plaintiff seeks to address possible technical issues relating to her previous demand for punitive damages. Some, but not all, courts have ruled that a plaintiff may only plead a claim for punitive damages, even a claim under

1

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

federal law, after proffering evidence to support a punitive damages claim. Although plaintiff believes that the Fair Credit Reporting Act preempts Florida law as to the recoverability of punitive damages[1], and reserves the right to make that argument in the future, plaintiff also files this motion to neutralize any technical arguments that she has not complied with Florida law. By this Motion, Plaintiff seeks to withdraw her punitive damages claim momentarily for the purposes of obtaining permission under Section 768.72, Florida Statutes, although the law is unclear whether she has to do so based on the Fair Credit Reporting Act's likely preemption of Section 768.72.

2.    Pursuant to Florida Statutes §768.72, Plaintiff is entitled to assert a claim for punitive damages upon a showing of evidence in the court record or by proffer that a reasonable basis exists for recovery of such damages. The same Statute provides that the Florida Rules of Civil Procedure shall be liberally construed so as to allow Plaintiff to amend her Complaint by adding a punitive damages claim where discovery has indicated the existence of such evidence. Plaintiff has satisfied this threshold.

3.    Florida Rule of Civil Procedure 1.190 provides that leave to amend shall be freely given when justice so requires. It is the policy in this State to freely allow amendments to pleadings so that causes may be tried on their merits and justice may be achieved. *Enstrom v. Dixon*, 354 So.2d 1251 (Fla. 4th DCA 1978). As a general rule, refusal to allow amendments of a pleading constitutes an abuse of discretion unless allowing the amendment would be clearly prejudicial to the opposing party, the privilege to amend has been abused, or amendment would be futile. *Bill Williams Air-conditioning & Heating, Inc. v. Haymarket Cooperative Bank*, 592

---

[1] See, e.g., *Sanchez v. Jenne*, 733 So. 2d 1103 (Fla. 4th DCA 2003)(Section 1983 preempts Section 768.72).

Appendix D
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

So.2d 302 (Fla. 1st DCA 1991). All doubts should be resolved in favor of allowance unless the privilege has been abused. *David Miller Distributing v. Florida. National Bank,* 342 So.2d 856 (Fla. 1st DCA 1977).

      4.    None of the above factors weighing against allowing the amendment are present in the instant case. The proposed amendment simply requests punitive damages for a willful violation of the Fair Credit Reporting Act. Defendant has never contested plaintiff's entitlement to punitive damages if she shows that Equifax willfully violated the Fair Credit Reporting Act. There have been no prior amendments to the pleadings by the Plaintiff. The introduction of punitive liability issues cannot give rise to prejudice to the Defendant since the claim is based on the evidence as adduced through discovery and relies on the same allegations as set forth in Plaintiff's original Complaint.

      5.    An evidentiary hearing is not required by the statute before a trial court has the authority to permit an amendment. *Solis v. Calvo,* 689 So.2d 366 (Fla. 3rd DCA 1997) and *Strasser v. Yalamanchi,* 677 So.2d 22, 23 (Fla. 3rd DCA 1996). Under Fla. Stat. § 768.72, a mere proffer of evidence is sufficient to support a trial court's determination that a reasonable basis exists for the recovery of punitive damages. It is not the function of the court to weigh or prejudge the evidence before it, but merely to determine whether a factual predicate for punitive damages exists. See *Dolphin Cove Association v. Square Co.,* 616 So.2d 553 (Fla. 2d DCA 1993).

      6.    Under the FCRA, a jury can award punitive damages where the Defendant's actions show a conscious or reckless disregard of the consumers' rights. In the FCRA, Congress provided for punitive damages where a credit reporting agency "willfully fails to comply with any requirement" of the FCRA. *See,* 15 U.S.C. § 1681n(a)(2). To willfully violate the FCRA, the credit reporting agency must have knowingly and intentionally committed an action or

Appendix D
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

inaction in conscious or reckless disregard of consumers' rights.[2]  In *Reynolds v. Hartford Financial Services Group, Inc.*, 435 F.3d 1081 (9th Cir. 2005), *cert. granted, Geico Gen. Ins. Co. v. Edo*, 2006 U.S. LEXIS 5421 (U.S. 2006), the Ninth Circuit surveyed the federal circuits.  In an eminently well-reasoned opinion, it showed that the weight of circuit authority overwhelmingly holds[3]:

> as used in FCRA "willfully" entails a "conscious disregard" of the law, which means "either knowing that policy [or action] to be in contravention of the rights possessed by consumers pursuant to the FCRA or in reckless disregard of whether the policy [or action] contravened those rights.

*Id.* at 1098, *quoting, Cushman v. Trans Union Corporation*, 115 F.3d 200, 227 (3rd Cir. 1997). *See also, Phillips v. Grendahl*, 312 F.3d 357, 370 (8th Cir. 2002); *Dalton v. Capital Associated Industries*, 257 F.3d 409, 418 (4th Cir. 2001); *Cousin v. Trans Union Corporation*, 246 F.3d 359, 372 (5th Cir. 2001); *Duncan v. Handmaker*, 149 F.3d 424, 429 (6th Cir. 1998).

The *Reynolds* court equated "conscious disregard" with "reckless disregard."  In sum, if a company knowingly and intentionally performs an act that violates the FCRA, either knowing that the action violates the rights of consumers *or in reckless disregard of those rights*, the company will be liable under 15 U.S.C. § 1681n for willfully violating consumers' rights. *Reynolds* at 1038.  Furthermore proof of malice or evil motive is not required. *Reynolds*, 435 F.3d at 1098; *Dalton*, 257 F.3d at 418; *Cousin v. Trans Union Corporation*, 246 F.3d at 372; *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998); *Cushman v. Trans Union*

---

[2] In non-FCRA contexts, the Eleventh Circuit has long followed the definition of "willful" given by the United States Supreme in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 11, 128 (1985).  See *Day v. Liberty Nat'l Life Ins. Co.*, 122 F.3d 1012, 1016 (11th Cir. 1997)(applying willful in ADEA context).  The Ninth Circuit cited this standard in *Reynolds* as further support of its interpretation of "willful" under the FCRA.  426 F.3d at 103.  A violation is "willful" where the violation evinces reckless disregard for whether it is lawful. *Furr v. AT&T Technologies, Inc.*, 824 F.2d 1537, 1546 (10th Cir. 1985).  A "willful" standard is less than "a stricter standard that would require intent, in the sense of evil motive or bad purpose." *Id.*  "Willful" means "not accidental" or "on purpose, hence, knowingly, and carelessly done in violation of law, and in disregard of the safety of the public." *Dun & Bradstreet, Inc. v. Nicklaus*, 340 F.2d 882 (8th Cir. 1965), *cert. denied*, 382 U.S. 825 (1965).

[3] The Eleventh Circuit has not interpreted "willful" in the context of the FCRA.

4

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

*Corporation*, 115 F.3d 200, 226 (3rd Cir. 1997).   Proof of willfulness need not be in the form of a "smoking gun," rather "the trier of fact may deduce it from surrounding circumstances." *Mirocha v. TRW, Inc.*, 805 F.Supp. 663, 675 (S.D. Ind. 1992).

Florida courts interpreting the standard for punitive damages have determined them to be appropriate when a Defendant engages in conduct that is fraudulent, malicious, deliberately violent or oppressive, or committed with such gross negligence as to indicate a wanton disregard for the rights of others. *Owens-Corning Fiberglass Corp. v. Ballard*, 749 So.2d 483 (Fla. 1999); *First Bank of Immokalee v. Farm Worker's Check Cashing, Inc.*, 745 So.2d 994, 997 (Fla. 2d DCA 1999) (quoting *W.R. Grace & Co. v. Waters*, 638 So. 2d 502 (Fla. 1994)); *Key West Convalescent Ctr., Inc., v. Doherty*, 619 So. 2d 367 (Fla. 3d DCA 1993); *See also Wackenhut Corp. v. Canty*, 359 So.2d 430 (Fla. 1978). Furthermore, Florida courts have equated reckless conduct with willful or wanton conduct and, in the context of punitive damages, have used the terms interchangeably. *Williams v. City of Minneola*, 619 So.2d 983 (Fla. 5th DCA 1993).

7.      Of course, the standard of proof required merely to assert a Plaintiff's punitive damages claim must be lower than that needed to survive a summary adjudication on its merits. As Florida courts have noted, the standard that applies to determine whether a reasonable basis has been shown to plead a claim of punitive damages should be similar to the standard that is applied to determine whether a complaint states a cause of action. *Estate of Despain v. Avante Group, Inc.*, 900 So.2d 637 (Fla. 5th DCA 2005). Clearly, the Plaintiff can meet the minimum initial threshold required by section 768.72, and there is no question this proffer constitute a "reasonable showing" which would provide a "reasonable basis for recovery" of punitive damages as required by the statute.

8.      As indicated below, there is no question that the Plaintiff's proffer in this case clearly exceeds the liberal threshold by meeting the "reasonable basis" standard which allows the

Plaintiff to amend the Complaint to seek punitive damages against Defendant, Equifax. This case would support a claim for punitive damages under the Fair Credit Reporting Act even if the most restrictive approach to punitive damages was involved. Plaintiff's proposed Amended and Supplemental Complaint and Demand For Jury Trial is attached hereto as Exhibit "A".

9.     The factual basis to allow a punitive damages claim by Plaintiff is set forth in the Affidavits filed by Plaintiff, including the affidavit of Angela Williams as to the factual background justifying punitive damages, i.e., her disputes to Equifax since 1994, and an affidavit/expert report of her expert, Evan Hendricks, which shows how Equifax has been aware of the mixed file problems for over a decade, and promised numerous state attorney generals and the Federal Trade Commission in consent decrees that it was important to use full identifying information including a social security number to avoid mixed files. It is clear in this case that Equifax did not. The affidavits of Mrs. Williams and Mr. Hendricks are incorporated herein by reference. A sampling of the numerous and repeated violations of the Fair Credit Reporting Act in this case which justifies punitive damages is as follows.

### A. Equifax Violated the Fair Credit Reporting Act when Equifax Mixed Mrs. Williams' Credit File with Another Person's and Did Not Separate the Two Files Despite Numerous Disputes

10.     Defendant Equifax mixed Plaintiff Angela Williams' credit file with the file of another person with a similar name since at least 1994. Equifax mixed Plaintiff's credit file with the file of a person named Angelina G. Williams who has a similar social security number. Plaintiff told Equifax about the mixing of her information with this other person and asked it to correct the errors but it would not do so for many years. This other person's credit file with Equifax included at least 25 false derogatory accounts over the years and at least 15 of those were collection accounts. This derogatory information was placed on Plaintiff's credit report circulated to those who pulled her credit report. Several times Equifax would delete false

6

Appendix D
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

information that plaintiff disputed but then put it back on her credit report at a later time.

11.     As a result of the false reporting by Equifax and despite Mrs. Williams actual credit history which she had tried to establish over the years, she was denied credit. For example, in July 2001, she applied for a credit card from American Express. Mrs. Williams received a letter from American Express saying she was denied because Equifax was reporting numerous delinquencies on her credit report. In September 2001, she wanted to start her own business. Mrs. Williams went to the Kennedy Space Center Credit Union to open an account and to get a credit card and ATM privileges. The credit union obtained Plaintiff's credit report from Equifax on September 26, 2001 and told her it would not give her a credit card or ATM.

12.     Mrs. Williams felt frustrated and helpless. She contacted the Federal Trade Commission and told them about Equifax continuously mixing her credit information with another person despite her requests that Equifax correct the errors. Mrs. Williams also suffered significant lost time, aggravation and embarrassment in connection with her repeated efforts to spur Equifax to correct the problems it had caused. Even as late as April 29, 2002, Equifax was reporting 15 collection accounts on Mrs. Williams' credit report. That was five more collections than were included on the September 17, 2001 Equifax credit report. **Equifax was the only credit reporting agency reporting these accounts.**

13.     Mrs. Williams filed numerous formal disputes over the years. Often, Equifax would claim it was providing her with her credit file but did not inform her of all of the accounts in her file that prospective and existing creditors would see when they receive her credit report. After failing to get Equifax to follow the law on her own and failing to have the Federal Trade Commission take action, Mrs. Williams sued Equifax under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA") seeking actual and punitive damages.

**B.     Equifax Violated the Fair Credit Reporting Act: The FCRA, § 1681i, Says Equifax Must Conduct Reasonable Investigations Concerning the Accuracy**

7

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

of Credit Information that a Consumer Specifically Disputes

14.     The FCRA establishes a legal duty that requires credit reporting agencies to allow consumers to correct an inaccuracies on their credit files. "If the completeness or accuracy of any item of information contained in a consumers's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute," Equifax must conduct a reinvestigation into the each disputed entry. *See*, 15 U.S.C. § 1681i. When the consumer disputes an entry, the agency must conduct a genuine reinvestigation:

> A credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position that one who has no such notice . . when a credit reporting agency receives such notice, it can target its resources in a more efficient manner and conduct a more thorough investigation.

*Henson v. CSC Credit Services*, 29 F.3d 280, 286-87 (7th Cir. 1994).

15.     The FCRA sets explicit standards and procedures that Equifax must perform when a consumer sends information or documents supporting the dispute.

- Equifax "shall review and consider all relevant information submitted by the consumer," making its own decision whether to correct the credit report. *See*, 15 U.S.C. § 1681i(a)(4);

- Equifax must forward to the business who reported the disputed information,"all relevant information" regarding the dispute that it receives from the consumer. This information enables the reporting business to adequately determine whether the consumer's dispute is valid. See, 15 U.S.C. § 1681i(a)(2)(B).

16.     In addition, Equifax *must prevent automatic reinsertion of deleted information*. If any information is deleted from a consumer's file upon an investigation, Equifax may not reinsert the information "unless the person who furnishes the information certifies that the information is complete and accurate." 15 U.S.C. § 1681i(a)(5). This is not what happened in this case. Equifax

8

Appendix D
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

simply placed derogatory accounts back on Mrs. Williams credit report. According to the Fair

Credit Reporting Act, Equifax was not supposed to reinsert any deleted information unless the

furnisher certified the information is complete and accurate, and then Equifax was supposed to

notify Mrs. Williams in writing within 5 days of reinsertion of the fact of the reinsertion, of the

furnisher's identity and how to contact the furnisher, and of her right to insert a dispute statement

into his file. None of this was done. Moreover, Equifax was mandated by Congress to "maintain

reasonable procedures designed to prevent the reappearance" of deleted information in a

consumer's file or credit report. 15 U.S.C. Section 1681i(a)(5)(C) ; See, *Cousin v. Trans Union

Corporation*, 246 F.3d 359, 369 (5th Cir. 2001).

**C.   Equifax Violated the Fair Credit Reporting Act: The FCRA, § 1681e(b) Says
Equifax Must Follow Reasonable Procedures to Assure *"Maximum Possible
Accuracy"***

The FCRA sets a high standard concerning the reporting of consumer credit information.

All credit reporting agencies – including Equifax – must meet this standard in recognition of the

**"grave** responsibilities" these agencies possess in maintaining the accuracy of consumer credit in

America. *See*, 15 U.S.C. § 1681(a)(4).

Equifax must implement and **"follow** reasonable procedures to assure *maximum possible

accuracy"* of consumer credit information. *See*, 15 U.S.C. § 1681e(b) (emphasis added). This

standard applies to all consumer credit information that Equifax reports, not just information that

a consumer specifically disputes. It also applies to information that Equifax continues to report

after that information was disputed. If a credit reporting agency continues to report inaccurate

information after it has had a chance to correct the incorrect information – but failed to correct it,

because its dispute process was not reasonable as applied to the particular facts of that dispute –

then the credit reporting agency fails to comply with § 1681i *and* § 1681e(b). *See, Hyde v.

Hibernia National Bank*, 861 F.2d 446 (5th Cir. 1988) (each publication of inaccurate credit

9

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

information states new and distinct FCRA claim).

**D.      Equifax Violated the Fair Credit Reporting Act: the FCRA, § 1681b Says Equifax must Allow Access to Credit Reports of Consumers Only If There Is a Permissible Purpose**

17.      15 U.S.C. Section 1681b provides that a credit reporting agency may only furnish a consumer report under certain limited circumstances. Because of the mixed file, Equifax provided Plaintiff's credit report to prospective creditors of Angelina Williams, the person Equifax was mixing her with. Thus, the credit report of Plaintiff was provided to others without a permissible purpose. With the wealth of information contained in a consumer credit report, the intrusion into privacy was significant. See *Hall v. Harleysville Insurance Company*, 896 F.Supp. 478 (E.D. Pa. 1995). (access to credit reports akin to unauthorized access to bank records, prohibited by Restatement of Torts 2d §652).

**E.      Equifax Violated the Fair Credit Reporting Act: the FCRA, § 1681g Says Equifax must Disclose to the Consumer, upon Request, All Information in the Consumer's File.**

18.      15 U.S.C. Section 1681g was violated because Equifax provided only a portion of the information to Mrs. Williams that was in her file that was being reported to her creditors and prospective creditors. Also, it was violated because Equifax refused to provide Plaintiff with her credit report on numerous occasions, despite request.

19.      Accordingly, the record evidence, even if only a sampling, and the reasonable inferences from the record evidence, are sufficient to establish a legal basis for pleading a punitive damages claim and having the jury consider the same as to Defendant intentional and outrageous conduct. *See S & S Toyota Inc., v. Kirby*, 649 So.2d 916 (Fla. 5th DCA 1995) (holding that the reasonable inferences from the evidence were sufficient for a jury to consider punitive damages); *See also Johns-Manville Sales v. Janssens*, 463 So.2d 242 (Fla. 1st DCA 1984) (holding that if an award of punitive damages may be supported under any view of the

10

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

evidence taking all inferences most favorable to the plaintiff, the decision whether to award such damages is an issue for the jury to decide).

WHEREFORE, the Plaintiff, **ANGELA WILLIAMS**, respectfully requests that this Court enter its Order granting Plaintiff's motion for leave to amend her Complaint so that she may add a claim for punitive damages against the Defendant, **Equifax Information Systems, LLC**, in the form as attached hereto as Exhibit "A".

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via facsimile and U.S. Mail to Glen Wieland, Esquire, 790 North Orange Avenue, Orlando, Florida, 32801; and G. John Cento, Esquire, 1100 Peachtree Street, Suite 2800, Atlanta, GA, 30309 this 27 day of October 2006.

Steven M. Fahlgren
Florida Bar No.: 0008450
Law Offices of Steven M. Fahlgren, P.A.
552318 U.S. Highway 1 North
Hilliard, Florida 32046
Telephone: (904) 845-2255
Facsimile: (904) 845-3934
Attorney for Plaintiff

*And*

ROBERT S. SOLA
Oregon Bar No. 84454
Robert S. Sola, P.C.
8835 SW Canyon Lane, Suite 130
Portland, OR 97225
Telephone: (503) 295-6880
Facsimile: (503) 291-9172
Attorney for Plaintiff

M:\Williams v. Equifax\Pleading\Motion by Williams For Leave to Amend Add Punitives against Equifax.wpd

Appendix D
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN
AND FOR ORANGE COUNTY,
FLORIDA

CASE NO.: 48-2003-CA-9035-O

ANGELA P. WILLIAMS,

      Plaintiff,

vs.

EQUIFAX INFORMATION SERVICES LLC,

      Defendant.

_____/

## AMENDED AND SUPPLEMENTAL COMPLAINT

## AND DEMAND FOR JURY TRIAL

    Plaintiff, ANGELA P. WILLIAMS, by and through her below signed counsel, sues Defendant, EQUIFAX INFORMATION SERVICES LLC and states:

    1.    Plaintiff Angela P. Williams ("plaintiff") is a consumer as defined by the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681a(c).

    2.    Defendant Equifax Information Services LLC ("Equifax") is a consumer reporting agency as defined by FCRA, 15 U.S.C. § 1681a(f).

    3.    Equifax has prepared and issued consumer credit reports concerning plaintiff since 1994 which include inaccurate, incomplete or misleading information. Plaintiff notified Equifax that she disputed the information Equifax was reporting and the information in Equifax's files on plaintiff. Equifax continued to report inaccurate, incomplete or misleading information and to maintain such information in its files on plaintiff, both prior to and after this action was filed.

    4.    Prior to and after this action was filed, Equifax failed to properly respond to plaintiff's disputes.

## EXHIBIT "A"

Appendix D

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

5.      Prior to and after this action was filed, Equifax wrongfully released information about plaintiff.

6.      Prior to and after this action was filed, Equifax failed to properly respond to plaintiff's requests for information concerning her.

## FIRST CLAIM FOR RELIEF

### (Against Equifax)

### (Negligent Noncompliance with FCRA)

7.      Plaintiff realleges and incorporates paragraphs 1 through 6.

8.      Defendant Equifax negligently failed to comply with the requirements of FCRA, including but not limited to:

(a) failing to follow reasonable procedures to assure maximum possible accuracy of the information in reports concerning plaintiff, as required by 15 USC §1681e(b);

(b) failing to comply with the requirements in 15 USC §1681i;

(c) failing to comply with the requirements in 15 USC §1681b;

(d) failing to comply with the requirements in 15 USC §1681g; and

(e) failing to comply with the requirements in 15 USC §1681c.

9.      Equifax's failure to comply with the requirements of the FCRA continued or was repeated after plaintiff filed this action.

10.     As a result of Equifax's failure to comply with the requirements of FCRA, plaintiff has suffered, and continues to suffer, actual damages, including denial of credit, lost opportunity to receive credit, economic loss, damage to her reputation, loss of self-esteem, invasion of privacy, interference with her normal and usual activities, and emotional distress for which she seeks an amount not less than $25,000.

11.     Plaintiff requests her attorney fees pursuant to 15 USC §1681o(a).

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

SECOND CLAIM FOR RELIEF

(Against Equifax)

(Willful Noncompliance with FCRA)

12.    Plaintiff realleges and incorporates paragraphs 1 through 6.

13.    Defendant Equifax willfully failed to comply with the requirements of FCRA, including but not limited to:

(a) failing to follow reasonable procedures to assure maximum possible accuracy of the information in reports concerning plaintiff, as required by 15 USC §1681e(b);

(b) failing to comply with the requirements in 15 USC §1681i;

(c) failing to comply with the requirements in 15 USC §1681b;

(d) failing to comply with the requirements in 15 USC §1681g; and

(e) failing to comply with the requirements in 15 USC §1681c.

14.    Equifax's failure to comply with the requirements of the FCRA continued or was repeated after plaintiff filed this action.

15.    As a result of Equifax's failure to comply with the requirements of FCRA, plaintiff has suffered, and continues to suffer, actual damages, including denial of credit, lost opportunity to receive credit, economic loss, damage to her reputation, loss of self-esteem, invasion of privacy, interference with her normal and usual activities, and emotional distress for which she seeks an amount not less than $25,000. Plaintiff also seeks punitive damages in an amount to be determined by the jury.

16.    Plaintiff requests her attorney fees pursuant to 15 USC §1681n(a).

PRAYER

WHEREFORE, plaintiff prays for judgment against Equifax as follows:

On the First Claim for Relief:

A.    Awarding actual damages in an amount not less than $25,000;

B.    Attorneys' fees;

C.    Costs and expenses incurred in the action;

Appendix D
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

On the Second Claim for Relief:

A.      Awarding actual damages in an amount not less than $25,000;

B.      Punitive damages;

C.      Attorneys' fees;

D.      Costs and expenses incurred in the action;

PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

DATED this _____ day of September 2006.

                                        Respectfully Submitted,

                                        _____
                                        STEVEN M. FAHLGREN
                                        Florida Bar No.: 0008450
                                        Law Offices of Steven M. Fahlgren, P.A.
                                        5523118 U.S. Highway 1 North
                                        Hilliard, FL 32046
                                        Telephone: (904) 845-2255
                                        Facsimile: (904) 845-3934

                                        ROBERT S. SOLA
                                        Oregon Bar No. 84454
                                        Robert S. Sola, P.C.
                                        8835 SW Canyon Lane, Suite 130
                                        Portland, OR 97225
                                        Telephone: (503) 295-6880
                                        Facsimile: (503) 291-9172

                                        Attorneys for Plaintiff Angela P. Williams

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

**MICHAEL C. BAXTER**
Oregon State Bar ID Number 91020
michael@baxterlaw.com
**JUSTIN M. BAXTER**
Oregon State Bar ID Number 99217
justin@baxterlaw.com
Baxter & Baxter, LLP
8835 S.W. Canyon Lane, Suite 130
Portland, Oregon 97225
Telephone (503) 297-9031
Facsimile (503) 291-9172
        Attorneys for Plaintiff Valentine

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **REBECCA L. VALENTINE,** | Case No. 05-CV-0801-JO |
| Plaintiff, | |
| | **PLAINTIFF'S TRIAL** |
| v. | **MEMORANDUM** |
| **EQUIFAX INFORMATION SERVICES LLC,** | |
| Defendant. | |

INTRODUCTION

        Rebecca Valentine is a victim of identity theft.  In 1987, she advised Equifax of this fact.

Equifax admits that it sold credit reports on Ms. Valentine containing false and derogatory

accounts and information.  Equifax admits it failed to delete false information in spite of

countless phone calls and dispute letters over many years.  Even when Equifax would delete

some accounts, the accounts would later reappear.  Equifax falsely told Mrs. Valentine that it had

deleted accounts and information when it had not done so.

Page 1    PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

Equifax admits that it and its outsource vendors[1] repeatedly ignored Equifax's own procedures for handling credit reports and credit report disputes. Equifax failed to follow its "verified victim" procedure whereby the deletion of one fraudulent account is supposed to cause all disputed accounts to be deleted. Equifax also knowingly used fraudulent identifying information to "verify" the false accounts belonged to Mrs. Valentine, when they did not.

Mrs. Valentine has perfect credit. Nevertheless, as a result of Equifax's repeated violations of the Fair Credit Reporting Act, Mrs. Valentine has suffered significant damages over many years. These include being removed from her mortgage and the deed to her home, being denied credit, and being forced to less favorable credit terms. She has also endured a seemingly futile battle to restore her good name.

I.  THE FAIR CREDIT REPORTING ACT.

A. Purpose of the Act.

The Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 et seq., was the product of Congressional concern over abuses in the credit reporting industry. Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995). Congress specifically found "a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

B. The 1996 Amendments.

The FCRA has always required credit reporting agencies to follow reasonable procedures to assure maximum possible accuracy and to reinvestigate the accuracy of disputed information.

---

[1] Equifax hires overseas firms in Canada, Jamaica, and other the Philippines to process consumer disputes. These outsource vendors are trained in Equifax's procedures, and Equifax assumes responsibility for their conduct.

Page 2   PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

In 1996, Congress substantially amended the FCRA in an effort to remedy inadequacies in credit reporting procedures.  Several of the amendments are directly relevant to the claims in this case.  Congress completely rewrote the reinvestigation section, 15 U.S.C. § 1681i, expanding it from one paragraph to five pages.

For example, Congress added provisions concerning the reinsertion of deleted material including the requirement that consumer reporting agencies follow reasonable procedures to prevent the reappearance of information that had previously been deleted.  15 U.S.C. § 1681i(a)(5)(c).  Congress also amended the FCRA to require Equifax to provide "all relevant information regarding the dispute that is received by the agency from the consumer" to the original creditor or furnisher of the information.  15 U.S.C. § 1681i(a)(2)(B).  Equifax seemingly ignores these new provisions.

    C.  <u>Claims for Relief.</u>

Equifax repeatedly failed to comply with numerous requirements of the FCRA in the following ways:

    1)      failing to follow reasonable procedures to assure the maximum possible accuracy of the information concerning plaintiff, in violation of 15 U.S.C. § 1681e(b);

    2)      failing to conduct a reasonable reinvestigation of disputed information, in violation of 15 U.S.C. §1681i(a)(1)(A);

    3)      failing to review and consider all relevant information submitted by plaintiff, in violation of 15 U.S.C. §1681i(a)(4);

    4)      failing to promptly provide all relevant information received from the consumer to the furnisher of the disputed information, in violation of 15 U.S.C. §1681i(a)(2)(B);

Page 3   PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

5)      failing to promptly delete information found to be inaccurate or incomplete or cannot be verified, in violation of 15 U.S.C. § 1681i(a)(5)(A);

6)      failing to provide the consumer with written notice of the results of reinvestigations, in violation of 15 U.S.C. § 1681i(a)(6)(A).

7)      reinserting previously deleted information without certification by the furnisher that the information is complete and accurate, in violation of 15 U.S.C. § 1681i(a)(5)(B)(i);

8)      failing to notify plaintiff that previously deleted information had been reinserted into plaintiff's credit file, in violation of 15 U.S.C. § 1681i(a)(5)(B)(ii) and (iii);

9)      failing to maintain reasonable procedures designed to prevent the reappearance of previously deleted information, in violation of 15 U.S.C. § 1681i(a)(5)(C).

D.  Civil Liability.

Any person who negligently fails to comply with any requirement under the FCRA is liable for actual damages sustained, costs, and attorneys' fees.  15 U.S.C. § 1681o(a).  In addition, punitive damages may be awarded if any person willfully fails to comply.  15 U.S.C. § 1681n.

A prima facie case is made if a consumer presents evidence tending to show that a credit reporting agency prepared a report containing inaccurate information.  Guimond, 45 F.3d at 1333.  The general negligence standard applies to claims pursuant to § 1681o.  The standard is what a reasonably prudent person would do under the circumstances.  Thompson v. San Antonio Retail Merchants Ass'n, 682 F.2d 509, 513 (5th Cir. 1982).  The Fifth Circuit has held that allowing inaccurate information back onto a credit report after deleting it because it is inaccurate is negligent.  Stevenson v. TRW, Inc., 987 F.2d 288, 293 (5th Cir. 1993).  The term "actual damages" includes emotional distress and humiliation.  Guimond, 45 F.3d at 1333.

Page 4   PLAINTIFF'S TRIAL MEMORANDUM

Appendix E

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

A consumer may recover punitive damages if the defendant acted willfully.  "Willful" under the FCRA means that defendant knowingly and intentionally performed an act that violates the Fair Credit Reporting Act, either knowing that the action violates the rights of consumers or in *reckless disregard* of those rights.  Safeco Ins. Co. of Am. v. Burr, 127 S. Ct. 2201, 551 U.S. ___, 167 L. Ed. 2d 1045 (2007).  "Reckless disregard" means an "action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Farmer v. Brennan, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  A consumer need not prove malice or evil motive.  Cushman v. Trans Union Corp., 115 F.3d 220, 226-27 (3rd Cir. 1997); Philbin v. Trans Union Corp., 101 F.3d 957, 970 (3d Cir. 1996); Thornton v. Equifax, Inc., 619 F.2d 700, 705 (8th Cir.), cert. denied, 449 U.S. 835, 66 L. Ed. 2d 41, 101 S. Ct. 108 (1980).

<u>CONCLUSION</u>

Rebecca Valentine has been trying to regain her good name for two decades.  In that time, Equifax has sold countless credit reports on Ms. Valentine containing false and derogatory accounts.  Equifax was either unable or unwilling to comply with its "grave responsibilities" under the FCRA.  Equifax ignored its own procedures, and ignored the law.

DATED this 28th day of September, 2007.

/s/ Justin M. Baxter

_____
Justin M. Baxter, OSB #99217
Michael C. Baxter, OSB 91020
(503) 297-9031 (Telephone)
(503) 291-9172 (Facsimile)
justin@baxterlaw.com
Of Attorneys for plaintiff Valentine

Page 5   PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the foregoing PLAINTIFF'S TRIAL MEMORANDUM on:

Lewis Perling
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309-3521

Jeffrey Edelson
Markowitz Herbold et al
1211 SW 5th Ave Ste 3000
Portland OR  97204
        Of Attorneys for Defendant Equifax Information Services

[  ] Via First Class Mail

[  ] Via Facsimile

[  ] Via Hand Delivery

[  ] Via E-Mail

[X] Via CM/ECF

DATED this 28th day of September, 2007.

                    /s/ Justin M. Baxter
                    _____
                    Justin M. Baxter, OSB #99217
                    Michael C. Baxter, OSB 91020
                    (503) 297-9031 (Telephone)
                    (503) 291-9172 (Facsimile)
                    justin@baxterlaw.com
                    Of Attorneys for plaintiff Valentine

Appendix E

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

**Michael C. Baxter, OSB No. 91020**
michael@baxterlaw.com
8835 S.W. Canyon Lane, Suite 130
Portland, Oregon 97225
Telephone (503) 297-9031
Facsimile (503) 291-9172

**Robert S. Sola, OSB No. 84454**
8835 S.W. Canyon Lane, Suite 130
Portland, Oregon 97225
Telephone (503) 295-6880
Facsimile (503) 291-9172
rssola@msn.com

Attorneys for Plaintiff Kirkpatrick

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MATTHEW KIRKPATRICK,** | **Case No. CV 02-1197-MO Lead** |
| Plaintiff, | **PLAINTIFF'S TRIAL MEMORANDUM** |
| vs. | |
| **EQUIFAX INFORMATION SERVICES, LLC,** a foreign corporation, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Matthew Kirkpatrick ("plaintiff" and "Mr. Kirkpatrick") is a consumer and brings

this action against defendant Equifax Information Services, LLC ("Equifax") for violations of the

Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.* Equifax is one of the "Big 3" credit

reporting agencies and maintains credit files on almost every adult American. Equifax reported

Page 1   PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

false and derogatory information in plaintiff's credit reports for four years.

## THE FAIR CREDIT REPORTING ACT

1. Purpose.

The FCRA was the product of Congressional concern over abuses in the credit reporting industry. *Guimond v. Trans Union Credit Information Co.*, 45 F3d 1329, 1333 (9th Cir. 1995). Congress specifically found "a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4). The legislative history of the FCRA indicates that it was crafted to protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner. "These consumer oriented objectives support a liberal construction of the FCRA." *Guimond*, 45 F3d at 1333, citing *Kates v. Croker National Bank*, 776 F2d 1396, 1397 (9th Cir. 1985).

2. The 1996 Amendments.

The FCRA has always required credit reporting agencies to follow reasonable procedures to assure maximum possible accuracy and to reinvestigate the accuracy of disputed information. In 1996, Congress substantially amended the FCRA in an effort to remedy the existing inadequacies in credit reporting procedures. Several of the amendments are directly relevant to the claims in this case. Congress completely rewrote the reinvestigation section, § 1681i, expanding it from one paragraph to five pages. For example, Congress enacted strict time limits for the commencement and completion of reinvestigations and required that credit reporting agencies provide the furnisher of the disputed information with "all relevant information"

Page 2   PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

received from the consumer.  15 U.S.C. § 1681i(a)(2)(A).  Congress also added provisions concerning the reinsertion of deleted material including the requirement that consumer reporting agencies follow reasonable procedures to prevent the reappearance of information that had previously been deleted.   15 U.S.C. § 1681i(a)(5)c).

3. Civil Liability.

Any person who negligently fails to comply with any requirement under the FCRA is liable for actual damages sustained, costs, and attorneys' fees. 15 U.S.C. § 1681o(a).  In addition, punitive damages may be awarded if any person willfully fails to comply.  15 U.S.C. § 1681n.

A prima facie case is made if a consumer presents evidence tending to show that a credit reporting agency prepared a report containing inaccurate information. *Guimond*, 45 F3d at 1333. The general negligence standard applies to claims pursuant to § 1681o.  The standard is what a reasonably prudent person would do under the circumstances. *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F2d 509, 513 (5th Cir. 1982).  The Fifth Circuit has held that allowing inaccurate information back onto a credit report after deleting it because it is inaccurate is negligent. *Stevenson v. TRW, Inc.*, 987 F2d 288, 293 (5th Cir. 1993).  The term "actual damages" in § 1681o includes emotional distress and humiliation. *Guimond*, 45 F3d at 1333.

A consumer may recover punitive damages if the defendant acted willfully, which means with a conscious or reckless disregard for consumer's rights. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 227 (3rd Cir. 1997).  A consumer need not prove malice or evil motive. *Cushman*, 115 F3d at 226; *Philbin v. Trans Union Corp.*, 101 F.3d 957, 970 (3d Cir. 1996); *Thornton v Equifax, Inc.*, 619 F.2d 700, 705 (8th Cir.), *cert. denied*, 449 U.S. 835, 66 L. Ed. 2d 41, 101 S. Ct. 108 (1980).

Page 3   PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

## CLAIMS FOR RELIEF

Equifax failed to comply multiple times with numerous provisions of the FCRA:

(1) failing to follow reasonable procedures to ensure maximum possible accuracy of the information concerning plaintiff, 15 U.S.C. § 1681e(b);

(2) failing to conduct reinvestigations and complete them within 30 days, 15 U.S.C. § 1681i(a)(1)(A);

(3) failing to provide the furnisher of disputed information with all relevant information regarding the dispute that Equifax received from plaintiff, 15 U.S.C. § 1681i(a)(2)(A);

(4) failing to provide the furnisher of disputed information with all relevant additional information regarding the dispute that Equifax received from plaintiff within 30 days of his original dispute, 15 U.S.C. § 1681i(a)(2)(B);

(5) failing to review and consider all relevant information submitted by plaintiff in conducting reinvestigations of disputed accounts, 15 U.S.C. § 1681i(a)(4);

(6) failing to promptly delete or correct disputed information that Equifax found to be inaccurate or which could not be verified, 15 U.S.C. § 1681i(a)(5)(A);

(7) failing to maintain reasonable procedures to prevent the reappearance of information that had previously been deleted, 15 U.S.C. § 1681i(a)(5)c);

(8) failing to provide plaintiff with the proper notice of reinsertion of previously deleted material, 15 U.S.C. § 1681i(a)(5)(B)(ii);

(9) failing to provide the businesses name and address to the consumer with reinserted information, allowing the consumer to dispute the information, 15 U.S.C. § 1681i(a)(5)(B)(iii);

(10) failing to provide the consumer with written notice of the results of reinvestigations,

Page 4   PLAINTIFF'S TRIAL MEMORANDUM

Appendix F

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

15 U.S.C. § 1681i(a)(6)(A);

(11) failing to provide a consumer a revised credit report based on their revised file, with notice of the consumer's rights, 15 U.S.C. § 1681i(a)(6)(B);

(12) failing to comply with the disclosure requirements in 15 U.S.C. §1681g;

(13) failing to comply with the permissible purpose requirements in 15 U.S.C. §1681b.

## FACTS

In January 2000, Mr. and Mrs. Kirkpatrick applied for a mortgage loan. They received a credit report and saw that there were false accounts on it. Mr. Kirkpatrick learned that his identity had been stolen, and later that Equifax was also mixing his identity with individuals who had different Social Security numbers.

The Kirkpatricks compiled a "to do" list to clear up their credit. The list included obtaining police reports, contacting individual creditors they had not done business with, calling the Social Security Administration, the FTC, the DMV, and the IRS, and generally, attempting to compile the documents which they were told would correct the false credit reporting. This was very important because the Kirkpatricks wanted a larger family and needed an addition to their home. During this process, they discovered many of the false accounts being reported about Mr. Kirkpatrick on his Equifax credit reports were for an individual who appeared to live in Coeur D'Alene, Idaho.

During mid-2000, Mr. Kirkpatrick borrowed from his and his wife's retirement plans to begin the remodeling of their home. He believed that his credit could be cleared up by April 15, 2001, and these loans could be repaid without penalty. On February 1, 2001, Mr. Kirkpatrick called Equifax and ordered his Equifax credit report. He did not receive the credit report.

Page 5   PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

On February 19, 2001, he called Equifax again concerned because he still had not received his credit report. He received an Equifax credit report dated February 19, 2001. The report contained nineteen false, derogatory, accounts and incorrect identifying information. The report indicated that Mr. Kirkpatrick's credit information had been sent to numerous businesses.

On February 25, 2001, Mr. Kirkpatrick sent Equifax a written dispute package in which he disputed the false information appearing on his credit report. He provided a letter explaining the problem, copies of police reports, an affidavit stating that he was a victim of identity theft, copies of his driver's license and Social Security card, and letters from creditors stating they had discovered fraud and were asking the credit reporting agencies to delete their accounts from Mr. Kirkpatrick's credit report. Equifax did not investigate this dispute package.

On March 13, 2001, Mr. Kirkpatrick applied for a home improvement loan with Bank of America. Mr. Kirkpatrick's loan was denied due to numerous false, derogatory accounts displaying on his Equifax credit report.

On March 19, 2001 Mr. Kirkpatrick called Equifax to determine the status of his dispute. Equifax told him it had never received his dispute package and that no investigations had begun.

On March 20, 2001, Mr. Kirkpatrick called Equifax again and disputed the false information. He informed Equifax that the Coeur D'Alene, Idaho address was not his. Equifax still had not received his dispute package. On March 22, 2001, Mr. Kirkpatrick resubmitted his dispute package. Equifax ignored this second dispute package.

On March 22, 2001, Mr. Kirkpatrick received a letter from Equifax dated March 12, 2001, indicating that Equifax had received his first dispute package but that Equifax had "shredded" it. On March 24, 2001, Mr. Kirkpatrick resubmitted his dispute package for a third time. Equifax

Page 6    PLAINTIFF'S TRIAL MEMORANDUM

ignored Mr. Kirkpatrick's third dispute package.

On April 6, 2001, Mr. Kirkpatrick called Equifax to see if an investigation had begun based on his written disputes. Equifax told him they still had not received any dispute packages and to call back in a week.

On April 11, 2001, Mr. Kirkpatrick called Equifax again to see if an investigation had begun regarding any of his written dispute packages. Equifax had no record of receiving any of them. Equifax recommended he resend his dispute package again via registered mail.

Mr. Kirkpatrick was unable to repay the loans made against the Kirkpatricks' retirement by April 15, 2001 and he was penalized by the IRS.

On April 20, 2001, Mr. Kirkpatrick called Equifax again. They still had no record of any dispute package. No investigations had begun based on these documents.

Mr. Kirkpatrick submitted the fourth dispute package via registered mail and requested a return receipt. On or about April 30, 2001, Mr. Kirkpatrick received the U.S. Postal Service return receipt card indicating that Equifax had received his fourth dispute package. On May 7, 2001, Mr. Kirkpatrick called Equifax to determine the status of his disputes. Equifax told Mr. Kirkpatrick that it did not have any record of receiving any dispute package. Equifax said that the mail room receives thousands of documents and the documents were probably lost.

On May 15, 2001, Mr. Kirkpatrick called Equifax again. Equifax told him they had no record of receiving anything from him and that no investigation had begun based on these documents. Equifax told Mr. Kirkpatrick that if he wanted to clean up his credit, Mr. Kirkpatrick would need to do it himself.

Later, Mr. Kirkpatrick received Equifax's Results of Investigation from his March 20,

Page 7   PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

2001, telephone dispute. Equifax said it had verified numerous false, derogatory accounts as accurate. Equifax continued to report false derogatory identifying information.

The Kirkpatrick's remodeling was only partially completed. What was done was accomplished by Mr. Kirkpatrick working overtime and paying for the materials himself. His family could not afford for him to finish the improvements. Mr. Kirkpatrick was unable to obtain a loan to help him continue the work. On February 20, 2002, Mr. Kirkpatrick attempted to obtain a personal loan for $2,500 from Bank of America. The loan was denied due to his Equifax credit report. Mr. Kirkpatrick also received a February 25, 2002 Equifax credit report. The report contained eleven false accounts. It still linked him to the Coeur D'Alene, address.

In late March, 2002, Mr. Kirkpatrick and his wife attempted to get a loan through U Lane O Credit Union. The Equifax credit report sent to U Lane O Credit Union contained eleven fraudulent, derogatory accounts. It continued to link Mr. Kirkpatrick to the thief in Coeur D'Alene, Idaho. U Lane O would allow the loan but only at an unacceptable interest rate. Mr. Kirkpatrick withdrew the loan request. He attempted unsuccessfully to obtain other loans.

On April 8, 2002, Mr. Kirkpatrick disputed the false information reporting on his February 25, 2002, Equifax report. Since he was unable to obtain a loan from a bank, the Kirkpatricks resorted to taking a loan from a friend so he could continue the work on his home.

Mr. Kirkpatrick received the results of his April 8, 2002 dispute and a May 21, 2002 Equifax credit report. It indicated that Equifax had forwarded his supporting materials to the furnishers. This was not true. Numerous false accounts had been verified. It continued to link him with the Coeur D'Alene, Idaho address.

On June 19, 2002, Mr. Kirkpatrick disputed what appeared to be a new NCO collection

Page 8   PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

included in his May 21, 2002 credit report. This account had not appeared on his February 25, 2002 credit report. Mr. Kirkpatrick again disputed the fraudulent Coeur D'Alene, Idaho addresses and the false inquiries. Equifax verified the fraudulent NCO account despite having the Coeur D'Alene address. NCO, and other accounts, were deleted, only to reappear later without notice. Equifax did not provide Mr. Kirkpatrick with the results of the investigation.

Equifax was only providing Mr. Kirkpatrick with one of his four credit files. Equifax does not know which credit files are being reported to creditors. Mr. Kirkpatrick had no ability to dispute information provided from files produced to creditors which were not provided to him.

In July 2002, Mr. Kirkpatrick attempted to get a loan through the Oregon Community Credit Union. He was denied the loan due to the false information on his Equifax credit report.

Mr. Kirkpatrick received a September 3, 2002 Equifax credit report. The credit report still reported ten false, derogatory accounts and identifying information. The false inquiries he disputed on June 19, 2002, remained in his credit report. The report indicated that false information had been disseminated to numerous businesses.

In November 2002, Mr. Kirkpatrick applied for a home equity loan with Wood Products Credit Union. The loan was denied because Equifax reported the file was under review and would not provide Mr. Kirkpatrick's accurate credit history to the credit union.

In December 2002, Mr. Kirkpatrick applied for a home equity loan with Bank of America. The loan was denied as a result of Equifax not providing a credit report to Bank of America. By this time, however, Bank of America had changed their policy and it could use a credit report from another credit reporting company. Mr. Kirkpatrick was approved for the home equity loan using a credit report from Trans Union.

Page 9   PLAINTIFF'S TRIAL MEMORANDUM

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

In December 2002, Mr. Kirkpatrick ordered his Equifax credit report on the computer. He never received a credit report. Mr. Kirkpatrick later received a May 2, 2003, Equifax credit report. Equifax continued to report numerous false accounts. The report still linked him to the Coeur D'Alene, Idaho address.

Mr. Kirkpatrick received an April 12, 2004 Equifax credit report. Equifax's April 2004, credit report still linked Mr. Kirkpatrick with the Coeur D'Alene, Idaho, address.

Despite being a victim of identity theft and being mixed with three other Social Security numbers, Equifax never submitted Kirkpatrick's disputes to its fraud or mixed file departments. Equifax has not changed its procedures since 1993.

Equifax routinely does not send consumer's supporting documents to creditors. It admits this information is relevant. Equifax does not require that its employees follow systems which prevent false data from going onto credit reports. Equifax routinely verified false Kirkpatrick accounts, even after the creditor told Equifax that the account belonged to someone else.

## CONCLUSION

The evidence will show that Equifax did not simply commit one or two minor isolated violations of the FCRA. Rather, Equifax repeatedly lied to Mr. Kirkpatrick as well as violating thirteen provisions of the FCRA. Such flagrant violations are not the result of simple negligence. They are the product of Equifax's conscious disregard for the consumer's rights under the FCRA.

DATED this 5 th day of December, 2004.

Michael C. Baxter, OSB #91020
(503) 297-9031 (Telephone)
(503) 291-9172 (Facsimile)
michael@baxterlaw.com
Of Attorneys for plaintiff Matthew Kirkpatrick

Page 10  PLAINTIFF'S TRIAL MEMORANDUM

Appendix F
EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Plaintiff's Trial Memo on:

Jeffrey M. Edelson
Markowitz, Herbold, Glade & Mehlhaf, P.C.
Suite 3000 Pacwest Center
1211 SW Fifth Avenue
Portland, OR 97204

J. Anthony Love
Kilpatrick Stockton, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309

[X] Via First Class Mail

[X] Via Facsimile

[ ] Via Hand Delivery

DATED this 15 th day of December, 2004.

Michael C. Baxter, OSB #91020
(503) 297-9031 (Telephone)
(503) 291-9172 (Facsimile)
michael@baxterlaw.com
Of Attorneys for plaintiff Matthew Kirkpatrick

Page 11  PLAINTIFF'S TRIAL MEMORANDUM

Appendix F

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

### Appendix F – Fair Information Practices (FIPs)

Prof. Alan F. Westin, of Columbia University, was one of the early, modern-day scholars of privacy. In his 1967 book, Privacy and Freedom, he focused on the emerging issue of "information-privacy" – how the amassing of personal data allowed for new forms of "data surveillance." In the book, Westin defined privacy in part as "the claim of individuals, groups, or institutions to determine for themselves when, how and to what extent information about them is communicated to others." Harvard Law Professor Charles Fried once referred to privacy as "that aspect of social order by which persons control access to information about themselves." Similarly, the U.S. Supreme Court wrote, "[t]o begin with, both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."[1]

The goal of providing individuals with reasonable control over their personal information led to the formulation of Fair Information Practice Principles, an effort in which Prof. Westin was integrally involved. In its 1973 report, the [HEW] Secretary's Advisory Committee on Automated Personal Data Systems defined five principles of fair information practice:

(1)   there must be no personal data record keeping systems whose very existence is secret;

(2)   there must be a way for an individual to find out what information about him or her is in a record and how it is used;

(3)   there must be a way for an individual to prevent information about him or her obtained for one purpose from being used or made available for other purposes without his or her consent;

(4)   there must be a way for an individual to correct or amend a record of identifiable information about him or her; and

(5)   any organization creating, maintaining, using, or disseminating records of identifiable personal data must assure the reliability of the data for their intended use and must take reasonable precautions to prevent misuse of the data.

One year after the 1973 report, the Watergate scandal raised the nation's privacy consciousness. Prof. Westin's book and the HEW Task Force report became the foundation for enactment of the U.S. Privacy Act of 1974. That Act, in turn in 1975 created the Privacy Protection Study Commission (PPSC), a blue-ribbon panel that held hearings, studied information-privacy issues relating to most of the private sectors, and made legislative and other

---

[1] U.S. Dept. Of Justice v. Reporters Committee, 489 U.S. 749 (1989). This definition of privacy was reaffirmed and expanded upon by the Court in Office of Independent Counsel v. Favish, 541 US 157 (2004)

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

recommendations published in its final report.[2]

The report's introduction articulated three objectives[3] that endorsed Fair Information Act Principles. "These three objectives both subsume and conceptually augment the principles of the Privacy Act of 1974 and the five fair information practices principles set forth in the 1973 report of the [HEW] Secretary's Advisory Committee on Automated Personal Data Systems."

After the introduction, the first PPSC's substantive chapter, Chapter 2, "The Consumer-Credit Relationship," focused on the FCRA. "Although their scope and particular requirements differ, the FCRA and the Privacy Act of 1974 share a common aim: that the policies and practices of record-keeping institutions minimize unfairness to individuals in the collection, maintenance, use and disclosure of records about them," the report stated.[4] In that chapter, the commission recommended 18 changes to strengthen the FCRA so it would more effectively realize these goals.[5]  Some of the recommendations became law with the enactment of the 1996 FCRA amendments.  Other recommendations became "industry best practices."[6]

The PPSC report set the foundation and methodology for analyzing and evaluating law, policy and organizational practices relating to the collection, use and disclosure of personal data. Its methodology was to identify the principles of Fair Information Practice and then apply them to the issue at hand, whether it be a standard industry practice or the statute governing that industry.

As discussed above, a goal of FCRA, like other information privacy laws, is to ensure that individuals maintain reasonable control over their personal information. Conversely, it is damaging to individuals when they unreasonably lose control over their information.

As noted above in the sections on Fair Information Practices, one of the dominant privacy concerns in today's information age is the collection, use, disclosure and security of personal data. In enacting the Fair Credit Reporting Act, Congress specified in the Act's findings and statement of purpose that, "There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality and a respect for the consumer's right to

---

[2] Personal Privacy In The Information Age: The Report of the Privacy Protection Study Commission, (July 1977; GPO Stock No. 052-003-00395) Herein referred to as the PPSC Report.

[3] The three general principles were: (1) minimize intrusiveness; (2) open up record-keeping operations in ways that will minimize the extent to which recorded information about an individual is itself a source of unfairness in any decision about him made on the basis of it (maximize fairness); and (3) create legitimate enforceable expectations of confidentiality

[4] Ibid, Pg. 67

[5] Ibid, "Chapter 2: The Consumer-Credit Relationship," pgs.41-100

[6] The remaining 14 chapters address personal data held by banks, insurers, employers, health care providers, direct marketers, government agencies, the Privacy Act, and Social Security numbers. In nearly all the chapters, the PPSC made extensive recommendations to enact new privacy laws or strengthen existing ones.  From a policy point of view, the commission defined "information privacy" in terms of Fair Information Practices, and explained that the FCRA was based on FIPs and therefore was an "information privacy" law.

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE

privacy."

Conversely, if privacy is not respected, i.e. if personal information is wrongly accessed, disclosed or misused, then it is damaging to the individual to whom the information pertains. Hence, a primary goal of the FCRA, and of other privacy statutes and rules, like the U.S. Privacy Act of 1974, the HIPAA regulations for patient data, the Video Rental Protection Act and the Cable Television Privacy Protection Act, is to prevent damage to individuals through the wrongful use or disclosure of their personal data.

A 1981 report by the Congressional Office of Technology Assessment (OTA) explained that not protecting privacy would be damaging both to society and to individuals. "The nature of societal values attached to privacy in the United States may change if larger and more ubiquitous information systems gradually remove the ability of individuals to control disclosures about their private activities. The possession by large organizations of personal data on individuals enhances the power, real or perceived of the organization over the person. These and similar effects may increase suspicion some citizens have of large organizations -- business, labor or government -- and thus erode social cooperation and a personal sense of well-being."

3

EXHIBIT A TO DEFENDANT'S MOTION TO EXCLUDE