```
                                                              Page 1
 1         IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3   MARTIN K. SAMMY,              )
                                   )
 4              Plaintiff,         )Civil Action No.
                                   )
 5          vs.                    )2:14-cv-00307-BMS
                                   )
 6   EQUIFAX INFORMATION SERVICES, )
                                   )
 7   LLC,                          )
                                   )
 8              Defendants.        )
     ------------------------------)
 9
10            DEPOSITION OF EVAN HENDRICKS
11
12              Bethesda, Maryland
13           Monday, December 1, 2014
14
15
16
17
18
19
20
21
22
23   Reported by:  Lori J. Goodin, RPR, CLR, CRR
24            Realtime Systems Administrator
25   JOB NO. 87796
```

EXHIBIT B TO DEFENDANT'S MOTION TO EXCLUDE

Page 2

```
 3                December 1, 2014
 4                    9:13 a.m.
 7        Deposition of EVAN HENDRICKS, held
 8    at the private residence of Evan Hendricks,
 9    8321 Tomlinson Avenue, Bethesda, Maryland,
10    before Lori J. Goodin, RPR, CLR, CRR,
11    Realtime Systems Administrator and Notary
12    Public in and for the State of Maryland.
```

Page 3

```
 1    APPEARANCES:
 3       Attorneys for Plaintiff:
 4          BAXTER & BAXTER
 5          8835 SW Canyon Lane
 6          Portland, Oregon  97225
 7       BY:  Justin Baxter
 8           (via telephone)
11       Attorneys for Defendants:
12          KING & SPALDING
13          1180 Peachtree Street
14          Atlanta, Georgia  30309
15       BY:  Lewis Perling
16           (via telephone)
17           Zachary McEntyre
18           (via telephone)
```

Page 4

```
 1                E. Hendricks
 2            EVAN HENDRICKS,
 3    having been first duly sworn, testified as
 4    follows:
 5                EXAMINATION
 6    BY MR. PERLING:
 7       Q.  Good morning, Mr. Hendricks.  Can
 8    you hear me okay?
 9       A.  Yes.
10       Q.  Great.  This is not the first expert
11    opinion that you have provided in a case
12    against Equifax, is it?
13       A.  That's correct.
14       Q.  How many prior cases have you
15    provided expert opinions in against Equifax?
16       A.  I don't know.
17       Q.  Is it more than ten?
18       A.  Yes.
19       Q.  More than 20?
20       A.  I am pretty sure it is more than 20.
21       Q.  More than 40?
22       A.  I'm not, that is not 100 percent
23    sure if it is more than 40.
24           But, it could be, if you included
25    all of the cases where Equifax was a defendant
```

Page 5

```
 1                E. Hendricks
 2    that I did an expert report.
 3       Q.  Okay.  Fair to say that you consider
 4    yourself an expert regarding Equifax's
 5    policies, right?
 6       A.  Yes.
 7       Q.  And fair to say you consider
 8    yourself an expert regarding Equifax's
 9    procedures?
10       A.  Yes.
11       Q.  And how did you become familiar with
12    the policies?
13       A.  I reviewed Equifax's manuals, and I
14    reviewed deposition testimony under oath of
15    Equifax's most knowledgeable people, answering
16    questions about what those policies were, and
17    at times what went wrong, either why they
18    weren't, why they weren't followed or why they
19    didn't work.
20           And, I learned about them through
21    trial testimony in the seven trials that I
22    testified against Equifax.
23       Q.  And you never worked for Equifax?
24       A.  That's correct.
25       Q.  You have never worked for any credit
```

```
                                          Page 6
 1              E. Hendricks
 2   reporting agency?
 3       A.   That's right.
 4       Q.   And you have never written a set of
 5   policies for consumer reporting agencies?
 6       A.   Correct.
 7       Q.   And, you are also familiar with
 8   Equifax's procedures.  How did you become
 9   familiar with those procedures?
10       A.   Well, through the process I just
11   described, a combination of reading the
12   manuals, reviewing deposition testimony under
13   oath from Equifax officials, listening to trial
14   testimony from Equifax officials.  And then
15   observing and studying how those procedures
16   were applied in the cases that I worked.
17       Q.   Okay.  And, again, you have never
18   written a set of procedures for a consumer
19   reporting agency to follow, correct?
20       A.   That's correct.  I have never been
21   invited to do that.
22       Q.   And is it fair to say that you
23   consider yourself an expert regarding Equifax's
24   re-investigations, right?
25       A.   Yes, sir.
```

```
                                          Page 7
 1              E. Hendricks
 2       Q.   But you have never designed a
 3   re-investigation procedure, have you?
 4       A.   That's correct.  I have never been
 5   invited to do that.
 6       Q.   And you don't know if you could
 7   design one better than the one in place at
 8   Equifax, do you?
 9       A.   I am confident I can improve on the
10   one that is at Equifax, yes.
11       Q.   But could you design one specifically
12   that is better overall than what Equifax has in
13   place?
14       A.   I believe if I had the chance, I
15   could, yes.
16       Q.   Okay.  And, do you know if that
17   could be implemented?
18       A.   I mean, I would certainly design it
19   with the purpose of it being implemented, yes.
20       Q.   Have you ever tested such theories?
21       A.   No.  I have never had the
22   opportunity.  That would be the first, if
23   Equifax would invite me to do that.
24       Q.   Okay.  No company has ever invited
25   you to do that, though, have they?
```

```
                                          Page 8
 1              E. Hendricks
 2       A.   Correct.
 3       Q.   And you have never put any of these
 4   theories that you could design a better
 5   procedure for re-investigation into place in
 6   any type of peer review, have you?
 7       A.   No, I have not had the opportunity.
 8       Q.   And you have never written a
 9   matching algorithm, have you?
10       A.   No.
11       Q.   You wouldn't consider yourself
12   qualified to write a matching algorithm, would
13   you?
14       A.   Not the algorithm, itself, no.  Just
15   to describe what the goals of the algorithm
16   would be.
17       Q.   What are the documents that you have
18   in your possession upon which you base your
19   opinion in this case?
20       A.   Well, we, I disclosed to plaintiff's
21   counsel a set of documents that were disclosed
22   in this case, and those should be available to
23   you by now.  They include Bates stamped
24   documents and the Equifax 2012 manual on
25   procedures.
```

```
                                          Page 9
 1              E. Hendricks
 2            And then the, I guess the knowledge
 3   I have accumulated, especially the knowledge I
 4   have accumulated through all of the cases in
 5   which I have been involved with Equifax before.
 6       Q.   Well, just to be clear, I'm just
 7   asking about the documents that you considered
 8   that are in your possession regarding this
 9   case.
10       A.   Okay.  Well, those documents are, I
11   spent yesterday pulling those together and
12   making them available to you.  And so, they are
13   the Bates stamped documents, the manuals, the
14   depositions.  And then I have general documents
15   like the NCLC manual and my book.
16       Q.   Well, you are aware of having given
17   expert reports in federal cases before that you
18   are required as an expert to identify in your
19   report the materials that you considered,
20   right?
21       A.   Right.  Well, I see.  At the time I
22   wrote my report, I don't -- I just had some
23   Bates stamped documents, I believe.
24       Q.   Well, let me back up.  How many
25   expert reports would you say you have given
```

Page 66

1  E. Hendricks
2  inaccurate furnishing case. But, I apologize.
3  I have to go back and look to see exactly what
4  it was.
5     Q.  And, I recall you testifying in the
6  Miller case last year. Did you give any court
7  testimony since then?
8     A.  Yes, I know I gave court testimony.
9  You will see on page 36 it says Terry Toler and
10 Donna Toler versus PHH Mortgage and Experian.
11    Q.  Okay.
12    A.  I gave trial testimony in that case.
13    Q.  When was that trial?
14    A.  Last week, I think. Let me see.
15 Today is what, Monday? So, I guess it would
16 have been not last week, because last week was
17 Thanksgiving, so it would have been the week
18 before.
19    Q.  In the Toler case, was there any
20 challenge to your appearing as an expert in the
21 case, such as a motion to exclude on any of
22 your testimony?
23    A.  Yes, of course. It was Experian.
24 And it was a sole defendant left at time of
25 trial. And that was the 12th Daubert challenge

Page 67

1  E. Hendricks
2  in a row that I have won.
3     Q.  And did that trial go to, was that a
4  jury trial?
5     A.  Yes, sir.
6     Q.  And you testified in that case.
7  What was the result of the case?
8     A.  It was a defense verdict.
9     Q.  Now, you are no longer publishing
10 your newsletter?
11    A.  That's correct.
12    Q.  Have you published anything since
13 the Miller trial back in July of last year?
14    A.  Well, let's see. Since the Miller
15 trial, I think I was finishing, that was in
16 2013, correct? So, I would have finished
17 publishing the newsletter up until December of
18 2013.
19       And I have not published, I don't
20 recall publishing anything since, you know,
21 starting in 2014.
22    Q.  I'm sorry. I don't know. Maybe it
23 was moving around, but I can't hear you.
24    A.  Okay. I'm taking it off the speaker
25 for a second.

Page 68

1  E. Hendricks
2      So, Miller was in 2013, if I'm
3  correct, memory-wise. And so I have finished
4  publishing my newsletter in December of 2013.
5  So, I published after the Miller trial, my
6  newsletter.
7       But starting in January of 2014, I
8  don't recall publishing anything this calendar
9  year.
10    Q.  Okay. And you haven't had any new
11 employment since the Miller case, have you?
12    A.  Correct.
13    Q.  Are you still a member of NACA?
14    A.  Yes.
15    Q.  Did you recently attend a NACA
16 convention?
17    A.  Well, it was the National Consumer
18 Law Center in which NACA plays a role.
19       And so the answer is yes.
20    Q.  Were you on any speaking panels or
21 lectures?
22    A.  Yes.
23    Q.  How many?
24    A.  I was just on one and it was about
25 big data.

Page 69

1  E. Hendricks
2     Q.  Okay. So, what did you -- summarize
3  your speech, or your portion of your report.
4     A.  I think my presentation was directed
5  at class action lawsuits resulting from data
6  breaches.
7     Q.  Were there any presentations
8  specifically about mixed files?
9     A.  Not, not by me, no.
10    Q.  How about by anyone that you
11 attended?
12    A.  Yes. I believe Justin Baxter and
13 Robert Sola and Jim Francis, John Sumelius, and
14 possibly Sylvia Goldsmith all touched on the
15 issue of mixed file.
16    Q.  Let's see. You haven't done any
17 work for any government agency since the Miller
18 trial, have you?
19    A.  I mean, not that I, not that I can
20 think of.
21    Q.  And you haven't had any additional
22 training related to any -- strike that.
23       You don't have any education related
24 to the operation of a credit reporting agency,
25 do you?

Page 70

1           E. Hendricks
2      A.   I have no formal education, no.  Not
3  in terms of like a certified university, or
4  that sort of thing.
5      Q.   Right.  And no training relating to
6  the operation of a consumer representing
7  agency?
8      A.   Just the ongoing on-the-job
9  training.
10     Q.   No training as a computer
11 programmer?
12     A.   Correct.
13     Q.   You have never been employed by the
14 CFPB, have you?
15     A.   That's correct.
16     Q.   And you are not a teacher or a
17 professor at a university, are you?
18     A.   That's correct.
19     Q.   You don't have any training or
20 education in psychology?
21     A.   That's correct.
22     Q.   You don't have any training or
23 education in banking?
24     A.   No.
25     Q.   You don't have any training or

Page 71

1           E. Hendricks
2  education on lending?
3      A.   Correct.
4      Q.   Do you know how many disputes
5  Equifax handles each year under its mixed files
6  policies and procedures?
7      A.   I don't.
8      Q.   Do you know how many consumers are
9  satisfied with the way Equifax handles issues
10 under its fixed files or policies and procedures.
11     A.   No.  And per that question and the
12 last question I don't have access to that
13 information.
14     Q.   You don't know how many consumers
15 have their problems remedied when they contact
16 Equifax and the mixed files policies and
17 procedures are utilized?
18     A.   That's correct.  Same answer.
19     Q.   And you don't know how frequently
20 those consumers were caused damage, if any, by
21 Equifax?
22     A.   Right.  I don't have access to that
23 information.
24     Q.   But you are attempting to opine
25 regarding plaintiff's damages in this case,

Page 72

1           E. Hendricks
2  right?
3      A.   Yes.  Absolutely.
4      Q.   Whether plaintiff was damaged is
5  ultimately up to the jury, right?
6      A.   Yes.  Everything is up to the jury.
7  And the reason that my role is to help give
8  relevant and reliable testimony that will help
9  the jury with the relevant issues in the case.
10     Q.   And the extent of any damages
11 plaintiff suffers would be up to the jury,
12 right?
13     A.   Yes, the extent.  I mean but the
14 jury will be helped by knowing when
15 inaccuracies cause damages and whether those
16 damages are foreseeable.
17     Q.   Well, you are not offering any type
18 of formula or method to determine damages, are
19 you?
20     A.   Well, I am not, -- I mean, in a
21 sense yes, I am, because there is a page in my
22 report where I say these are, there are
23 categories of known damages, and then there are
24 factors for assessing the severity.
25          So, in that sense that does create a

Page 73

1           E. Hendricks
2  methodology or approach that would help the
3  jury evaluate plaintiff's damages.
4      Q.   Has that methodology or approach
5  ever been tested?
6      A.   I have testified to it at trials,
7  and juries have reached damages verdict after
8  my testimony, so in that sense I think it has
9  been tested.
10     Q.   Okay.  But no type of scientific
11 process that was tested?
12     A.   None that I know of.
13     Q.   And you don't have any training in
14 accounting, do you?
15     A.   That's correct.
16     Q.   You don't have training as an
17 economist?
18     A.   Correct.
19     Q.   You don't have any training in
20 financial planning?
21     A.   Correct.
22     Q.   And you are not an attorney?
23     A.   That's right.
24     Q.   Do you know what sections of the
25 Fair Credit Reporting Act the plaintiff is

EXHIBIT B TO DEFENDANT'S MOTION TO EXCLUDE